## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

WENDY WYLER : CIVIL ACTION NO.
: 3:12-CV-00097(RNC)
:
v. :
:
:
CONNECTICUT STATE UNIVERSITY :
SYSTEM, SOUTHERN CONNECTICUT :
STATE UNIVERSITY, DAVID CHEVAN, :
STANLEY BATTLE, AND :
JONATHAN IRVING : FEBRUARY 7, 2014


## DOCUMENTS FILED IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Ex. A**   Bailey Deposition

**Ex. B**   Bailey Affidavit

   Ex. B-1   Sexual Harassment Policy

   Ex. B-2   Copies of pages from Handbooks

**Ex. C**   Battle Deposition

**Ex. D**   Battle Affidavit

**Ex. E**   Irving Deposition

**Ex. F**   Irving Affidavit

   Ex. F-1   Wyler Statement to Irving

   Ex. F-2   Thank you Email

Ex. F-3   Wyler-Irving Emails

**Ex. G**   Chevan Deposition

**Ex. H**   Wyler Deposition

**Ex. I**   Hlavac Deposition

**Ex. J**   Marquez Affidavit

Ex. J-1   Letter to Chevan

Ex. J-2   ODE Report

Ex. J-3   Letter to Wyler

**Ex. K**   Marquez Deposition

**Ex. L**   Mazza Affidavit

Ex. L-1   Notes of Fact-finding Meeting with David Chevan

Ex. L-2   Union Settlement Agreement

**Ex. M**   Mazza Deposition

THE STATE DEFENDANTS

BY: GEORGE JEPSEN
ATTORNEY GENERAL

/s/ _Linsley J. Barbato_

Linsley J. Barbato
Assistant Attorney General
Federal Bar No. ct 03751
55 Elm Street
P. O. Box 120
Hartford, CT 06141-0120
Telephone: (860) 808-5160
Facsimile: (860) 808-5384
E-mail: linsley.barbato@ct.gov

## CERTIFICATION

I hereby certify that a copy of these documents was filed electronically on this 7th

day of February 2014. Notice of this filing will be sent, via email, to all parties by

operation of the Court's electronic filing system. The undersigned did cause to be sent,

via first class U.S. mail, postage prepaid, a hard copy of the foregoing to the chambers

of the Honorable Robert N. Chatigny and to all counsel and pro se parties who do not

have access to the Court's electronic filing system or are designated by the Court.

Parties may access this filing through the Court's system.

_Linsley J. Barbato_

Linsley J. Barbato

# EXHIBIT
## A

1        UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
2

3
   _____
WENDY WYLER,                  ) CIVIL ACTION NO.
4      Plaintiff,             ) 3:12-CV-00097(RNC)
                              )
5          vs.                )
                              )
6  CONNECTICUT STATE UNIVERSITY)
   SYSTEM, SOUTHERN CONNECTICUT)
7  STATE UNIVERSITY, DAVID     )
   CHEVAN, STANLEY BATTLE, AND )
8  JONATHAN IRVING,            )
         Defendants.          )
9  _____   )

10

11

12

13

14
      DEPOSITION OF:     JAYE BAILEY
15
      DATE:             NOVEMBER 20, 2013
16
      HELD AT:          LUCAS, BAGNELL, VARGA, LLC
17                      2425 POST ROAD, SUITE 200
                        SOUTHPORT, CT
18

19

20

21

22        BRANDON SMITH REPORTING & VIDEO
      249 Pearl Street           Six Landmark Square
23    Hartford, CT 06103         4th Floor
      (860) 549-1850             Stamford, CT 06901
24    (800) 852-4589             (800) 852-4589

25
      Reporter:  Samantha M. Howell, LSR #00462

EXHIBIT
A

```
 1     APPEARANCES:

 2

       REPRESENTING THE PLAINTIFF, WENDY WYLER:
 3
           Lucas, Bagnell, Varga, LLC
 4         2425 Post Road, Suite 200
           Southport, CT 06890
 5         (203) 227-8400
           By:  Jeffrey S. Bagnell, Esq.
 6
       REPRESENTING THE DEFENDANTS, CONNECTICUT STATE UNIVERSITY
 7     SYSTEM, ET AL:

 8         Assistant Attorney General
           55 Elm Street
 9         Hartford, CT 06141-0120
           (860) 808-5160
10         By:  Linsley J. Barbato, Esq.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2   WITNESS:                                        PAGE:

 3   Jaye Bailey

 4
     Direct Examination by Attorney Bagnell            5
 5

 6   _____

 7                  PLAINTIFF'S EXHIBITS
                    (for identification)
 8

 9   EXHIBIT:                                        PAGE:

10   Plaintiff's Exhibit 1    Letter                   62

11   Plaintiff's Exhibit 2    Letter                   80

12   Plaintiff's Exhibit 3    Fact finding meeting     84

13   Plaintiff's Exhibit 4    Redacted e-mail          88

14   Plaintiff's Exhibit 5    E-mail                  101

15   Plaintiff's Exhibit 6    Agreement               104

16   _____

17   (Reporter's Note:  Original exhibits for identification
     were returned with original transcript.)
18

19

20

21

22

23

24

25
```

1              S T I P U L A T I O N S

2

3       IT IS STIPULATED by the attorneys for the parties that

4    each party reserves the right to make specific objections

5    in open court to each and every question asked and the

6    answers given thereto by the witness, reserving the right

7    to move to strike out where applicable, except as to such

8    objections as are directed to the form of the question.

9

10      IT IS STIPULATED and agreed between counsel for the

11   parties that the proof of the authority of the Notary

12   Public before whom this deposition is taken is waived.

13

14      IT IS FURTHER STIPULATED and agreed that the reading

15   and signing of this deposition is not waived and any

16   defects in the Notice are waived.

17

18

19

20

21

22

23

24

25

```
 1              (Deposition commenced:  10:05 a.m.)

 2

 3              Jaye Bailey, called as a

 4     witness, having been first duly sworn by Samantha

 5     Howell, a Notary Public in and for the State of

 6     Connecticut, was examined and testified as follows:

 7

 8          D I R E C T   E X A M I N A T I O N

 9

10    BY ATTORNEY BAGNELL:

11

12        Q    Good morning, Ms. Bailey.

13        A    Good morning.

14        Q    What's your position at Southern?

15        A    I'm chief of staff and vice-president of

16    organizational development.

17        Q    How long have you held that position?

18        A    July 1st of 2013.

19        Q    What was your prior position?

20        A    Associate vice-president for human resources and

21    labor relations.

22        Q    Associate vice-president?

23        A    Yes.

24        Q    Who was VP?

25        A    There's no VP of HR.
```

1      Q     That's what I'm asking, your knowledge.  Do you
2  have knowledge of any?

3      A     Of consensual relationships?

4      Q     Yeah.

5      A     No, I don't think so.

6      Q     Okay.  What about non-consensual?

7      A     Other than this case?

8      Q     Yes.

9      A     I don't think so.

10      Q     What is -- and I know it's in writing, but to the
11  best of your knowledge, Ms. Bailey, what is the
12  university's policy regarding sexual harassment of students
13  by professors?

14      A     That it's forbidden.

15      Q     Okay.  Did you have any involvement in offering
16  or modifying the policy in that regard?

17      A     No.

18      Q     You told me a little bit about your legal
19  background, Ms. Bailey; did you ever have any training in
20  any sexual harassment laws before you came to Southern?  I
21  mean, after law school, if you dealt with it in law school.

22      A     Formal training?

23      Q     Yeah, by that I guess I mean either work
24  experience cases or seminars, continuing education,
25  anything like that?

1     A     Well, we are all trained by -- it's a permanent

2   comission on the status of women and CHRO require

3   foundation training with regard to Title VII.  We all do

4   updated training on that.

5     Q     Not now, Ms. Bailey, but before you came to

6   Southern; that's the time frame I'm asking about now.

7     A     I mean, the continuing legal education I would

8   have attended seminars on that, but my primary focus is

9   collective bargaining.

10    Q     Did you ever deal with any cases involving

11  relationships between professors and students before you

12  came to Southern?

13    A     No.

14    Q     Have you ever developed any opinion on whether

15  those kinds of relationships can really be consensual?

16    A     No.

17    Q     You do not have an opinion on that?

18    A     No.

19    Q     What about Title IX, Ms. Bailey; before you came

20  to Southern did you ever have any exposure, professionally

21  or in any other context, regarding Title IX?

22    A     No.

23    Q     Since joining Southern, can you tell me what kind

24  of training you had in Title IX laws?

25    A     We do our annual training, our sexual harassment

1   training and then whatever I have read and learned from our

2   Office of Diversity and Equity.

3        Q    Are you given a test at Southern in terms of

4   sexual harassment laws?

5        A    There's a training online and then there's an

6   assessment at the end.

7        Q    Okay.  And you took that?

8        A    Yes.

9        Q    How many times have you taken that?

10       A    I think once.

11       Q    That a multiple choice test?

12       A    I don't remember.

13       Q    Do you -- I assume you passed it?

14       A    Yes.

15       Q    Was it a terribly long test?

16       A    No.

17       Q    About an hour?

18       A    Probably less.

19       Q    Is your office charged with making sure all the

20   professors take that test?

21       A    Yes.

22       Q    How does that work, do you e-mail them the link

23   to take the test?

24       A    We give all new employees that information in

25   their packet when we on board them.  And, actually, we make

1   everybody go through it, so we don't select out any class

2   of employees; everybody who's hired is required to go

3   through it.  And then it's an automated -- we have a vendor

4   that we run the online training through and so we get a

5   monthly list of the people that have taken the training and

6   then Paula Rice is the person now in our office who sends

7   out e-mail reminders.

8          We also do an announcement every year on our

9   affirmative action plan to the whole campus, and in that

10  historically the Office of Diversity and Equity has

11  reminded everybody of the training that they're required to

12  take.

13         Q    Has any professor ever failed?

14         A    I don't know.  I don't know.

15         Q    Is it graded?  Is there any kind of, you know, A,

16  B, C, D, F?

17         A    No, I don't think so.

18         Q    It's pass, fail?

19         A    Yes.

20         Q    How many questions approximately?

21         A    I don't know.

22         Q    And let's take the case of a given professor.

23  You've been there -- I keep getting this wrong -- five

24  years?

25         A    Yes.

1     A     Just what I've read in the paper.

2     Q     Okay.  So the investigator that you've used, if

3  I'm correct, has been Ms. Mazza or I assume someone at the

4  Attorney General's Office?

5     A     No.

6     Q     Mr. Marquez; am I getting it wrong?

7     A     The -- in a perfect organizational world

8  allegations of sexual harassment would go to the Office of

9  Diversity and Equity, which is not HR, and can't be HR

10 under the statute.

11    Q     Right.

12    A     Those allegations would go directly to that

13 office, either through the complainant or they would come

14 into the office of HR.  And we would look at it and say

15 it's a sexual harassment case, it goes to the Office of

16 Diversity and Equity.

17          Mr. Marquez was brought in because there was a

18 gap at that time in the Office of Diversity and Equity.

19 The director was on medical leave, so we brought him in to

20 replace her so there wouldn't be that gap, but it was in

21 the Office of Diversity and Equity.

22    Q     And so Ms. Mazza then is not really working for

23 the OD office; correct?

24    A     No.

25    Q     Okay.  Who's the Title IX coordinator at the

1   University now?

2        A    Pamela Lasiter.

3        Q    All right.  How long have you had a Title IX

4   coordinator at the university?

5        A    We've always had a Title IX coordinator.

6        Q    As long as you've been there?

7        A    As long as I've been there, yes.

8        Q    Who was it when you started?

9        A    Marsha Smith Glasper.

10        Q    Can you identify all the Title IX coordinators

11   since you've been there?

12        A    Marsha Smith Glasper, in the interim period it

13   was Paula Rice after Ms. Smith Glasper left, and then

14   Pamela Lasiter.

15        Q    And what's your understanding of the obligations

16   or role of the Title IX coordinator at the university?

17        A    It's their obligation to comply with the

18   requirements under Title IX.  So notification of who they

19   are, what their office provides, the complaint procedures,

20   investigating, working with the university to insure that

21   the behavior is found to have happened that it doesn't

22   happen again, and to educate the community.

23        Q    Does the Title IX coordinator report to you?

24        A    No.

25        Q    To the president?

1  yourself or a female student?

2       A    Not that I recall.

3       Q    As a graduate student?

4       A    Not that I recall.

5       Q    Okay.  Did you know of anyone -- did you know of

6  any undergraduate females -- and I'm excluding this case --

7  at any time who have alleged that their professors have

8  sexually harassed them?

9                 ATTORNEY BARBATO:  Objection to form.  Are

10  you talking about at Southern or anywhere in the world?

11      Q    (By Attorney Bagnell)  I said any time.  You can

12  answer.

13      A    I don't recall.

14      Q    Okay.  Before Southern is it fair to say that you

15  had not heard of any -- let me change that word, that you

16  didn't have firsthand knowledge of any female students ever

17  alleging sexual harassment by a professor?

18      A    I don't recall.

19      Q    You don't recall, all right.  And since you were

20  employed by Southern, how many cases are you aware of where

21  a female student alleged sexual harassment by a

22  professor?

23      A    I believe this one.

24      Q    Any others than this one?

25      A    I don't think so.

| | | |
|---|---|---|
| 1 | Q | Does Megan Coyne, does that name ring a bell? |
| 2 | A | Yes. |
| 3 | Q | All right.  What's your understanding of what |
| 4 | Ms. Coyne complained about? | |
| 5 | A | That she complained of similar behavior by David |
| 6 | Chevan. | |
| 7 | Q | So Ms. Coyne and Ms. Wyler? |
| 8 | A | Yes. |
| 9 | Q | Anyone else? |
| 10 | A | Well, Ms. Coyne didn't file a complaint with |
| 11 | us. | |
| 12 | Q | I understand the formal complaint issue, but I'm |
| 13 | really talking about someone who articulated any type of | |
| 14 | harassment allegation, and Ms. Coyne qualifies.  I assume | |
| 15 | you agree with me on that? | |
| 16 | A | She submitted a statement to Mr. Marquez. |
| 17 | Q | And you saw that statement at some point? |
| 18 | A | Yes. |
| 19 | Q | Did you ever meet with Ms. Coyne? |
| 20 | A | No. |
| 21 | Q | Do you know if anyone at the Office of Diversity |
| 22 | and Equity met with her? | |
| 23 | A | I don't know. |
| 24 | Q | What about the Title IX coordinator? |
| 25 | A | At the time that was Paula Rice; no, I don't |

1    University letterhead dated April 25, 2011.  It is an

2    investigation report by Ernest Marquez.

3         A    Okay.

4         Q    Do you recognize this document?

5         A    Yes.

6         Q    It's not the first time you've seen it?

7         A    No.

8         Q    When is the first time you saw this, to the best

9    of your recollection?

10        A    After Mr. Marquez issued it.

11        Q    All right.  And just so I understand the

12   hierarchy issues, is there any reason why he had to send

13   this to you given that he was working for ODE at this

14   point?

15        A    Well, he was turning it over to the offices of

16   human resources for potential disciplinary action.

17        Q    And disciplinary action was your jurisdiction at

18   that point?

19        A    Yes.

20        Q    Okay.  So he submitted this to you and you read

21   it; correct?

22        A    Yes.

23        Q    Did you, after reading this, ever sit down with

24   Ms. Wyler and ask her questions about it?

25        A    No.

1    offensive or hostile to constitute the type of sexual

2    harassment referred to as, quote, hostile environment."

3         And then there's a reference to the sexual

4    harassment definition, I assume, in one of the university's

5    policies.  And then there's a recommendation made to

6    forward the case to your office to determine whether and

7    what degree of disciplinary action may be required.  And

8    the case is also referred to the provost to determine the

9    proper academic remedy.

10        I think you said this already, Ms. Bailey, but

11   this report, I assume, at some point was forwarded to you?

12        A    Yes.

13        Q    All right.  And what other documents did you

14   review besides this report by Mr. Marquez in determining

15   whether and what degree of disciplinary action was

16   required?

17        A    I did not review the initial documents.  I didn't

18   do the investigation.

19        Q    Okay.  Did you make the decision yourself,

20   Ms. Bailey, as to what discipline would be imposed in this

21   case?

22        A    No.

23        Q    Who did that?

24        A    Diane Mazza investigated it and she talked with

25   me about it.  And the union proposed a suspension, I

1    believe Diane negotiated with them.  It was finally settled

2    as a one week suspension and that was reported to Dr.

3    Battle and he said it was okay.

4        Q    Why did you not make any recommendation yourself,

5    Ms. Bailey, in this case?

6        A    Oh, because Diane was keeping me informed.

7    That's Diane's job.

8        Q    To make the recommendation?

9        A    To do the investigation and to tell me what she

10   thinks the appropriate discipline would be based on what

11   she's found out, and I would review it with her and

12   determine whether that was -- whether I agreed that that

13   was appropriate and then I would recommend that to

14   Dr. Battle.  I didn't mean to say I didn't make a

15   recommendation, but I didn't do the investigation.

16       Q    What was Ms. Mazza's recommendation?

17       A    That he be suspended.

18       Q    For how long?

19       A    I don't remember what she said; it was longer

20   than a week.

21       Q    Okay.  You don't know how long?

22       A    No.

23       Q    And did you agree with her recommendation?

24       A    At the least, yes.

25       Q    I assume it's fair to say that Ms. Mazza was not

1   period?

2       A    She didn't formally recommended a longer period,

3   we talked about it.   That's what I said.

4       Q    I'm not asking formal or informal.   She

5   recommended a longer period?

6       A    We talked about a longer period.

7       Q    Well, did she recommend it or not?

8       A    I don't remember.

9       Q    Because you said earlier she recommended

10  something?

11      A    Oh, did I?   I thought I said she came and talked

12  to me about it and that she was considering what period and

13  that was longer than a week.

14      Q    Did anyone in your office make a recommendation,

15  Ms. Bailey, because it says here that it was forwarded to

16  your office for a recommendation?

17      A    We recommended to the president that we accept

18  the settlement of a week.

19      Q    All right.   Was any recommendation made before

20  that?   I'm not asking about your response to the union.

21  Did Ms. Mazza ever say to you, Jaye, I think we need to do

22  two months here or a month here?

23      A    Not that I recall.

24      Q    You have no recollection whatsoever?

25      A    Not that I recall.

| | | |
|---|---|---|
| 1 | | forward that to Mr. Battle? |
| 2 | A | It's Dr. Battle and no. |
| 3 | Q | He's not a medical, is he a PhD? |
| 4 | A | Yes. |
| 5 | Q | All right. You did not do that? |
| 6 | A | No, because it's not a recommendation from the |
| 7 | | union. It is a... |
| 8 | Q | An offer? |
| 9 | A | It was an offer that had come down to we think a |
| 10 | | week will be sufficient in this case and I would have taken |
| 11 | | that to Dr. Battle. |
| 12 | Q | So that was the degree of disciplinary action |
| 13 | | that your office thought was required; is that correct? |
| 14 | A | That was the settlement. |
| 15 | Q | Okay. I'm asking -- I'm using Mr. Marquez's |
| 16 | | language, Ms. Bailey, he says, "It's to be referred to your |
| 17 | | office to determine whether and what degree of disciplinary |
| 18 | | action may be required." |
| 19 | | So what I'm asking: At some point you |
| 20 | | communicated to Dr. Battle the degree of disciplinary |
| 21 | | action that you thought would be required; is that correct? |
| 22 | A | I communicated to him the settlement agreement. |
| 23 | Q | The settlement agreement? |
| 24 | A | Right. |
| 25 | Q | But you did not communicate the degree of |

1    disciplinary action that you thought was required?

2        A    The settlement agreement included a degree of

3    disciplinary action that I could agree with.

4        Q    Which you could agree with?

5        A    Yes.

6        Q    But it's not your ideal settlement; is that fair

7    to say?

8        A    Settlements are never anybody's ideal.

9        Q    I understand.  I'm asking about this one.

10       A    No.

11       Q    It was not ideal to you?

12       A    No.

13       Q    Did you know anything about Ms. Wyler's

14   psychological make up before this incident with Dr. Chevan,

15   Ms. Bailey?

16       A    I did not know anything about her psychological

17   make up.  I did know she was seeing a psychiatrist because

18   that's how I found about Ms. Wyler.

19       Q    Initially?

20       A    Yes.

21       Q    And when was that, when did you found out that

22   she'd been seeing a psychiatrist?

23       A    I found out she was seeing a psychiatrist on

24   March 17th of 2011.  I remember the day because it was

25   St. Patrick's Day when he -- when the psychiatrist e-mailed

1      A    Well, this wouldn't -- this would have been

2  preinvestigation by HR, the letter from Mr. Marquez would

3  have been prior to the Office of Human Resources doing any

4  investigation at all.

5      Q    In addition to the investigation that he had

6  done?

7      A    Exactly.  We would take it up...

8      Q    All right.  So do you think he's incorrect where

9  he says appropriate personnel actions has been -- there's a

10  typo here.  Appropriate personnel action has been

11  recommended, would it have been premature at that point

12  given that your office had not done an investigation?

13      A    No.

14      Q    Okay.  Is he correct then that your office -- I'm

15  trying to understand.  Is it correct where he says

16  appropriate personnel actions have been recommended?

17      A    I can tell you what I think he means.

18      Q    Sure.

19      A    He means that he has forwarded it for appropriate

20  personnel action to be taken.  He's recommended that we

21  take appropriate personnel action.

22      Q    Did he tell you what he thought what the

23  appropriate personnel action should be?

24      A    No.

25      Q    Did he have authority to do that?

1    message was forwarded to you?

2         A    I read it.

3         Q    What did you do after that?

4         A    And I talked with Diane Mazza about it and I

5    called Patrick about it.

6         Q    Did you ever talk to Patrick and Dr. Battle about

7    it?

8         A    No.

9         Q    At no time?

10        A    No.

11        Q    Why not?

12        A    Dr. Battle was leaving the university at that

13   time.  He may have actually already started some vacation

14   around the holidays and as of the last week in December he

15   wouldn't have had anything to do with the university at

16   that point, so I decided not to forward it to him.

17        Q    Because his last day was going to be December

18   30th?

19        A    Well, his last official day was December 30th, he

20   was off campus a significant amount between -- if you see,

21   his e-mail to the campus was December 8th which I believe

22   is what Ms. Wyler was responding to which is why Patrick

23   got it.  So he was going to be taking vacation, he was

24   wrapping up, he knew he wasn't getting the job as

25   president.

1                          C E R T I F I C A T I O N

2       STATE OF CONNECTICUT:
        COUNTY OF HARTFORD:

3

4           I, SAMANTHA M. HOWELL, a Notary Public duly
        commissioned and qualified in and for the State of

5       Connecticut, do hereby certify that pursuant to
        Attorney Bagnell there came before me on the 20th of

6       November, 2013, the following named person, to wit: Jaye
        Bailey, who was previously duly sworn to testify to the

7       truth and nothing but the truth; that she was thereupon
        examined upon her oath; that the examination was reduced to

8       writing by computer under my supervision and that this
        transcript is a true record of the testimony given by said

9       witness.

10

11          I further certify that I am neither attorney nor
        counsel for, nor related to, nor employed by any of the

        parties to the action in which this deposition was taken,

12      and further, that I am not a relative or employee of any
        attorney or counsel employed by the parties hereto, or

13      financially interested in the outcome of this action.

14          In witness whereof I have hereunto set my hand
        this 5th day of December, 2013.

15

16

17                          _____
                                  Samantha M. Howell

18                                Notary Public

19

20      My Commission expires
            September 31, 2016

21

22

23

24

25

| | | | |
|---|---|---|---|
| 1 | | ERRATA SHEET | |
| 2 | Page  Line | From | To |
| 3 | 6    8 | a VP | AVP |
| 4 | 6    14 | Cot | UConn |
| 5 | 7    15 | into | based upon |
| 6 | 9    24 | Larow | Lareaux |
| 7 | 10    9 | interim vice president | interim associate vice president |
| 8 | 11    12 | Giordano | Jordano |
| 9 | 11    13 | Chapel | Chapple |
| 10 | 11    23 | '09 | '10 |
| 11 | 15    6 | Associate | Association |
| 12 | 15    15 | SWAF | SWOAF |
| 13 | 24    20 | school | SWOAF |
| 14 | 53    2 | Lasiter | Lassiter |
| 15 | 53    14 | Lasiter | Lassiter |
| 16 | 54    2 | Christmas | ? |
| 17 | 54    6 | Nicol | Nicol |
| 18 | 55    4 | Dintley | Dunkel |
| 19 | 55    16 | Duntley | Dunkel |

1.31.14
Date                                    Jaye Bailey
Sworn to before me this 31st day
of January, 2014.

Sandra A. Huebner
Notary Public

My commission Expires: 10/31/17

| | | | | |
|---|---|---|---|---|
| 1 | | | ERRATA SHEET | |
| 2 | Page | Line | From | To |
| 3 | | | | |
| 4 | 71 | 6 | oh | no |
| 5 | 102 | 6 | Know | Known |
| 6 | 103 | | | |

Date  1.31.14

                                                    Jaye Bailey

Sworn to before me this 31st day
of January , 2014 .

                    Sandra A. Huebner
                    Notary Public

My commission Expires: 10/31/17

JURAT

_____
                    Jaye Bailey

Subscribed to and sworn before me on this

_31 st_____ of _January_____ 2013.

              Sandra A. Huebner
              _____
              Sandra A. Huebner

My commission Expires: 10/34/17

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WENDY WYLER | : | CIVIL ACTION NO. |
| | : | 3:12-CV-00097(RNC) |
| v. | : | |
| | : | |
| CONNECTICUT STATE UNIVERSITY | : | |
| SYSTEM, SOUTHERN CONNECTICUT | : | |
| STATE UNIVERSITY, DAVID CHEVAN, | : | |
| STANLEY BATTLE, AND | : | |
| JONATHAN IRVING | : | FEBRUARY 6, 2014 |

### AFFIDAVIT OF JAYE BAILEY

I, Jaye Bailey, being duly sworn, do hereby depose and say of my own personal knowledge:

1. I am over the age of eighteen (18) and I understand and appreciate the obligations of an oath.

2. I am currently employed as the Chief of Staff and Vice President for Organizational Development at Southern Connecticut State University [SCSU].

3. I have held the position since July 1, 2013.

4. My prior position was Associate Vice President for Human Resources [HR]; and I held that position in 2011. In that capacity, I served as head of the university's Human Resources Department [HR] and supervised staff, including Diane Mazza, who handled university personnel matters, including general labor disputes between the seven unions and the administration. As Associate Vice President my



EXHIBIT
B

duties included overseeing hiring, promotion, discipline and termination of all employees; benefit management; employment related training; retirement; and workers compensation. I also supervised the administration of the seven union contracts in place at the university.

5. To date, I have been employed by SCSU for five years.

6. SCSU is a state educational institution, established by statute as part of the Connecticut State College and University System.

7. The university has, and had in 2011, an Office of Diversity and Equity and a director, also serving as the Title IX coordinator, who is responsible for training and investigations of Title IX complaints, including claims of sexual harassment.

8. In 2011 and at all times of my employment at SCSU, the university had a policy forbidding sexual harassment. I have attached a true and accurate copy of the sexual harassment policy to this affidavit as Ex. B-1.

9. In 2011 and at all times of my employment at SCSU, SCSU's sexual harassment policy was available in writing and published on the university's web page, in the student handbook and in the employee handbook. I have attached true and accurate copies of some of these pages to this affidavit as Ex. B-2.

10. In 2011 and at all times of my employment at SCSU, the university required sexual harassment training for all university employees, including professors.

11. In 2011 and at all times of my employment at SCSU, SCSU's sexual harassment policy provided that a complainant may initiate a complaint by bringing the

matter to the attention of the ODE director, appropriate dean, appropriate vice president or associate vice president or supervisor. The policy does not provide that a complainant should file a complaint with the president.

12.     Individuals filing such complaints will be informed of and provided a copy of the university's policies on sexual harassment; asked if they wish to pursue the complaint on an informal or formal basis; and advised that they have the right not to be retaliated against for filing the complaint and that the university will not tolerate retaliation.

13.     If the complaint is initially received by another university official, it shall be promptly forward to the ODE director. If the complaint is verbal, the person receiving the complaint shall make a written summary and request that the complainant sign it.

14.     ODE will review the complaint and determine whether the acts complained of constitute a violation of the policy. The policy does not require the president to conduct the review or make such determination.

15.     ODE shall then issue a written report of the findings to the president within 90 days of the receipt of the formal complaint. The complainant and respondent shall also be notified in writing of the findings by ODE. The policy does not provide that the president should issue any report or notifications.

16.     If ODE finds a reasonable cause to believe that a violation has occurred, it will refer the complaint to the appropriate member of management for a decision as to what, if any, further action is warranted, including whether to pursue formal disciplinary

action. In most cases, the complaint should be referred to HR. The policy does not require the president to make such determination.

17.    The process for disciplinary action, if any, will be governed by the applicable sections of the collective bargaining agreement.

18.    In 2011, Wendy Wyler was a student and Stanley Battle, Jonathan Irving and David Chevan were employees of the university.

19.    At the end of the fall 2010 semester Wyler had a 3.24 grade point average.

20.    In the 2011 spring semester, Battle was interim president, a position he held for 14 months; Irving was the music department chair and Chevan was a music department professor.

21.    Before the 2011 spring semester, I had never heard that Chevan had sexually harassed a student and was unaware of any sexual harassment complaint against him.

22.    On April 4, 2011, Irving and Professor Craig Hlavac notified me that Wyler had accused Chevan of sexual harassment; and that they would commit Wyler's complaint to writing and provide it to me and the Office of Diversity and Equity [ODE].

23.    Irving brought me the statements signed by Wyler; and I forwarded them to ODE.

24.    Ernest Marquez of ODE was then assigned to conduct an investigation of the Wyler's complaint.

25.     Neither Battle nor Irving was a member of HR or ODE; and neither of them conducted or assisted Marquez in the investigation of Wyler's complaint or the resulting findings.

26.     On April 27, 2011, Marquez sent a copy of his investigation report to HR to determine whether and what degree of disciplinary action the university should impose against Chevan.

27.     In his report, Marquez concluded that Chevan violated the university's discrimination and sexual harassment prevention policy.

28.     After HR received Marquez's report, Mazza, then an administrator in HR under my supervision, conducted an investigation for the purpose of determining whether and what disciplinary action against Chevan would be appropriate, given Marquez's findings.

29.     After concluding her investigation, Mazza recommended that Chevan be disciplined for his conduct.

30.     After negotiations with Chevan's union representatives who argued for a shorter suspension, Mazza recommended a settlement agreeable to the union: that Chevan be suspended without pay for five days; and that the agreement would remain in his personnel file and removed after 24 months, only if he did not engage in further conduct violative of the university's discrimination and sexual harassment policy.

31.     I approved the settlement and advised Battle of the agreement; and the university imposed the recommended discipline, per the agreement with the union.

32.     Irving played no part in deciding Chevan's discipline; and as a professor and department chair had no authority to discipline Chevan or any other faculty member.

33.     At SCSU, department chairs are not supervisors and have no duty or right to hire; evaluate, except as part of a committee with other department members; discipline; or terminate fellow professors.

34.     Service as chair is not a promotion, but a faculty assignment, for a three-year term. The chairs are members of the same collective bargaining unit as all other professors; and, although they perform some administrative functions and may serve on hiring or evaluations committees, they have no more authority over their colleagues than any other professor. Therefore, other than to answer Mazza's questions, Irving had no personal involvement whatsoever in the investigation of Chevan's conduct or the subsequent discipline.

35.     In Wyler's case, all university employees followed and complied with the provisions of the sexual harassment policy:  (a) Irving made a written summary of her complaint, had her review and sign the summary, and referred the complaint to HR that same day; (b) HR staff promptly forwarded the complaint to ODE; (c) ODE staff reviewed the complaint; assigned it for investigation; conducted an investigation, issued a written report of findings and recommendations; sent copies of the report to the president, HR and the Provost; and informed Wyler of findings, all well within the required timeframes; (d)  HR staff conducted further investigation into Chevan's record

to determine whether he had any past offenses, concluded that Chevan should be disciplined, negotiated an appropriate discipline with the union, advised the president of the settlement, and imposed the discipline.

36.     Wyler graduated from SCSU in May of 2012 with a 3.54 overall grade point average; and has not returned to study at the university.

_____
Jaye Bailey

STATE OF CONNECTICUT    )
                        )     ss
COUNTY OF New Haven      )

Sworn and subscribed before me this 6th day of February 2014.

_____
Notary Public/
Commissioner of the Court

**SANDRA A. HUEBNER**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES OCT. 31, 2017

# EXHIBIT
# B-1

# PROCEDURES FOR DISCRIMINATION AND HARASSMENT COMPLAINTS

The following procedures are designed to provide an internal process for the handling of complaints involving claims of discrimination or harassment. Such claims may arise from violation of federal or state statutes or University policy or regulations. In addition, a complaint may be filed with state and federal civil rights enforcement agencies, generally within 180 calendar days of the date of the alleged discriminatory event.

Any complainant who believes that he or she is a victim of discrimination or harassment in violation of University policies is encouraged to promptly notify the alleged perpetrator (the "respondent") verbally or in writing that his or her conduct is unwelcome. Such an action may cause the offending conduct to cease as well as help to maintain a discrimination and/or harassment free environment. Regardless of having given this notice, the complainant may initiate a complaint under the policies by bringing the matter to the attention of any one of the following: Director of Diversity and Equity, appropriate Dean, appropriate Vice President or Associate Vice President, or supervisor. Filing of the complaint should be made as soon as possible, but must take place no more than 180 calendar days following the act or omission giving rise to the complaint or the date on which the complainant knew or should have known of such act or omission. The Complainant should understand, however, that the state civil rights agency, CHRO, also has a 180 time limit for filing a claim of discrimination and that filing a complaint under this SCSU policy does not affect that timeline.

Individuals filing complaints internally will be 1) informed of and provided a copy of University policies on non-discrimination and/or sexual harassment 2) asked if they wish to pursue the complaint on an informal or formal basis, and 3) advised that they have the right not to be retaliated against for bringing the complaint and that the University will not tolerate retaliation. Individuals will be further advised that they have the legal right to file a complaint with the Connecticut Commission on Human Rights and Opportunities, the United States Equal Employment Opportunity Commission, the U. S. Department of Labor, Wage and Hour division, and any other agencies, state, federal, or local, that enforce laws concerning discrimination in employment. When appropriate, the ODE may also recommend confidential counseling or other support services that provide victim assistance.

If the complaint is initially received by another university official, it shall be promptly forwarded to the Director of Diversity and Equity. If the complaint is verbal, the person receiving the complaint shall make a written summary and request that the complainant sign it. Any supervisor who has witnessed or becomes aware of the alleged occurrence of discrimination or harassment, or who receives a complaint of discrimination or harassment, involving a person within their purview is required to report the matter to the Director of Diversity and Equity and to take prompt corrective action as appropriate. Failure of the supervisor to report the incident or take appropriate corrective action shall be a violation of this policy and shall constitute misconduct subject to disciplinary action.

The Director will review the complaint and, at this stage or at a later stage after further investigation, determine whether the acts complained of, as stated by the complainant, constitute a violation of the Discrimination and Sexual Harassment Prevention Policy ("Policy"), and if not the complainant will be so informed. The Director may still recommend that informal resolution be pursued, particularly in the situation where the Director determines that the complaint involves


EXHIBIT
B-1

4/5/11 12:10 PM

unprofessional or other objectionable behavior, but not discrimination or harassment on the basis of a protected class category as defined in the Policy. If the Director determines the alleged acts may constitute a violation of the policy, investigation will proceed as set forth in the Formal Process below, unless the matter is satisfactorily resolved through the Informal Process.

### rmal Process

en circumstances Informal resolution of a complaint agreeable to both parties may be more satisfactory than proceeding directly to a formal complaint. Under alty, there are essentially two types of Informal resolution: (1) with complainant's agreement, an Informal resolution by the appropriate Dean, Associate Vice dent or Vice President, and/or (2) mediation between the parties arranged by the Office of Diversity and Equity.

In the informal process of resolution with the department head or supervisor, appropriate Vice President or Dean or other designated university official, he/she takes some action to eliminate the causative factors precipitating the original complaint, stop the offending behavior, and resolve the complaint in a manner that is equitable and timely to all parties. In this case, however, the university official taking this action is required to promptly inform the Office of Diversity and Equity of the allegations as well as how he/she proposes to eliminate or resolve the situation resulting in the complaint.

In appropriate cases, the complainant and respondent may agree to pursue mediation and the Office of Diversity and Equity will arrange for a mediator who is mutually acceptable to both parties. The mediator will consult with and advise both the complainant and the respondent about the mediation process. If the mediation results in a mutually acceptable agreement, copies of the agreement will be forwarded to the Director of Diversity and Equity for review and monitoring. If the mediation does not result in an agreement, the case will be returned to the Office of Diversity and Equity to proceed through the formal process.

Complaints initiated through the informal process must be closed or the Complainant must file a formal complaint within thirty (30) days of initiating the informal process. Extensions·may be granted by the Executive Assistant to the President with the consent of the complainant.

### nal Process

Informal process is unsuccessful or if the Complainant wishes to proceed directly to the formal process, the complainant must file a written complaint within ays following the act or omission giving rise to the complaint or the date on which the complainant knew or should have known of such act or omission. the e complaint should follow the format in Appendix A.

The Office of Diversity and Equity will notify the respondent in writing that a complaint has been filed and provide him/her with a copy of the complaint with any attachments, the discrimination and or sexual harassment policy. Respondents shall be informed of the allegations and be given an opportunity to respond orally or in writing.

Within fifteen (15) calendar days of filing of the formal complaint, the Director of Diversity and Equity may afford the parties an opportunity to mediate a resolution to the complaint. The university will designate an individual who has been trained to mediate such complaints.

If the complainant or the respondent decides not to participate in mediation or if the mediation is not successful, the Director will further investigate the complaint. The investigation may include, but not be limited to, interviewing witnesses deemed appropriate and obtaining written statements, propounding written questions, reviewing any documents or files deemed relevant, and interviewing the parties to the complaint.

The Office of Diversity and Equity shall issue a written report of findings, including

recommended action(s), to the President within ninety (90) days of receipt of the formal complaint. The complainant and respondent shall be notified in writing of the findings by the Office of Diversity and Equity. If the Office of Diversity and Equity finds a reasonable cause to believe that a violation of this policy has occurred, the complaint will be referred to the appropriate member of management for a decision on what, if any, further action is warranted, including whether to pursue formal disciplinary action up to and including termination. The process for disciplinary action will be governed by the applicable sections of the collective bargaining agreement, the personnel policies if no collective bargaining agreement is in effect, or for students, the disciplinary articles of the Student Code of Conduct.

This procedure for formal investigation of complaints regarding violations of the policies governing discrimination and harassment shall be conducted in accordance with applicable collective bargaining agreements of the University.

**Procedure for Review of Findings (applicable to AAUP members only)**

Within ten (10) calendar days of receiving the notice of the findings from the Director of the Office of Diversity and Equity, a faculty member who brought the complaint may request a review, by the Discrimination and Harassment Complaint Review Committee, of an ODE finding that the discrimination or sexual harassment policy has not been violated. If the Office of Diversity and Equity finds that the policy has been violated, and the respondent is also an AAUP member, that faculty member may also request review by the Committee. The request for review must be submitted in writing to the Director of the Office of Diversity and Equity and include a statement describing in detail the grounds for the review request. The grounds for review will be limited to a) violations of complaint procedures; and b) additional evidence, which was not available during the investigation. The findings of the Office of Diversity and Equity will be binding on all parties unless the complainant or the respondent files a request for review within ten (10) calendar days of receipt of the findings.

Upon receiving the written request, the Director of Diversity and Equity shall forward copies of the request to the Associate Vice President for Human Resources and Labor Relations or designee, and the SCSU-AAUP President or designee. If a request for review is filed, the complainant and respondent shall have access to all relevant documents to the extent permitted by law. Access shall include, but not be limited to, all documents presented to or considered by the Committee.

Within thirty (30) days of filing the request for review, the Panel shall be convened for the purpose of reviewing the findings and recommendations of the Office of Diversity and Equity. The Committee shall consist of three members selected from a volunteer panel of reviewers who will serve two-year terms. The panel will include SCSU full-time faculty members, members of the administration, and individuals from other campus constituencies. When a Committee must be convened, one faculty member, one member of administration, and one member from one of the other campus constituencies will be selected. Every effort will be made to rotate the selection of Committee members. The panel of reviewers will be given an orientation on the nature of the review process, and prohibited forms of discrimination, including harassment.

The Committee's responsibility will be to review the complaint and the ODE findings and recommendations and submit a report to the President. The proceedings of the review panel are informal. The Committee should not consider cumulative, repetitious, or irrelevant evidence. In discharging their duties, the Committee may interview the principals in the specific complaints, review complaint records, and have access to additional relevant records, which may not already be included with the Office of Diversity and Equity file.

Within thirty (30) days of convening, the Committee shall forward their findings and recommendations to the President in writing.

Upon receipt of the Committee's report, the President will make the final decision as to the disposition of the complaint. The President will give written notice of his or her decision to the Complainant, the Respondent, the Committee, and the ODE within thirty (30) calendar days of the receipt of the Committee's report. If the President's decision upholds a recommendation that action(s) are required to remedy a violation, the President will refer the matter to the appropriate university administrator who will decide what further action is warranted, including any disciplinary action.

### Filing a False Complaint

Any member of the University community who knowingly files a false complaint of discrimination or harassment, or who knowingly provides false information to or intentionally misleads any University official who is investigating a complaint, is subject to disciplinary action.

DIRECTIONS & MAPS • 1 888 500 SCSU

Southern Connecticut State University

# EXHIBIT
# B-2



Student
Handbook
2010-2011

Southern Connecticut
State University
SC
SU

EXHIBIT
B-2

activities to the public, including the annual jazz series and the annual Mary and Louis Fusco Distinguished Lecture Series. Among those who have spoken at the Southern lecture series are Colin Powell, Madeleine Albright, Christopher and Dana Reeve, Rudolph Giuliani, Mario Cuomo, Bill Belichick, Whoopi Goldberg, and Tim Russert. In athletics, Southern has one of the top NCAA Division II programs in the country, with 10 national team titles and 71 individual championships. In 2007, the women's basketball team won its first-ever national title.

## The Student Handbook

The Southern Connecticut State University Student Handbook, which complements the University Catalog, contains information about campus life. This handbook is provided to students and applicants for their general information and guidance only. It does not constitute a contract, either express or implied, and is subject to revision at the university's discretion. It is prepared and published by the Office of Student Affairs in cooperation with the Office of Public Affairs. Southern Connecticut State University reserves the right to change announcements, procedures, and regulations whenever necessary. The Student Handbook can also be found on the university Web site http://handbook.SouthernCT.edu.

## Discrimination and Sexual Harassment Prevention Policy

It is the policy of Southern Connecticut State University to prohibit discrimination based on all protected classes including, but not limited to, race, color, religious creed, age, sex, marital status, national origin, ancestry, physical or mental disability, and sexual orientation. Discrimination includes harassment on any basis mentioned above, and sexual harassment as defined in the Connecticut General Statutes, U.S. EEOC Guidelines of Sexual Harassment, and in Title IX of the Higher Education Amendments of 1972. Discrimination or harassment will not be tolerated at Southern Connecticut State University, whether by faculty, students or staff, or by others while on property owned by or under the control of the University.

The purpose of this policy is to help prevent acts of discrimination/harassment and to offer students and employees who believe they have experienced discrimination or harassment a means to promptly redress any such claim. The University's goal is to end the discrimination or harassment and promote a learning and working environment free of discrimination and harassment.

Any employee, student, or applicant for employment or admission to the University, who believes that he or she has been discriminated against or harassed as defined by this policy may file a complaint by following the Procedures for Discrimination and Harassment Complaints available on the SCSU Web site through the Office of Diversity and Equity Web address at http://www.SouthernCT.edu/diversityequity/.

Inquiries regarding the university's compliance with state and federal laws regarding discrimination may be directed to the Office of Diversity and Equity Programs at (203) 392-5492 or (203) 392-5491 at Southern Connecticut State University; the Commission of Human Rights and Opportunities, West Central Region Office, 55 West Main St., Suite 210, Waterbury, CT 07602; or the Office of Civil Rights, United States Department of Education, 8th Floor, 5 Post Office Square, Boston, MA 02109-3921, (617) 289-0111, ocr.boston@ed.gov.



# EMPLOYEE HANDBOOK

Southern Connecticut State University

## ▶ 2. AMERICANS WITH DISABILITIES/ EQUAL OPPORTUNITY EMPLOYER

The University acknowledges and affirms its commitment to provide a workplace with equal access for all employees. The University recognizes its obligations to make reasonable accommodation(s) to employees protected by the Americans with Disabilities Act and to prevent any inequitable treatment.

It is the policy of Southern Connecticut State University that employment decisions be based on merit, qualifications, and competence. Except where required or permitted by law, employment practices will not be influenced or affected by virtue of an applicant's or employee's race, sex, color, religious creed, national origin, national ancestry, sexual orientation, marital status, veteran status, age, criminal record, or disability including learning disability, past or present history of a mental disorder, genetic information, or any other characteristic protected by law. In addition, the University intends to provide a work environment that is free of unlawful harassment of any kind. This policy governs all aspects of employment, promotion, assignment, discharge, and other terms and conditions of employment.

## ▶ 3. SEXUAL HARASSMENT PREVENTION

The University shall provide an educational and work environment free of sexual advances, requests for sexual favors, and other verbal or physical conduct or communications constituting sexual harassment as defined by law.

Sexual harassment may include, but is not limited to:

> Sexually oriented verbal harassment or abuse.

> Subtle pressure for sexual activity.

> Inappropriate patting or pinching or other physical contact.

> Intentional brushing against a student's or an employee's body.

> Demanding sexual favors accompanied by implied or overt threats concerning an individual's employment or educational status.

> Demanding sexual favors accompanied by implied or overt promises of preferential treatment with regard to an individual's employment or educational status.

> Any sexually motivated touching.

> Displaying sexually suggestive pictures, objects, cartoons, posters, or other pornographic or offensive materials.

> Sexual remarks or jokes.

Employees who believe that they may have been subject to sexual harassment should report the incident immediately to their direct supervisor. If the complaint is against the direct supervisor or member of the University administrative staff, the employee should contact the Director of Diversity and Equity. A complete investigation and report will be made upon receipt of a complaint. If the complaint is found to be valid, the offending party may be subject to disciplinary action, up to and including termination.

For further information: *www.SouthernCT.edu/diversityequity/*

### The Women's Center

The Women's Center is a place for women to gather together and to explore and celebrate the richness and diversity of their lives. The center provides information, support groups, referral, and services to facilitate education on issues related to feminism, women, men, and gender. The center organizes events of interest to women and men such as discussion groups, speaker series, workshops, concerts, and films. The center also maintains a resource room with information on health, sexual harassment, sexual assault, AIDS, drug and alcohol abuse, and gay, lesbian, and bisexual issues. The Women's Center is located in Schwartz Hall, Garden Level. For further information, call 203-392-6946 or visit the center's Web site at *www.SouthernCT.edu/womenscenter/*

## ▶ 4. ETHICS STATEMENT

### Purpose

It is important that all Southern Connecticut State University employees conduct themselves with the highest degree of honor

# EXHIBIT
# C

1

1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
2

3

     * * * * * * * * * * * * *
4                                *
     WENDY WYLER,                 *
5                                *
             Plaintiff,          *
6                                *  Civil Action No.
          VS.                    *  3:12-CV-00097(RNC)
7                                *
     CONNECTICUT STATE           *
8    UNIVERSITY SYSTEM,          *
     SOUTHERN CONNECTICUT        *
9    STATE UNIVERSITY, DAVID     *
     CHEVAN, STANLEY BATTLE,     *
10   AND JONATHAN IRVING,        *
                                 *
11           Defendants.         *
                                 *
12   * * * * * * * * * * * * *
13                                  Southport, CT
14                                  December 20, 2013
15                                  10:03 a.m.
16                      - - -
17        DEPOSITION OF STANLEY BATTLE
                        - - -
     APPEARANCES:
18

19      FOR THE PLAINTIFF:

20           LUCAS BAGNELL VARGA, LLC
             BY:   JEFFREY S. BAGNELL, ESQUIRE
21                 2425 Post Road, Suite 200
                   Southport, CT 06890
                   Phone:  (203) 227-8400
22                 Fax:  (203) 227-8402
                   E-Mail:  Jbagnell@lbv-law.com
23

24

25                   - Cont'd -




EXHIBIT
C

1    FOR THE DEFENDANTS:

2        ASSISTANT ATTORNEY GENERAL

         BY:   LINSLEY J. BARBATO, ESQUIRE

3            55 Elm Street

            Hartford, CT 06103

4            Phone:  (860) 808-5160

            Fax:  (860) 808-5384

5            E-Mail:  Linsley.barbato@ct.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7        Deposition of STANLEY BATTLE, a

8  defendant herein, taken on behalf of the plaintiff

9  herein, for the purpose of discovery and for use

10  as evidence in this cause, pending in the United

11  States District Court for the District of

12  Connecticut, pursuant to Notice, before Matina

13  Papas, RPR, Licensed Shorthand Reporter, No.

14  00489, and a Notary Public within and for the

15  State of Connecticut, at the law offices of Lucas

16  Bagnell Varga, LLC, 2425 Post Road, Suite 200,

17  Southport, Connecticut, on the 20th day of

18  December, 2013 at 10:03 a.m., at which time

19  counsel appeared as hereinbefore set forth . . .

20

21

22

23

24

25

1          THE COURT REPORTER:  Stipulations?

2          MS. BARBATO:  Usual stips, read and

3    sign.

4    Thereupon:

5          STANLEY BATTLE, residing at 352

6    Strickland Street, Glastonbury, Connecticut, being

7    first duly sworn, as hereinafter certified, was

8    examined and testified as follows:

9    DIRECT EXAMINATION BY MR. BAGNELL:

10        Q.    Dr. Battle, good morning.

11        A.    Good morning.

12        Q.    As I think you know, I represent Wendy

13   Wyler in this case against yourself, Dr. Irving and

14   the University defendants.

15              I want to ask you, I guess, at the

16   outset, have you been deposed before?

17        A.    Mm-hmm.

18        Q.    Can you tell me how many times?

19        A.    One time.

20        Q.    What kind of case was that?

21        A.    It was -- I was Associate Vice President

22   at Eastern and there was a gentleman, who had some

23   mental health challenges and he was threatening in

24   terms of behavior, and certain action was taken, and

25   he subsequently was given an opportunity, through

1          Okay, can you tell me at the outset,

2   Doctor, what you did to get ready for the deposition

3   today?

4          A.     Reviewed the case with Linsley and was

5   made aware of many -- up-to-date in terms of what

6   the processes were and where we were at, and that's

7   essentially it.

8          Q.     Okay.  Did you go to the Attorney

9   General's Office?  Did you meet with her?

10         A.     No.

11         Q.     This was on the phone?  When you said

12  you spoke with Linsley --

13         A.     Of course I went to her office, and we

14  had some conversation by phone.

15         Q.     Where are you working now, Doctor?

16         A.     At USJ, University of St. Joseph.

17         Q.     And where is that?

18         A.     In West Hartford.

19         Q.     And you were Interim President at

20  Southern for about seven years, if I'm getting that

21  correct?

22         A.     Fourteen months.

23         Q.     All right.  So I am way off on that.

24  How did you come about to get that interim position?

25         A.     I was nominated for the position.  I was

1      A.      I am escaping her name.  I think she is

2  now President.  I can't recall her name.  I believe

3  she is the President in Pennsylvania.

4      Q.      All right.  Before your nomination,

5  Doctor, had you had any experience running a

6  university?

7      A.      Of course.

8      Q.      And can you describe that a little bit,

9  what your prior experience was?

10      A.      Coppin State University, a historically

11  Black institution that was in Maryland; and then

12  North Carolina; and then Southern.

13      Q.      In those positions, did you have any

14  experience with cases involving sexual harassment by

15  professors against students?  And I guess I will

16  limit the question to that area for now.

17      A.      Complaints?  At Coppin State, I don't

18  recall any.  At North Carolina A&T, I can't recall

19  any.  It doesn't mean it didn't happen.

20      Q.      Did you have any training in Title 9

21  requirements in any of those prior --

22      A.      Training at each institution.

23      Q.      Can you describe the kind of training

24  you had?

25      A.      You have -- which is required by

1   state -- you have classroom training and you also

2   have online training.

3        Q.     And when you got the position at

4   Southern, did they give you any training in addition

5   to what you already had in those areas?

6        A.     We had training at Southern.

7        Q.     Was that online?

8        A.     We had sessions with presidents, and we

9   had discussions about it.  That was face-to-face.

10        Q.     The departing president, you mean?

11        A.     No, there are four presidents of the

12   four institutions:  Southern, Western, Eastern and

13   Central.  So we had discussions at that level.

14        Q.     In the course of those discussions, were

15   any new policies or procedures implemented regarding

16   compliance with Title 9, Title 9 statutes of the

17   federal government?

18        A.     I can't recall that kind of detail.

19        Q.     All right.  And I think you said at

20   North Carolina -- the North Carolina University,

21   what was it again?

22        A.     A&T.

23        Q.     You don't recall whether there had been

24   any harassment complaints?

25        A.     I can't recall.  It doesn't mean it

1  I know you were there for a limited time.  You were

2  in an interim position.

3            Can you tell me the first time

4  Ms. Wyler's allegations came to your attention when

5  you were at Southern?

6       A.     Through contacts with Jaye Bailey, who

7  is Associate Vice President over Human Resources.

8  And I was informed, as I recall, by her that there

9  was an issue.

10      Q.     And what exactly did she tell you?

11      A.     That there was an allegation with a

12  student and a faculty member.  And at that point, we

13  moved to affirmative action, and that's where the

14  investigation normally would take place.

15      Q.     Did you order the investigation to take

16  place?

17      A.     That's the general process.  The

18  President doesn't have to order it.

19      Q.     That just happens?

20      A.     It's going to happen.

21      Q.     Did you monitor the investigation or

22  exercise any oversight over it?

23      A.     Oversight in terms of day-to-day, no.

24  Once that investigation starts, there are people --

25  Marsha was the person who was in that office -- and

1   the investigation would take place.  And, of course,

2   it would move from there, all findings, a report

3   that was done.  There was another gentleman who did

4   the report.

5              And once that is done, the report is

6   completed.  Then that information is provided to me.

7   And, also, human resources gets involved in that

8   simply because it's a faculty member, and the Union

9   is also engaged in that.

10       Q.    When Ms. Bailey came to you to tell you

11  about Ms. Wyler's complaint, had you heard of the

12  professor involved before?

13       A.    I met with him with other faculty

14  members.  There was a contingency of Jewish faculty

15  members and he was part of that.  And he was a

16  musician, so I was aware of who he was.

17       Q.    Did you know him well?

18       A.    No.

19       Q.    Had you socialized with him?

20       A.    No.

21       Q.    Had you -- at the time she came to you,

22  had you heard of any prior allegations against

23  Professor Chevan --

24       A.    None at all.

25       Q.    -- involving sexual harassment of

1  students?

2      A.      None at all.

3      Q.      And you've testified that you didn't

4  exercise any day-to-day control over the

5  investigation, which I understand.

6              Were you made aware of the conclusion of

7  the investigation at some point?

8      A.      Made aware of the conclusion of the

9  investigation.  And, also, I met with Jaye Bailey on

10  a regular basis.  She was the Associate Vice

11  President for Human Resources and that was her job.

12  And she was very clear to make sure that I was aware

13  of what was happening in the case.  And that was the

14  day-to-day responsibility that she had and she kept

15  me informed.

16      Q.      Was her office near yours, Doctor, at

17  the University campus?

18      A.      Well, it was just -- it's not in the

19  same building.  She was in another building, but,

20  certainly, it was very easy to get to her.

21      Q.      So she would come to your office

22  occasionally and brief you on the latest?

23      A.      We met every week, not only on this

24  issue, on a variety of issues.  That was part of my

25  responsibility.  Obviously, the President has to be

1      A.      On the part of who?

2      Q.      On the part of Professor Chevan, that he

3   had violated the University's sexual harassment --

4      A.      Who said he violated it?

5      Q.      The University came to that conclusion,

6   the Office of Diversity and Equity.

7      A.      Well, in the actual report?

8      Q.      Yes.

9      A.      Yes.

10     Q.      You were made aware of that, I assume?

11     A.      Yes.

12     Q.      Ms. Bailey told you?

13     A.      I actually saw the report, and, also,

14   she shared it with me.

15     Q.      All right.  Now --

16     A.      Once that report was complete, they

17   shared the report with me.

18     Q.      Understood.  What was your -- you read

19   the report?

20     A.      Mm-hmm.

21     Q.      What was your reaction after you went

22   through it and had some time to think about it?

23     A.      Well, that it was a thorough

24   investigation.  It was an act of first offense and

25   that the University was going to take action against

1    Was it your responsibility, Doctor, to
2 appoint the investigator to look into this matter?
3    A.    The investigation is done by affirmative
4 action and that's a standard procedure.  The
5 President does not appoint the investigation.
6    Q.    Understood.  Were you asked to review
7 your computer or paper files at some point, Doctor,
8 regarding any information?  Let me ask it another
9 way.
10    Did anyone from Ms. Barbato's office ask
11 you to look through your computer files or paper
12 files for information regarding Ms. Wyler and
13 Professor Chevan?
14    A.    Yes.
15    MS. BARBATO:  Wait a minute.  I am
16 going to object to any questions about conversations
17 between a client and an attorney.  That's
18 privileged.
19    MR. BAGNELL:  It's noted.
20    Q.    (By Mr. Bagnell)  You can answer.  The
21 answer is yes?
22    A.    Yes.
23    Q.    And you did do that?
24    A.    I didn't have any access to it.  Once I
25 left -- when I walked out of the door, those files

1  Ms. Wyler's mother.

2      Q.      Did you ever hear about that later after

3  you left?

4      A.      No.

5      Q.      Did you make any attempts to reach out

6  to Ms. Wyler, herself?

7      A.      The student?

8      Q.      Yes.

9      A.      No.

10     Q.      Any reason why you didn't want to?

11     A.      No, I did not.

12     Q.      And I think you said Ms. Wyler's

13  allegations were the only allegations of sexual

14  harassment of which you were aware when you were

15  Interim President; is that correct?

16     A.      At Southern?

17     Q.      At Southern.

18     A.      Allegations of a student against a

19  faculty member?

20     Q.      A faculty member.

21     A.      To my knowledge, I can't recall.  There

22  were -- I can't recall any other allegations.

23     Q.      Okay.  And, as you know, I am narrowing

24  that question to faculty and student, not student on

25  student.  Student, student is out there.  I'm not

1    concerned about it.  But student and faculty?

2         A.      Student making an allegation against a

3    faculty member, I can't recall that.

4         Q.      Okay.

5                 MR. BAGNELL:  Doctor, I don't have

6    any other questions for you.  That's all I have

7    today.  Thanks for your time.

8                 MS. BARBATO:  Thank you.

9                 MR. BAGNELL:  Thanks, Doctor.  You

10   are free to go.

11   (Whereupon, the deposition concluded at 10:25 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

I, MATINA PAPAS, Court Reporter and Notary Public within and for the State of Connecticut, duly commissioned and qualified, do hereby certify that pursuant to Notice, STANLEY BATTLE, the deponent herein, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this case; that his was thereupon carefully examined upon his oath and his testimony reduced to writing by me; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this          day of                    , 2014, at Norwalk, Connecticut.

_____

Matina Papas, RPR, LSR

My commission expires:     Notary Public
April 30, 2015             State of Connecticut
Lic. No. 000489

1  UNITED STATES DISTRICT COURT

2  DISTRICT OF CONNECTICUT

3

4

5  *Stanley Battle*
   CT DLH O%6118880 EXP 6-12-2015
   STANLEY BATTLE

6

7

8

9          STANLEY BATTLE personally appeared

10  before me at *141 Hebron Ave Glastonbury*, Connecticut,

11  this *8TH* day of *JANuary*_____, 2014 made oath

12  and acknowledged this deposition to be a true and

13  accurate transcription of his testimony.

14

15

16

17  My Commission Expires: *11-30-2018*

18

19

20

21                     NOTARY PUBLIC

22

23                     PAULA L. ALDERUCCIO
                        NOTARY PUBLIC
                        STATE OF CONNECTICUT
24                      MY COMM. EXP. 11-30-18

25

# EXHIBIT
# D

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

WENDY WYLER        :     CIVIL ACTION NO.
                                 :     3:12-CV-00097(RNC)

      v.                          :

                                    :

CONNECTICUT STATE UNIVERSITY    :
SYSTEM, SOUTHERN CONNECTICUT    :
STATE UNIVERSITY, DAVID CHEVAN,    :
STANLEY BATTLE, AND                :
JONATHAN IRVING               :     FEBRUARY 1, 2014

## AFFIDAVIT OF STANLEY BATTLE

     I, Stanley Battle, being duly sworn, do hereby depose and say of my own

personal knowledge:

     1.      I am over the age of eighteen (18) and I understand and appreciate the

obligations of an oath.

     2.      From May, 2010, to December, 2011, I held the position of interim

president at Southern Connecticut State University [SCSU]. Prior to that time I was not

employed at SCSU.

     3.      SCSU is a state educational institution, established by statute as part of

the Connecticut State University System.

     4.      In 2011 and at all times when I was interim president, SCSU had a policy

forbidding sexual harassment.



5.      In 2011 and at all times when I was interim president, Jonathan Irving and David Chevan were music professors at the university. Irving also served as department chair.

6.      In 2011 and at all times when I was interim president, the university had an Office of Diversity and Equity and a Director, also serving as the Title IX coordinator, who responsible for training and investigations of Title IX complaints, including claims of sexual harassment.

7.      In 2011 and at all times when I was interim president, SCSU's sexual harassment policy was available in writing and published on the university's web page.

8.      In 2011 and at all times when I was interim president, the university required sexual harassment training for all university employees.

9.      Before Wendy Wyler's complaint, I had no knowledge or notice that Chevan had sexually harassed her or anyone else.

10.     I heard that there was an allegation with a student and a faculty member for the first time from Jaye Bailey, then Associate Vice President of Human Resources. At that point, Bailey told me Ms. Wyler's complaint was being investigated by the university's Office of Diversity and Equity [ODE].

11.     I had never met Ms. Wyler and she did not file her complaint with me.

12.     I did not participate in ODE's investigation of Ms. Wyler's complaint; and made no findings or conclusions regarding her complaint. Per university procedures, I

did not appoint the investigator, monitor the investigation or exercise any daily oversight over the investigation.

13.    I did receive a copy of ODE's report after the investigation was concluded.

14.    I did not participate in any further investigation of Chevan for disciplinary purposes, but relied on Bailey, the member of management assigned to such tasks, and her staff to do so.

15.    Bailey did inform me of the conclusions of her staff's investigation and the recommended settlement with the union.

16.    On December 8, 2011, I announced my resignation from the position of interim president, withdrew from the search for a permanent president, and received no further information about Chevan or Ms. Wyler's complaint, until sometime in 2012, when I learned that Ms. Wyler had sued me.

_____
Stanley Battle

STATE OF CONNECTICUT    )
                                              )   ss Glastonbury
COUNTY OF _Hfd_            )


Sworn and subscribed before me this _1_ day of February 2014.

_____
Notary Public/
Commissioner of the Court



GINA LEOGRANDE
NOTARY PUBLIC
STATE OF CONNECTICUT
MY COMM. EXP. 10-31-16

# EXHIBIT
# E

```
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT
 2

 3        _____
    WENDY WYLER,                   ) CIVIL ACTION NO.
 4        Plaintiff,               ) 3:12-CV-00097(RNC)
                                   )
 5             vs.                 )
                                   )
 6    CONNECTICUT STATE UNIVERSITY )
    SYSTEM, SOUTHERN CONNECTICUT)
 7    STATE UNIVERSITY, DAVID      )
    CHEVAN, STANLEY BATTLE, AND )
 8    JONATHAN IRVING,             )
         Defendants.               )
 9    _____)

10

11

12

13

14
              DEPOSITION OF:    JONATHAN IRVING
15
              DATE:            NOVEMBER 19, 2013
16
              HELD AT:         LUCAS, BAGNELL, VARGA, LLC
17                             2425 POST ROAD, SUITE 200
                               SOUTHPORT, CT
18

19

20

21

22          BRANDON SMITH REPORTING & VIDEO
        249 Pearl Street            Six Landmark Square
23      Hartford, CT 06103          4th Floor
        (860) 549-1850              Stamford, CT 06901
24      (800) 852-4589              (800) 852-4589

25
           Reporter:  Samantha M. Howell, LSR #00462
```

EXHIBIT
E

```
 1     APPEARANCES:

 2

       REPRESENTING THE PLAINTIFF, WENDY WYLER:
 3
           Lucas, Bagnell, Varga, LLC
 4         2425 Post Road, Suite 200
           Southport, CT 06890
 5         (203) 227-8400
           By:  Jeffrey S. Bagnell, Esq.
 6

 7     REPRESENTING THE DEFENDANTS, CONNECTICUT STATE UNIVERSITY
       SYSTEM, ET AL:
 8
           Assistant Attorney General
 9         55 Elm Street
           Hartford, CT 06141-0120
10         (860) 808-5160
           By:  Linsley J. Barbato, Esq.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2   WITNESS:                                    PAGE:

 3   Jonathan Irving

 4
     Direct Examination by Attorney Bagnell          5
 5

 6   _____

                     PLAINTIFF'S EXHIBITS
 7                    (for identification)

 8

 9   EXHIBIT:                                    PAGE:

10   Plaintiff's Exhibit 1    Note                   40

11   Plaintiff's Exhibit 2    E-mail                 56

12   Plaintiff's Exhibit 3    Notation               58

13   _____

14   (Reporter's Note:  Original exhibits for identification
     were returned with original transcript.)
15

16

17

18

19

20

21

22

23

24

25
```

```
 1              S T I P U L A T I O N S

 2

 3        IT IS STIPULATED by the attorneys for the parties that

 4   each party reserves the right to make specific objections

 5   in open court to each and every question asked and the

 6   answers given thereto by the witness, reserving the right

 7   to move to strike out where applicable, except as to such

 8   objections as are directed to the form of the question.

 9

10        IT IS STIPULATED and agreed between counsel for the

11   parties that the proof of the authority of the Notary

12   Public before whom this deposition is taken is waived.

13

14        IT IS FURTHER STIPULATED and agreed that the reading

15   and signing of this deposition is not waived and any

16   defects in the Notice are waived.

17

18

19

20

21

22

23

24

25
```

1    representing you here today?

2        A    Yes.

3        Q    You understand you have a right to read and sign

4    your transcript here today?

5        A    Yes.

6        Q    I assume it's fair to say you intend to tell the

7    truth today?

8        A    Absolutely.

9        Q    Okay.  What's your current position at Southern,

10   Professor?

11       A    Professor of music.

12       Q    All right.  Are you the chairman of the music

13   department?

14       A    No.

15       Q    Who holds that position?

16       A    Dr. Craig Hlavac.

17       Q    Okay.  Did you ever hold that position?

18       A    Yes, I did.

19       Q    In what years?

20       A    Prior six years, 2007 beginning September 1st and

21   to just before this fall semester started, August 20th, I

22   believe, 2013.

23       Q    So from 2007 to 2013 approximately?

24       A    Yeah.

25       Q    When did you first join Southern's faculty?

| | |
|---|---|
| 1 | ever any instances of students complaining of sexual |
| 2 | harassment? |
| 3 | A    None that I was aware of during my entire time. |
| 4 | Q    When you went to Southern, did they give you |
| 5 | any -- I'm talking about the administration -- did they |
| 6 | give you any training on sexual harassment at Southern? |
| 7 | A    There's an online training, which I did. |
| 8 | Q    Can you explain how that worked? |
| 9 | A    You logged in, and there were a number of |
| 10 | questions and situations and you read about them, and you |
| 11 | answered certain questions, and at the end there was a test |
| 12 | and you had to get -- I forget what the minimum score for |
| 13 | passing was, but I passed. |
| 14 | Q    How soon did -- after you joined did this online |
| 15 | test happen? |
| 16 | A    Some years afterwards I took it. |
| 17 | Q    Okay.  Did anyone pick up the phone and call you |
| 18 | from human resources, or did you just get an e-mail saying |
| 19 | take this online test? |
| 20 | A    I don't recall.  There may have been an e-mail, |
| 21 | but -- that went out, but I don't recall. |
| 22 | Q    All right.  So it was an online test.  How many |
| 23 | times during your tenure as chairman do you recall taking |
| 24 | it? |
| 25 | A    Once. |

1    no longer in the role of chair; correct?

2         A    Yeah.

3         Q    And Professor Hlavac is now the chair?

4         A    Yes.

5         Q    That's for a six year term?

6         A    No, three year term.

7         Q    So you were reappointed after three years?

8         A    Yeah.

9         Q    When's the first complaint you ever heard of a

10   student against David Chevan, Professor?

11        A    Could you qualify; complaint of what nature?

12        Q    Sure.  I want to start with the broadest

13   category, any kind of complaint you heard, and then narrow

14   it down.

15        A    I heard -- I can't give you an exact.

16        Q    No need for exact dates, but approximate.  Your

17   obligation is your best recollection.

18        A    Yeah, within the past six years I've heard a few

19   complaints about classroom issues, the giving of a test or

20   the rescheduling of a test or the like.

21        Q    Any complaints that you're aware of regarding

22   sexual harassment, or inappropriate sexual conduct by David

23   Chevan during your tenure at Southern?

24        A    Prior to Wendy Wyler coming in, no, Wendy was the

25   first person.

```
1        Q    How long did Ms. Mazza meet with you,
2    Professor?
3        A    Between 20 and 30 minutes, I'd say.
4        Q    All right.  And the sticker came up, I assume,
5    during the conversation?  Was it a sticker or a sign?
6        A    Oh, it's like a sticker on the door.
7        Q    And it says this is a hate free office?
8        A    Yeah.  I think it says this office is a hate free
9    zone.
10       Q    Okay.  And then -- and you don't know why he had
11   that up there?
12       A    No.
13       Q    And you don't know what question prompted you to
14   state that?
15       A    No.
16       Q    And then the next sentence is where you claim to
17   relay his statement at the departmental meeting that there
18   was a need to share intimacy that's not appropriate;
19   correct?
20       A    Yeah.
21       Q    And all this meeting is 20 or 30 minutes?
22       A    With Ms. Mazza.
23       Q    Okay.  When you said you had not witnessed any
24   illegal touching, Professor, had you heard about any
25   illegal touching?
```

1     A    No.

2     Q    Any reason why -- let me ask it this way:  Was

3 she questioning you whether you had witnessed any illegal

4 touching; do you remember?

5     A    I don't know.

6     Q    Where did this meeting take place; in her office,

7 you said?

8     A    Yes.

9     Q    What was her title, to your knowledge?

10    A    I don't know her title.

11    Q    Were you nervous during this meeting?

12    A    No, not at all.

13    Q    Did she tell you she was investigating

14 Ms. Wyler's complaint?

15    A    She -- I don't recall her using the words I am

16 investigating Ms. Wyler's complaint, I do remember her

17 telling me that she wanted to ask me some questions that

18 referred to Ms. Wyler's complaint.

19    Q    Okay.  But she clearly asked you about whether

20 there was any illegal touching going on; is that fair to

21 say?

22    A    Yes.

23    Q    And at some point you made the comment that once

24 or twice there had been some complaints about exam

25 changes?

1           C E R T I F I C A T I O N

2    STATE OF CONNECTICUT:
     COUNTY OF HARTFORD:
3

4        I, SAMANTHA M. HOWELL, a Notary Public duly
     commissioned and qualified in and for the State of
5    Connecticut, do hereby certify that pursuant to
     Attorney Bagnell there came before me on the 19th of
6    November, 2013, the following named person, to wit:
     Jonathan Irving, who was previously duly sworn to testify
7    to the truth and nothing but the truth; that he was
     thereupon examined upon his oath; that the examination was
8    reduced to writing by computer under my supervision and
     that this transcript is a true record of the testimony
9    given by said witness.

10

11       I further certify that I am neither attorney nor
     counsel for, nor related to, nor employed by any of the
12   parties to the action in which this deposition was taken,
     and further, that I am not a relative or employee of any
13   attorney or counsel employed by the parties hereto, or
     financially interested in the outcome of this action.

14       In witness whereof I have hereunto set my hand
     this 4th day of December, 2013
15

16

17   _____

18              Samantha M. Howell
                Notary Public

19

20   My Commission expires
        September 31, 2016
21

22

23

24

25

ERRATA SHEET                          PAGE 1 of 2

| Page | Line | From | To |
|------|------|------|-----|
| 7 | 19 | "YES." | "NO, I STARTED ON A FULL-TIME TENURE TRACK LINE AS DEPARTMENT CHAIR." |
| 9 | 2 | "SHE'S" | "SHE" |
| 9 | 9 | "THEY HAD" | "THERE WERE" |
| 9 | 16 | "NOT IN THE SAME DEGREE." | "I DID NOT MANAGE FACULTY AT SOUTHERN. WHEN I WAS EMPLOYED AT THE BROOKLYN CONSERVATORY OF MUSIC FROM 1993-95 I MANAGED FACULTY AS THE DIRECTOR OF EDUCATIONAL OUTREACH MUSIC PROGRAMS" |
| 11 | 18 | "THE FILE" | "A FILE" |
| 11 | 18 | "CHAIR THAT" | "CHAIR, THAT" |
| 11 | 18 | "HAD MADE UP" | "HAD BEEN WRITTEN" |
| 17 | 17 | "NO, I HAD EXTENSIVE TRAINING." | "NO." |
| 18 | 15 | "I DON'T KNOW." | "I DON'T KNOW IF THERE IS A POLICY HANDBOOK. THERE IS A SEXUAL HARASSMENT POLICY." |
| 20 | 4 | "COMPLETED IT AN HOUR." | "COMPLETED IT IN AN HOUR." |
| 21 | 15 | "I CAN'T GIVE YOU AN EXACT." | "I CAN'T GIVE YOU AN EXACT DATE." |

12/18/13
Date                                    Jonathan Irving

Sworn to before me this 18 day
of December , 2013.

                                        Notary Public

My commission Expires: 8/31/2015

| Page | Line | From | To |
|------|------|------|-----|
| | | ERRATA SHEET | **PAGE 2 of 2** |
| 24 | 19 | "DR. HLAVAC." | "DR. HLAVAC AND MYSELF." |
| 29 | 25 | "INSURE" | "UNSURE" |
| 30 | 1 | "INSURANCIES" | "UNCERTAINCIES" |
| 44 | 17 | "THAT WAS THE ONLY TIME" | "THAT WAS THE ONLY TIME AT A MEETING." |
| 44 | 20 | "YEAH." | "YEAH, AT A MEETING. I RECALL ONE ADDITIONAL TIME IN THE MUSIC OFFICE AT THE PHOTOCOPY MACHINE." |
| 47 | 20 | "ONE POINT, EXACTLY WHEN..." | "ONE POINT BEFORE WENDY COMPLAINED ABOUT DAVID CHEVAN. EXACTLY WHEN:..." |
| 48 | 11 | "I AM AWARE OF THAT." | "I AM AWARE THAT WENDY SAID THAT." |
| 48 | 21 | "NO I DIDN'T APPROACH HER, WE JUST HAPPENED TO..." | "NO I DIDN'T APPROACH HER AFTER THAT. WE JUST HAPPENED TO..." |
| 48 | 22 | "PASS EACH OTHER IN THE HALL." | "PASS EACH OTHER IN THE HALLWAY SOMETIME BEFORE." |
| 60 | 7 | "THE ONLY ACTION THAT I TOOK WAS ON A..." | "THE ONLY ACTION THAT I TOOK WITH THE MUSIC FACULTY WAS ON A..." |
| 60 | 13 | "IMMEDIATELY" | "IMMEDIATELY. I ALSO CALLED (2) TWO MEETINGS WITH MUSIC STUDENTS TO TELL THEM THAT IF THEY ENCOUNTER ANY HARASSMENT TO REPORT IT IMMEDIATELY." |

12/18/13
_____
Date

_____
Jonathan Irving

Sworn to before me this __18__ day
of __December__ , 2013.

_____
Notary Public

My commission Expires: __8/31/2015__

JURAT

1
2
3
4
5
6
_____

Jonathan Irving

7
8
9
10
11      Subscribed to and sworn before me on this

12      _____18_____ of _____December_____ 2013.

13
14
_____

15
16   My commission Expires: 8/31/2015

17
18
19
20
21
22
23
24
25

# EXHIBIT
# F

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WENDY WYLER | : | CIVIL ACTION NO. |
| | : | 3:12-CV-00097(RNC) |
| v. | : | |
| | : | |
| CONNECTICUT STATE UNIVERSITY | : | |
| SYSTEM, SOUTHERN CONNECTICUT | : | |
| STATE UNIVERSITY, DAVID CHEVAN, | : | |
| STANLEY BATTLE, AND | : | |
| JONATHAN IRVING | : | FEBRUARY 4, 2014 |

## AFFIDAVIT OF JONATHAN IRVING

I, Jonathan Irving, being duly sworn, do hereby depose and say of my own personal knowledge:

1. I am over the age of eighteen (18) and I understand and appreciate the obligations of an oath.

2. In 2011, I was an employee of Southern Connecticut State University [SCSU], serving as music professor and chair of the music department.

3. David Chevan and Craig Hlavac were also music department professors at that time.

4. SCSU has a policy prohibiting sexual harassment; and I had read and was familiar with the policy.

5. On April 4, 2011, Wyler reported to Hlavac and me that Chevan had sexually harassed her.



6.     I immediately notified the university's Human Resources Office [HR] and the Dean of Arts and Sciences that I would commit the plaintiff's complaint to writing and forward it to HR or the Office of Diversity and Equity [ODE].

7.     We listened to Ms. Wyler, wrote down her statement, asked her to review and make corrections and sign it. I have attached to this affidavit a true and accurate copy of the statement from Ms. Wyler that I committed to writing as Ex. F-1.

8.     The next day, I brought Ms. Wyler's statement to Associate Vice President Jaye Bailey at HR.

9.     I had no involvement in the university's response to Wyler's complaint after I referred it to Bailey.

10.    Before Wyler complained to Hlavac and me, I had no knowledge or notice that Chevan had sexually harassed her or anyone else.

11.    I believe that I followed the university's sexual harassment policy by writing a written summary of Ms. Wyler's complaint; having her review and sign it, and taking her complaint to Associate Vice President Bailey, an appropriate member of university management.

12.    I later learned that the university's Office of Equity and Diversity [ODE] conducted an investigation into Ms. Wyler's claim, but I was not a member of ODE and was not involved at all in its investigation or conclusions.

13.     At some later point Dianne Mazza of HR asked me some questions about Chevan, but other than answering her questions, I was not involved in her HR investigation either.

14.     I also played no part in the decision to discipline Chevan; and had no authority to discipline a professor.

15.     At SCSU, department chairs are not supervisors and have no duty or right to hire; evaluate, except as part of a committee with other department members; discipline; or terminate fellow professors.

16.     At SCSU, service as chair is not a promotion, but a faculty assignment, for a three-year term. The chairs are members of the same collective bargaining unit as all other professors; and, although they perform some administrative functions and may serve on hiring or evaluations committees, they have no authority over their colleagues.

17.     On April 27, 2011, Ms. Wyler sent an email to Hlavac and me, thanking us for our help and support. In the email, Ms. Wyler thanked me for my compassion and help to her. I have attached to this affidavit a true and accurate copy of this email as Ex. F-2.

18.     I wrote back to Ms. Wyler that same day, complimenting her on her courage and wishing her courage in the rest of her life. I have attached to this affidavit a true and accurate copy of this email and the subsequent email exchanges with Ms. Wyler as Ex. F-3).

19.     Ms. Wyler then asked me in an email what it meant that Chevan would be penalized. In response, I told her that it was my understanding that it could mean anything from a slap on the wrist, to losing a week or a month of salary, to a suspension or even dismissal. In sympathy for her apparent frustration with the process, I wrote, "Welcome to the world of academia," and again complimented her on her courage. I also offered to talk to her at any time and to help in any way I could.

20.     When Ms. Wyler replied that she was offended by my reference to "the world of academia," I tried to explain my intent – to be supportive and sympathetic.

21.     At all times I met with or corresponded with Ms. Wyler, I tried to be supportive and sympathetic; and tried always to treat her with kindness and sensitivity.


_____
Jonathan Irving

STATE OF ~~CONNECTICUT~~ *New York*     )
                                                                    )     ss
COUNTY OF *Westchester*     )

Sworn and subscribed before me this _4th_ day of February 2014.


_____
Notary Public/
Commissioner of the Court

ANDREA L BOROFSKY
Notary Public, State of New York
No. 01BO4924297
Qualified in Westchester County
Commission Expires April 04, 2014

# EXHIBIT
# F-1



**Southern Connecticut State University**

SC
SU

April 4, 2011

The following is documentation of a statement given by undergraduate student Wendy Wyler, regarding a sexual harassment complaint against Dr. David Chevan.

On Monday, April 4, 2011, student Wendy Wyler approached Asst. Professor Craig Hlavac to discuss a sexual harassment report she was filing against music department faculty member Dr. David Chevan.

Ms. Wyler knows Mr. Hlavac because he coaches/oversees a student ensemble of which Ms. Wyler is a member. Mr. Hlavac brought Ms. Wyler's issue to my attention, as I am the music department chair.

We met in my office (EA 120A) from 3:30-4:30pm. The following is documentation of that meeting.

**Spring 2009**
As far back as Spring 2009, as a member of a small ensemble coached by Dr. Chevan, Wendy recalled receiving comments from Dr. Chevan that were inappropriate, and both racial and sexual in nature.

**Fall 2009**
The Fall 2009 semester produced no ill feelings or personal comments towards Ms. Wyler. Dr. Chevan offered to teach Ms. Wyler some private instrumental saxophone lessons, and those went smoothly, with no inappropriate (from Ms. Wyler's point of view) comments or actions from Dr. Chevan.

**Spring 2010**
The Spring 2010 semester was one of little contact between the two persons. As Ms. Wyler reflected, she purposely stayed away from Dr. Chevan, and had very little contact with him. She did not continue instrumental lessons with Dr. Chevan. However, Ms. Wyler did state that Dr. Chevan seemed *"rather distant"* towards her during that time, which she attributed to her decision to end private lessons with him.

**Fall 2010**
In the Fall 2010 semester, Ms. Wyler returned to the Blues Ensemble, a small ensemble directed by Dr. Chevan, and *"things were OK,"* according to Ms. Wyler.

**Spring 2011**
In the Spring 2011 semester Ms. Wyler related how, following the Mardi Gras concert on 3/8 (in Garner Recital Hall, which Ms. Wyler attended as a member of the audience), Dr. Chevan stopped her outside of Earl Hall and said *"there's something between us, some kind of*



EXHIBIT
F-1

towards her. Ms. Wyler said that Dr. Chevan said, in front of the group, that the song was being played *"especially for Wendy"* – which had all the members of the group feeling a bit puzzled, as that song was not in the normal repertoire or style for that particular ensemble.

Ms. Wyler said she felt very uneasy, especially given what had just transpired in the storage room in Engleman Hall. The rehearsal then concluded at the usual time period that evening.

According to Ms. Wyler, Dr. Chevan continued to send emails to her (she did not specify the content of those emails). However, she did not reply to those emails, and continued to feel uneasy about the entire situation; wondering if her non-responsive behavior would result in a lowered grade? Or some other repercussion?

At this point, although specific dates remained slightly confused, the circumstances remained clear and precise according to Ms. Wyler.

According to Ms. Wyler, she began to feel a greater sense of unease, to the point of illness. During one such rehearsal, Dr. Chevan (according to Ms. Wyler) made an insensitive and provocative comment when he said – in front of Ms. Wyler and the entire class – *"Wendy, are you sick physically or psychologically?"*

Finally, on the Friday before Spring Break (3/18), after Dr. Chevan had (according to Ms. Wyler) continued to relentlessly criticize one particular student in the ensemble (Andrew M.), Ms. Wyler said that she became emotionally overcome to the point where she could not take the "vibe" in the classroom any further. Fearing that she would say something out loud, or simply be overcome emotionally and start to cry (this is in her own words), she simply waited until Dr. Chevan paused the rehearsal and turned his back for a moment; she grabbed her stuff and abruptly left the classroom. Over the next two days she and Dr. Chevan exchanged emails, with Dr. Chevan exclaiming that her behavior was *"irresponsible to the group"* and with Ms. Wyler replying that she could not take the way in which Dr. Chevan relentlessly criticized the student (Andrew M.).

On Tuesday, 3/29, Ms. Wyler dropped ("W" = withdraw) the ensemble class she had been taking with Dr. Chevan.

Furthermore, Ms. Wyler also stated that a recent encounter with another friend and Southern student (Megan C.), revealed that Ms. C had also incurred similar inappropriate behavior from Dr. Chevan. And, Ms. C related that *she* knew of another Southern student (Anna D.) who had also incurred similar inappropriate behavior from Dr. Chevan. It was at that point Ms. Wyler decided that she had the obligation to file a formal complaint against Dr. Chevan.

On, or around 3/16, Ms. Wyler spoke with Paula Rice, of the SCSU Office of Diversity & Equity Programs, regarding what Ms. Wyler felt was inappropriate behavior on the part of Dr. Chevan, and her desire to file a formal complaint. Present was also Kathy Christie, Paula Rice's associate.

*chemistry.*" and "*I'm a sensual person.*" Ms. Wyler responded by telling Dr. Chevan that he was "*misinterpreting*", only to have Dr. Chevan reply, "*No, I'm not,*" and, "*If only I wasn't your professor and you my student, things could be different.*" According to Ms. Wyler, Dr. Chevan concluded with, "*My only mistress is music.*"

Around that time (Ms. Wyler was not sure of the exact date), Ms. Wyler received an email from Dr. Chevan, whereby he stated, "*Stop by my office.*" While there, Dr. Chevan shared with Ms. Wyler intimacies such as "*I once had an affair with a student many years ago.*" Ms. Wyler stated that she was in Dr. Chevan's office for a good hour, going past the time the Latin Jazz Ensemble rehearsal was supposed to start. Dr. Chevan shared with Ms. Wyler that he had not considered his affair from the past until in the presence of Ms. Wyler, and that he could see himself engaging in those behaviors with Ms. Wyler. Ms. Wyler said she had no response to Dr. Chevan's statement, and that Dr. Chevan concluded by saying "*fantasies are better than affairs.*"

Dr. Chevan then complimented Ms. Wyler on her "*good looks.*" This made Ms. Wyler very uncomfortable. And then Dr. Chevan concluded by saying that since he had "*shared something personal*" with Ms. Wyler, he knew they could then "*trust each other.*"

All of this seemed to culminate while preparing for a rehearsal of the Latin Jazz ensemble, a small ensemble directed by Dr. Chevan, of which Ms. Wyler was a member. While asking his other students to set up the rehearsal room in Earl Hall in preparation for the rehearsal, Dr. Chevan invited Ms. Wyler to get coffee with him at the Bagel Wagon Café in Engleman Hall. Ms. Wyler stated that she felt surprised and uneasy at this, since she felt singled out to have coffee while the other members of the group were asked to stay behind and set up the rehearsal room.

Instead of going directly to the Café, Ms. Wyler stated that Dr. Chevan took the lower level stairway up to Garner Recital Hall (which is located just down the hall from the café). He then opened a music instrument storage room (EN C106-A) adjacent to the main entrance to Garner Recital Hall, entered the storage room, and told Ms. Wyler to also come into the room with him. Ms. Wyler stated that she felt uneasy about this, but upon seeing another student nearby who was watching, Ms. Wyler felt embarrassed and so decided to do as Dr. Chevan asked.

According to Ms. Wyler, Dr. Chevan then closed the door (no one else was in the room except for the two of them) and faced Ms. Wyler with his back to the door — in other words, preventing exit from the room. Looking directly at her, Dr. Chevan said, "*Remember that affair I told you about? If something were to happen, it's going to happen now.*" Ms. Wyler responded by saying again that she thought he was "*misinterpreting her*" and that nothing was going to happen. Dr. Chevan responded with "*are you sure?*" Ms. Wyler again refused and after a moment Dr. Chevan then opened the door, stating that it was "*time to re-enter reality.*" They both left the storage room.

Returning to the rehearsal, Ms. Wyler explained how Dr. Chevan then introduced a new song into the group's repertoire, the Beatles' song "While My Guitar Gently Weeps" which according to Ms. Wyler, Dr. Chevan explained that the lyrics of the song would be directed

Ms. Rice advised Ms. Wyler to think about the situation, and the options (filing a sexual harassment complaint or not, etc.) during the Spring Break, and that Ms. Rice would "get back to Wendy."

Ms. Wyler decided to pursue filing a complaint for sexual harassment. She called Ms. Rice. Much to Ms. Wyler's surprise, instead of moving forward with the complaint, Ms. Rice suggested Ms. Wyler wait an extra 1 to 2 weeks, because Ms. Rice was moving to the Office of Human Resources and a new person (Mr. Ernest Marquez) would be coming in shortly to handle Ms. Wyler's complaint.

Ms. Wyler felt outraged and slighted, and the constant "put-off" by Ms. Rice made Ms. Wyler take further action. She told her therapist about this issue, and the therapist himself called Ms. Rice and confronted Ms. Rice on the spot. According to Ms. Wyler it was only then that she started getting some movement on the case. Ms. Rice apologized for the "lack of timely response," and told Ms. Wyler that "Tuesday (4/5) might be good to set up a meeting."

On Monday (4/4) Dr. Irving phoned Ms. Rice to confirm the meeting with Ms. Wyler and the new caseworker, Mr. Marquez. Ms. Rice stated that Mr. Marquez was unable to meet with Ms. Wyler on Tuesday (4/5), and that Mr. Marquez would be in touch with Ms. Wyler to re-schedule the meeting for Thursday (4/7).

Respectfully submitted,


_____          _____
Dr. Jonathan Irving                        Date
Chairperson, Music Department
Southern CT State University



_____          _____
                                           Date

# EXHIBIT
## F-2

Subject: Wendy Wyler in regard to Investigation
Date: Wednesday, April 27, 2011 6:19:00 PM ET
From: wendy wyler
To: Irving, Jonathan A.

Dr. Irving and Dr. Hlavac,

I have attached the decision made yesterday by the Investigator with which we had met with a couple of weeks ago. I feel it would have been wrong of me not to share this with you both as I would probably
be in a very different position right now if it were not for your help. Based off the following, Human Resources is now taking over and beginning their own investigation which was said to draw to
an end in May. As I met with them today, and received the full report of the investigation ( comments/ interviews etc.), I was informed that they will make a decision as to what will happen with the obtained information. It looks like what happened was finally acknowledged, which initself makes me feel much better.
Dr. Chevan has the opportunity to appeal against both the attached statement and the decision made by Human Resources; however, based on his statements in the report it seems very unlikely that he will be doing so. He admitted to pretty much everything that was reported, events and things that were said.

You are both entitled to the report, what happened did not only hurt me and effect me but I think it had an impact on pretty much everyone. You are both welcome to view the report if you want to.
I have another interview with Human Resources, similar to the one we had, tomorrow. As of now I am trying to get back to normal life and keep both my grades and spirit up, but I miss the bands and things with all the band kids have been uncomfortable and awkward.

I wanted you to know how much it meant to me that you both not only took the time to listen, and actually listened, but also took initiative which many throughout this entire ordeal unfortunately did not have the strength to do. I learned that something like this takes a lot of courage, rightfully so, and I know that without the compassion and courage I saw in a few others, like you, I would have been very lost.

I appreciate your help very much, Thank you,

Wendy

----- Forwarded Message ----
From: "Marquez, Ernest R" <marquezo1@southernct.edu>
To: "wendywyler89@yahoo.com" <wendywyler89@yahoo.com>
Cc: "Mazza, Diane" <mazzad3@southernct.edu>; "Smith, Marcia L." <smithglaspm1@southernct.edu>
Sent: Tue, April 26, 2011 3:12:17 PM
Subject: Wyler v. Chevan

Please see attached notice.





# EXHIBIT
## F-3

REDACTED

----- Forwarded Message -----
From: "Irving, Jonathan A." <irvingj2@southernct.edu>
To: wendy wyler <wendywyler89@yahoo.com>
Sent: Tuesday, May 31, 2011 12:25 PM
Subject: Re: case

Hi Wendy,

You misunderstood what I was saying. I don't know what decision was handed
down to Dr. Chevan – I do not receive that information from Human Resources. I
could not agree with you more that if a teacher behaves irresponsibly or in a
threatening way, then he or she should be handed a "sentence" that reflects the
severity of his or her behavior and actions. I do not condone anyone, or any
institution, that would not consider most seriously the issues presented by you and
other students (Megan, etc.). I would hope you know that.

Since I once went through a grieving process with my last academic job (it was a
promotional issue, not anything like what you experienced), and in the end found
that colleagues I had known for years suddenly went silent, for lack of wanting to
get involved and for the sake of the status quo, that is what I meant in my comment
"welcome to the world of academia." I was shocked, angered and totally





disappointed at the time. And those feeling lingered.

So I applaud you for continuing to fight for the justice you feel you deserve, and in your hope of protecting others from what happened to you, not happening to them. If you are not satisfied with the decision of Human Resources, rather than be disappointed and still feel victimized, I support your quest for justice.

Regards,
Jonathan

On 5/27/11 12:24 PM, "wendy wyler" <wendywyler89@yahoo.com> wrote:

Hi, Dr. Irving,

I'm sorry, but what do you mean with " welcome to the world of academia" ? I take offense to that. I am not about to sit here and accept the decision that was made when we both know, and almost everyone involved knows that it is not a fair decision. With what you said, you are asking me to give in to a faulty decision, a faulty system. You are asking me to give up my right and my freedom of speech and freedom to safety. You are willing to allow a predator who has done wrong not only to not be held accountable, but to remain a predator. Who will it be next Dr. Irving? What does it take? If psychological well being is not enough, if my statement and Meghan's statement were not enough, what does it take? Blood and bruises? I'm sorry I couldn't provide Human Resources with that and I am sorry for the victim that will.

It is not correct to let a professor get away with presenting marijuana to a student, placing his hands between her thighs, asking her to go home with her, and then cornering me into a closet. Do you have any idea what the past three month were like for me, what it felt like in that closet, what it feels like to be told that I should let it go? Do you have any idea what Meghan is going through? Everyone seems to nod and smile, you say you understand but where is your help, where is your voice? With no disrespect Dr. Irving, but you are head of the Music Department, you know what this guy did and you have the power. I don't. You have power, why wont you help us? Why do you say you stand for peace? How can you just say, " oh, it took courage" ? Where is the justice?

I have contacted several people, lawyers, attorneys, sexual harassment advocates and I will go to the police in New Haven and eventually the press. They suppress us, Human Resources do not pick up our calls, no one returns calls. Everyone is apathetic and I don't blame you, how could you not be? I won't let them win and make me that way. Please do not ask me or Meghan or anyone else for that matter, to give in to injustice.

I ask for your strength and your help, Dr. Irving, this is the stuff that matters, that we take care of each other,

Wendy

From: "Irving, Jonathan A." <irvingj2@southernct.edu>
To: wendy wyler <wendywyler89@yahoo.com>
Sent: Tue, May 24, 2011 11:51:13 AM
Subject: Re: case

Hi Wendy,
Yes, I heard. Welcome to the world of academia! Penalized can mean anything from a slap on the wrist, to losing a week or a month of salary, to suspension or even dismissal. Obviously the last two were not in the final decision. What you did took courage. In the end, this is what you must hold on to for your life will move well beyond the hallways of Southern. And because you did what you did, you created a documented trail of evidence and testimony, so, should this ever happen again to with this professor, your testimony will provide crucial evidence in any decision-making process. If you ever need to talk, or have other issues, please know that I am available to help in any way I can.
Best wishes,
Jonathan Irving


On 5/24/11 10:55 AM, "wendy wyler" <wendywyler89@yahoo.com> wrote:

Dr. Irving,

I'm just informing you that I received a call from Diane Mazza yesterday, she's in

Human Resources, and
she said the teacher has been penalized and the case is closed. He will be there in
the fall. I don't really know what penalized means, I don't know how a teacher can
get penalized.

Enjoy your summer,

Wendy Wyler


From: "Irving, Jonathan A." <irvingj2@southernct.edu>
To: wendy wyler <wendywyler89@yahoo.com>
Sent: Wed, April 27, 2011 6:40:33 PM
Subject: Just a note...

Wendy,

I'll look at the document later, when things are quieter. Yes, it took courage for you
to speak up, no matter what the results may be from the hearings, or any decisions
that will be made by the forces that be. May this courage always stay with you
throughout your life.

Peace,
Jonathan

# EXHIBIT
# G

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WENDY WYLER                          :     CIVIL ACTION NO.
                                     :     3:12-CV-00097(RNC)
VS.                                  :
                                     :
CONNECTICUT STATE UNIVERSITY         :
SYSTEM, SOUTHERN CONNECTICUT         :
STATE UNIVERSITY, DAVID CHEVAN,      :
STANLEY BATTLE, AND                  :
JONATHAN IRVING                      :     DECEMBER 13, 2013


DEPOSITION OF:   DAVID CHEVAN

DATE:            December 13, 2013

HELD AT:         New Haven Legal Center
                 900 Chapel Street, Suite 620
                 New Haven, CT


REPORTER:   MICHELE C. CLIFFORD, LSR No. 56
        BRANDON HUSEBY REPORTING & VIDEO


    249 Pearl Street          Six Landmark Square
    Hartford, CT  06103       Stamford, CT  06901
  Tel:  (860) 549-1850          (203) 316-8591
  Fax:  (860) 549-1537          (860) 549-1537


EXHIBIT
G

APPEARANCES:

REPRESENTING THE PLAINTIFF, WENDY WYLER:

    JEFFREY S. BAGNELL, ESQ.
    LUCAS BAGNELL VARGA LLC
    2425 Post Road, Suite 200
    Southport, CT  06890
    Telephone (203) 227-8400
    Facsimile (203) 227-8402
    jbagnell@lbv-law.com

REPRESENTING THE DEFENDANT, DAVID CHEVAN:

    DAVID R. SCHAEFER, ESQ.
    BRENNER SALTZMAN & WALLMAN, LLP
    271 Whitney Avenue
    New Haven, CT  06511
    Telephone  (203) 772-2600
    Facsimile  (203) 562-2098
    dschaefer@bswlaw.com

REPRESENTING THE DEFENDANT, CONNECTICUT STATE
UNIVERSITY SYSTEM, SOUTHERN CONNECTICUT STATE
UNIVERSITY:

    LINSLEY J. BARBATO, ESQ.
    OFFICE OF THE ATTORNEY GENERAL
    55 Elm Street
    P.O. Box 120
    Hartford, CT  06141-0120
    Telephone (860) 808-5160
    Facsimile (860) 808-5384
    linsley.barbato@ct.gov

## I N D E X

WITNESS:                                                          PAGE
DAVID CHEVAN

### E X A M I N A T I O N S

Direct Examination By Mr. Bagnell ................5

### E X H I B I T S

Exhibit:        Description:                        PAGE

PLAINTIFF'S:        (For Identification)

Exhibit 1     11/18/13 affidavit of Hillary .......25
              Brentson
Exhibit 2     4/5/97 music dept eval committee .....28
              letter
Exhibit 3     10/30/13 deposition transcript .......34
              Tilden Russell

   (Original exhibits retained by court reporter.)


Transcript Legend

[sic]          - Exactly as said.

[phonetic]     - Exact spelling not provided.

[--]           - Break in speech continuity and/or
                 unfinished sentence.

[...]          - Indicates omission of word(s) when
                 reading or deponent's testimony
                 trailing off and incomplete.

1          after written deposition to designate what

2          we believe is protected by the protective

3          order and so we intend to do that.  The

4          other thing is counsel have an agreement

5          that any testimony about the deponent's

6          personal life, not dealing with

7          interactions with the plaintiff, will not

8          be disclosed to his client until we have a

9          chance to designate the transcript and the

10         judge has an opportunity to rule on any

11         claim we have that that information should

12         not be disclosed to the plaintiff.

13              MR. BAGNELL:  At any time.

14              MR. SCHAEFER:  Correct.

15              MR. BAGNELL:  That's correct.

16              MR. SCHAEFER:  Thank you.

17    BY MR. BAGNELL:

18         Q    Okay.  Professor, what's your current

19    position at Southern?

20         A    I'm a professor of music.

21         Q    Are you full professor?

22         A    Yes.

23         Q    How long have you been a full professor?

24         A    Since 2007.

25         Q    All right.  Now, I take it that that was a

1    Q    How long was he chair of the music

2  department?

3    A    Six years.

4    Q    What's your current employment status in

5  the sense of, are you on probation now, Professor?

6    A    I am not.

7    Q    Has that probationary period expired at

8  this point?

9    A    Yes.

10   Q    It was a 24-month period?

11   A    Yes.

12   Q    And when did that expire?

13   A    In August.

14   Q    When it expired, did you have any meetings

15  with any administrative employees at the school about

16  the end of it or any meetings of any kind about it?

17   A    No.

18   Q    No union representatives contacted you?

19   A    I contacted my union to find out what

20  happens, and they said that I should be in touch with

21  HR to find out if the letter had been removed from my

22  file.

23   Q    Have you done that?

24   A    No.

25   Q    Do you plan on it?

1    Q      And then you also taught Jazz Music, as I

2    understand it, a course where students would play, you

3    know, jazz instruments I guess?

4    A      Those would be ensembles.  At that time

5    there was no jazz ensemble.

6    Q      Okay.  Did the university ever inform you

7    of its policy regarding sexual harassment once you

8    joined the university, Professor?

9    A      Yes.

10   Q      When did that happen to the best of your

11   recollection?

12   A      Sometime in the early- to mid-2000s we

13   were all asked to attend a seminar.

14   Q      All right.  You started in '93, so you

15   recall getting this seminar notice in the mid-2000s?

16   A      I don't recall when.

17   Q      Approximately?

18   A      2003, 2004.

19   Q      Before that, had the university put on any

20   seminars regarding sexual harassment?

21   A      Not to my knowledge.

22   Q      Were you given any individual instruction

23   on the university's policies about sexual harassment

24   before that conference?

25   A      No.

1        Q       Any online testing?

2        A       There was no online testing at that time.

3    There was no online.

4        Q       Okay.  Well, I think the record will show

5    the Internet existed back then --

6        A       At the university --

7        Q       Let me finish, Professor.

8                Were you ever sent anything by email, for

9    example, explaining to you what the university's

10   policies were on sexual harassment?

11       A       I don't know.

12       Q       You don't recall?

13       A       I don't.

14       Q       Did you have email when you joined

15   Southern?

16       A       No.

17       Q       When did that start?

18       A       Around 1996, 1997.  Somewhere in there.

19       Q       Okay.  But closing the circle in this area,

20   Professor, it sounds like you're saying sometime in

21   the mid-2000s or early-2000s, do you recall getting

22   some kind of notice on a seminar on sexual harassment?

23       A       It was some kind of required session that

24   every member of the university employees had to

25   attend at some point.

| | | |
|---|---|---|
| 1 | Q | You don't recall anything before that? |
| 2 | A | I don't. |
| 3 | Q | Did you attend this? |
| 4 | A | Yes. |
| 5 | Q | Who presented at it, if you recall?  If it |
| 6 | | was one person, maybe it was more? |
| 7 | A | I don't. |
| 8 | Q | You don't recall? |
| 9 | A | I don't recall. |
| 10 | Q | Do you recall attending it? |
| 11 | A | Yes. |
| 12 | Q | Who was present? |
| 13 | A | I don't recall. |
| 14 | Q | What was -- how long was it approximately? |
| 15 | A | Maybe an hour. |
| 16 | Q | Were there any attorneys present for the |
| 17 | | university? |
| 18 | A | I don't know. |
| 19 | Q | Did this take place -- I assume this took |
| 20 | | place during a semester, not in the summer or off |
| 21 | | season? |
| 22 | A | Yes. |
| 23 | Q | Were your colleagues in the music |
| 24 | | department present? |
| 25 | A | I don't remember. |

CERTIFICATE OF REPORTER

    I, Michele C. Clifford, a Licensed Shorthand
Reporter/Commissioner within and for the State of
Connecticut, do hereby certify that I took the
deposition of DAVID CHEVAN, on December 13, 2013, who
was by me duly sworn to testify to the truth and
nothing but the truth; that he was thereupon carefully
examined upon his oath and his examination reduced to
writing under my direction by means of Computer
Assisted Transcription, and that this deposition is a
true record of the testimony given by the witness.

    I further certify that I am neither attorney nor
counsel for, nor related to, nor employed by any of
the parties to the action in which this deposition is
taken and further that I am not a relative or employee
of any attorney or counsel employed by the parties
hereto, nor financially interested in the outcome of
the action.

    IN WITNESS THEREOF, I have hereunto set my hand
December 16, 2013.

*Michele C Clifford*

_____

Michele C. Clifford

Notary Public:  License No. 00056
My commission expires:  12-31-2015

# EXHIBIT
# H

PORTIONS ARE CONFIDENTIAL –
SUBJECT TO PROTECTIVE ORDER

1              UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
2

3    - - - - - - - - - - -x
     WENDY WYLER,
4                    Plaintiff,
                                     |Civil Action No.:
5              v.                    |3:12-CV-00097 (RNC)

6    CONNECTICUT STATE UNIVERSITY    |
     SYSTEM, SOUTHERN CONNECTICUT    |
7    STATE UNIVERSITY, DAVID CHEVAN,|September 24, 2013
     STANLEY BATTLE, AND             |
8    JONATHAN IRVING,                |
                    Defendants.      |
9    - - - - - - - - - - -x

10

11

12

13               DEPOSITION OF WENDY WYLER

14

15        Taken before Kristine A. Paradis, LSR 338, a
          Court Reporter and Notary Public within and
16        for the State of Connecticut, pursuant to
          Re-Notice and the Federal Rules of Civil
17        Procedure, at the Attorney General's Office,
          55 Elm Street, Hartford, Connecticut, on
18        September 24, 2013, commencing at 10:39 a.m.

19

20

21

22

23

              FALZARANO COURT REPORTERS, LLC
24                117 North Saddle Ridge
          West Simsbury, Connecticut 06092
25                  860.651.0258


          Falzarano Court Reporters, LLC

EXHIBIT
H

PORTIONS ARE CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

1    APPEARANCES:

2          For the Plaintiff:

3                LUCAS, BAGNELL, VARGA, LLC
                 2425 Post Road, Suite 200
4                Southport, Connecticut 06890
                 203.227.8400
5                slucas@lbv-law.com
                       BY:  SCOTT R. LUCAS, ESQ.
6

7          For the Defendants Connecticut State
           University System, Southern Connecticut State
8.         University, Stanley Battle, and
           Jonathan Irving:
9
                 OFFICE OF THE ATTORNEY GENERAL
10               55 Elm Street
                 P.O. Box 120
11               Hartford, Connecticut 06141-0120
                 860.808.5160
12               linsley.barbato@ct.gov
                       BY:  LINSLEY J. BARBATO, ESQ.
13

14

15

16

17.

18

19

20

21

22

23

24

25

PORTIONS ARE CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

1                    S T I P U L A T I O N S

2

3              It is stipulated and agreed by counsel for

4     the parties that all objections are reserved until

5     the time of trial, except those objections as are

6     directed to the form of the question.

7              It is stipulated and agreed between counsel

8     for the parties that the proof of the authority of

9     the Notary Public, before whom this deposition is

10    taken, is waived.

11             It is further stipulated that any defects

12    in the Notice are waived.

13             It is further stipulated that the

14    deposition may be signed before any Notary Public.

15

16                  T R A N S C R I P T   L E G E N D

17
      (sic)              - Exactly as said.
18
      (Phonetic)         - Exact spelling not provided.
19
      ( -- )             - Break in speech continuity and/or
20                          interrupted sentence.

21    (. . .)            - Indicates omission of word[s] when
                            reading OR trailing off and not
22                          finishing a sentence.

23    (As read)          - When reading, adding, deleting or
                            changing words so as not to be a
24                          direct quote from document.

25

PORTIONS ARE CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

1       Q       All right.  So, if you remember during

2   the course of the deposition their names, I would

3   like you to let me know --

4       A       Okay.

5       Q       -- okay?

6       A       Okay.

7       Q       All right.  So, you're single, correct;

8   not married?

9       A       No.

10      Q       No kids?

11      A       No.

12      Q       And you graduated from Southern in what

13  year?

14      A       2012.

15      Q       And since you graduated from Southern

16  have you had any higher education, any graduate

17  school?

18      A       No.  I started a post-bachelor program

19  in medicine at Boston University and I dropped out

20  on a medical leave in the fall of 2012.

21      Q       Okay.  So, what was the program at

22  Boston University?

23      A       A post-bachelor, baccalaureate program

24  in medicine.

25      Q       And when did you start that?

1      Q     Okay.  So, that began --

2      A     In 2009.  The fall semester of 2009.

3      Q     Okay.  So, even though the paragraph

4    says, "During the spring semester," you're telling

5    me now that that part of that Complaint is not

6    accurate, it --

7                    MR. LUCAS:  Objection.

8                    THE WITNESS:  No, it's accurate.

9    BY MS. BARBATO:

10     Q     It's accurate?

11     A     Uh-hum.

12     Q     But -- okay.  So, during the spring

13   semester he arranged --

14     A     "Began to target plaintiff through

15   suggestive actions."

16     Q     Okay.

17     A     Before then I didn't feel -- it didn't

18   seem that he was targeting me.

19     Q     Okay.  All right.  So, how many times

20   did he arrange time to spend alone with you at his

21   office?

22     A     In the spring semester of 2011?

23     Q     Yes.

24     A     I don't recall.

25     Q     Okay.  Was it more than a dozen?

1        talking about?

2              MS. BARBATO:  In the office, yeah.

3              THE WITNESS:  In the office, no.

4   BY MS. BARBATO:

5      Q    Okay.  All right.  And when did the

6   conversations about his wife occur?  I know that

7   this is all -- you've alleged it's all between

8   January and May --

9      A    Yeah.

10     Q    -- of 2011.  But if you can narrow it

11  down for me by month, that would be good.  So,

12  what month --

13     A    So, during the semester he -- in the

14  class they had a lot of -- Dr. Chevan referred to

15  these students as ghost students because they

16  weren't signed up for the course.  So, they would

17  just be musicians that wanted to accompany the

18  band and play, but they didn't have enough room

19  left in their schedules to add another credit in,

20  things like that.

21       So, I started taking classes or going to

22  those courses in 2009, but I would never register

23  for his class.  So, in that semester of 2011, he

24  came up to me and he said that he was getting in

25  trouble from Dr. Irving because Dr. Irving was

1    relations."

2          Okay.  So, the request to go for a cup

3    of coffee immediately precedes the walk to the

4    storage room, right?

5        A    Yeah.

6        Q    This is talking about the same day?

7        A    Yeah.

8        Q    All right.  And the something-between-us

9    conversation was the day or two before; is that

10   what you're telling me?

11       A    Yeah.

12       Q    So, proposing the moment be used to

13   engage in intimate relations.  What were his exact

14   words?

15       A    In the storage room?

16       Q    Yeah.

17       A    He said there was something between us;

18   he can feel that there's something between us,

19   some type of chemistry that I can't ignore.  And

20   he gave me compliments again.  And he said that

21   remember the affair that I told you about?  He

22   hadn't really thought about that again until now

23   with me.  And if something were to happen between

24   us, it would happen right now, right here.

25       Q    And how did you respond?

1      A      I started backing up further into the

2   closet and kept saying no, no, no, no, no.

3      Q      And then what did he say?

4      A      He proceeded to say that -- but he felt

5   something between us.  And he asked me if I was

6   sure.  We went over it again.

7      Q      And you said?

8      A      Yes, I'm sure.

9      Q      And then what happened?

10     A      And then he put his hand on the handle

11  of the door and he said, Okay, I'm going to open

12  the door now and we're going to re-enter reality.

13  We're going to go back into the real world.

14     Q      And then he opened the door?

15     A      Yeah.

16     Q      And let you out?

17     A      He walked out.

18     Q      Okay.  And then you walked out?

19     A      Yeah.

20     Q      And at no time while you were in that

21  room did he touch you; is that correct?

22     A      No.

23     Q      Okay.  And at no time when you and he

24  were in the storage room was he violent in any

25  manner; is that correct?

PORTIONS ARE CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

1     A    That's correct.

2     Q    Okay.  Did anyone see you entering that

3  storage room?

4     A    Yeah.

5     Q    Who?

6     A    I don't know.  A student.

7     Q    You don't know the name?

8     A    No.

9     Q    Male or female?

10    A    A female.

11    Q    Was it somebody you knew?

12    A    No.

13    Q    Someone who has come forward to you

14  since the incident?

15    A    No.  Sometimes when I, like, recount --

16  when I have flashbacks and stuff of the memory, I

17  always -- I just think of her a lot.  And

18  sometimes I wonder if she maybe was from one of my

19  courses.  She seemed familiar.  I don't know.  I

20  just always wondered who she was.  Maybe she was

21  in one of my classes at one point.  But I don't

22  know who she is.

23    Q    All right.  So, at any time before April

24  when you filed your complaint with the

25  university -- not your allegation, I'm sorry.  I'm

Falzarano Court Reporters, LLC

1    jumping ahead.

2          Paragraph 21.  "In or about April 4th,

3    plaintiff filed a report with the university via

4    human resources."

5        A    Uh-hum.

6        Q    So, at any point before April 4, 2011

7    did you complain to anybody at the university that

8    Dr. Chevan was arranging to spend time alone with

9    you as you've alleged in subparagraph A?

10       A    I've made -- Dr. Chevan had asked me to

11    go -- to give him rides home because he had broken

12    his foot or something.  And he asked me for rides.

13    And I complained to a student and said that I

14    didn't feel comfortable driving him home.  And

15    then he said, Wendy, just tell him no.

16       Q    Did you complain to anybody other than

17    students at the university, like administrators or

18    human resources --

19       A    No.

20       Q    -- or -- okay.

21          So, I'm going to ask you those questions

22    for each of your paragraphs.  But when I say did

23    you complain to anyone in administration, let's

24    just be clear who I mean.  I mean did you complain

25    to any -- you know, anyone other than students?

1    So, human resources, Office of Equity and

2    Diversity, dean --

3         A    Before I made my Complaint?

4         Q    -- vice president?  Yeah.  Yeah.

5              So, for each of these incidents before

6    you made your Complaint did you tell any

7    university officials about any of the allegations

8    that you made in paragraphs A through G?

9         A    I told my best friend who then told me

10   to tell my doctor, and I did.  And my doctor, I

11   believe, contacted the university immediately.

12   And I don't know who he contacted, but he got a

13   list of people, resources I could go to, to make a

14   report.

15        Q    Okay.

16        A    So, maybe he told them.

17        Q    And ultimately you did do that?

18        A    Yeah.

19        Q    And that would be the April 4, 2011?

20        A    Yeah.  But besides that, no.

21        Q    Okay.  Then the incident in the storage

22   room, how long did that take?  How long did that

23   last?

24        A    I'd say around ten minutes.  I can't

25   recall specifically.

1    Q    It could have been less?

2    A    It could have been less.

3    Q    Okay.  All right.  And then in

4    paragraph 22 you allege that on or about

5    April 26th the Office of Diversity and Equity

6    programs completed -- I'm sorry.  Let me start

7    again.

8    A    Twenty-sixth?

9    Q    "On April 26, 2011, the Office of

10   Diversity and Equity Programs, ODEP, of defendant

11   university completed an investigation prompted by

12   plaintiff's complaint to HR and found that

13   defendant Chevan violated defendant university's

14   discrimination and sexual harassment prevention

15   policy and had an intimidating, hostile, or

16   offensive educational environment."

17        So, the university Office of Diversity

18   and Equity did complete -- did conduct an

19   investigation, correct?

20   A    Eventually, yes.

21   Q    And they did find that Dr. Chevan

22   violated the university's discrimination and

23   sexual harassment prevention policy, correct?

24   A    Yes.

25   Q    And they issued a report on or about

1    as Defendants' 6?

2         A    I don't remember when I got these two.

3    I know I got them; I just don't remember when.

4         Q    Okay.

5         A    It should be in my e-mail.

6         Q    Okay.  So, back to paragraph 23.  I'd

7    asked you if the student, other student who

8    provided a statement was Megan and you said yes.

9    So, I now want to show you a document we've marked

10   as Exhibit 7 --

11        A    Okay.

12        Q    -- for identification.  Now, have you

13   seen this before today?

14        A    Yeah, I think I saw it when she gave it

15   to -- I was -- she was there when I had my meeting

16   with Martinez, and she might have given it to him

17   then.

18        Q    Okay.  Do you know -- so, you recognize

19   this as the document that Megan Coyne provided to

20   Mr. Marquez?

21        A    It's one of them, yes.

22        Q    And do you know who typed this up?

23        A    I assume Megan did.

24        Q    It wasn't you?

25        A    Why would it be me?

PORTIONS ARE CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

1    Q    I'm asking you.

2    A    No.

3    Q    It wasn't you.  And you don't know for

4  sure, but you assume it was Megan?

5    A    I mean, if she provided it to them, who

6  else would have written it?  I don't understand

7  what you're trying to imply.

8    Q    I'm not trying to imply anything.  I

9  just want to know if you know who wrote it.

10            MR. LUCAS:  If you don't, I just

11            don't want you to guess.

12            THE WITNESS:  Megan wrote it.

13            MS. BARBATO:  Yeah, don't guess.

14            MR. LUCAS:  If you don't know, you

15            don't know.

16  BY MS. BARBATO:

17    Q    Do you know who -- I asked you who wrote

18  it.

19    A    I don't know.

20    Q    Okay.  That's all.

21            So, are you aware of any other statement

22  that Megan Coyne provided to anyone at the

23  university?

24    A    No.

25    Q    Okay.  And you note this one isn't

Falzarano Court Reporters, LLC

PORTIONS ARE CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

1   signed?

2        A    It doesn't look like it's signed.

3        Q    Okay.  So, you don't know if she ever

4   gave a statement under oath?

5        A    I don't recall.

6        Q    Okay.  I'll take that back.

7             I want you to have a look again at this

8   document.  That's Mr. Marquez's report that we've

9   marked as Defendants' Exhibit 6 for

10  identification.  And if you look at the third page

11  of this document, there's a section that begins

12  "summary of facts."  Do you see that?

13       A    What page is it?

14       Q    The third page.  There's no page numbers

15  on it, but --

16       A    Okay.

17       Q    -- the subtitle on the top of the page

18  says "summary of facts."

19       A    Oh, yeah, look, it was after Mardi Gras.

20       Q    So, each paragraph begins with a name.

21  Ms. Wyler stated; Dr. Chevan, when asked;

22  Ms. Wyler stated; Dr. Chevan, when asked;

23  Ms. Wyler stated.  So, what I'd like you to do is

24  just -- you can read through, you know, as much of

25  the document as you want to read through.  But

PORTIONS ARE CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

1      Q     -- right?

2            And nothing in that statement or in

3      anything Mr. Marquez told you indicated that

4      Professor Irving was going to be responsible for

5      discipline; is that correct?

6      A     Dr. Irving was supposed to come to the

7      meeting.  He said that he would be at the meeting.

8      He didn't show up and Dr. Hlavac came.

9      Q     But Marquez never told you that Irving

10     was the one who was going to determine what

11     discipline was appropriate?

12     A     No.

13     Q     Okay.

14     A     Did you want this back?  (Handing.)

15     Q     Yes, please.

16           So, if you would flip to page 6 of the

17     Complaint that you filed in the federal court.

18     And before I ask the question -- so, after you

19     filed the complaint, your sexual harassment

20     complaint with the university, you're not making

21     any claim that Dr. Chevan continued to sexually

22     harass you, are you?

23     A     No.  His last e-mail was before I made

24     the report.

25     Q     Okay.  So, at least as of April 4, 2011

PORTIONS ARE CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

1   there was no more -- no more sexual harassment by

2   Chevan, nothing after April 4, 2011?

3       A    His wife recently e-mailed me.

4       Q    Okay.  But let's answer the question.

5   So, you're not claiming that Professor Chevan

6   sexually harassed you at any time after April 4,

7   2011, are you?

8       A    No.

9       Q    Okay.  All right.  You want to tell me

10  about the wife --

11              MR. LUCAS:  Objection.

12  BY MS. BARBATO:

13      Q    -- e-mail?

14              You just mentioned his wife e-mailed

15  you.  Tell me about that.

16      A    She e-mailed me.

17      Q    And what was the substance of the

18  e-mail?

19      A    I was the Southern Speaks --

20              MR. LUCAS:  She's just asking what

21              the e-mail said.

22  BY MS. BARBATO:

23      Q    Yeah, I'm sorry.  If you didn't

24  understand -- that's what I meant when I said,

25  what is the substance?

1   Complaint. So, you allege or your lawyers allege

2   on your behalf that "ODEP found that Chevan had

3   created an intimidating, hostile, or offensive

4   educational environment. His conduct qualified as

5   sexual harassment under university policies, but

6   defendant university and supervising defendants

7   took no immediate or adequate remedial action in

8   light of this finding."

9         Okay. But you agree with me that the

10   university did take some action, don't you?

11     A   They found him to have violated their

12   policy.

13     Q   Okay. And they did mete out some

14   discipline, although I understand you don't agree

15   with it. Is that true?

16     A   I found out a year or two later that he

17   received a one-week suspension at the end of the

18   semester.

19     Q   So, it's your opinion, though, that that

20   was not adequate action; isn't that true?

21     A   It is my opinion and other people's

22   opinions, yes.

23     Q   All right. So, paragraph 42, the next

24   paragraph makes some allegations about the

25   university's failures. And so subparagraph A

PORTIONS ARE CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

1    Q    Okay.  And I note on this page 240,

2    you've made a change.  The paragraph I'm referring

3    to begins, "To this day his words echo in my ear

4    and the shadow of my experience with him haunts

5    me.  To be honest, I'm still afraid to be in an

6    enclosed space with a man.  It sets off a trigger,

7    a rush of memories of what he said to me."  And

8    originally you typed -- it was you who typed this,

9    right?

10   A    Well, I typed it up, and then David Meth

11   worked on it too.  And I wanted to change this

12   because that didn't happen in the closet.  He

13   didn't touch me in the closet, so --

14   Q    Okay.

15   A    And I didn't want --

16   Q    So, you changed "how he touched me" to

17   change "what he thought of me" for accuracy?

18   A    Yeah, because I didn't want -- I

19   wanted -- he didn't touch me.

20        MR. LUCAS:  What I thought of

21        myself.

22        MS. BARBATO:  Yeah, what I thought

23        of myself.

24   BY MS. BARBATO:

25   Q    So, you made the change to reflect the

Falzarano Court Reporters, LLC

1    statements.

2         Q    Okay.  So, you agree then that in the

3    fall of 2009, from your point of view, there were

4    no appropriate (sic) comments or actions from

5    Dr. Chevan?

6         A    Yeah.

7         Q    And in the spring of 2010 you agree that

8    that was the semester with little contact between

9    you and Dr. Chevan?

10        A    Yeah.  There was a time in the fall

11   of -- I believe it was the fall of 2010 where

12   Chevan -- Dr. Chevan had asked me -- it was during

13   the time when he was giving me private lessons

14   when school wasn't in session.  He was doing that.

15        And then at one point he asked me to

16   come to a concert early, saying that students were

17   going to show up early to have -- eat something

18   beforehand.  And I showed up and there was nobody

19   there.  And it was just him, and the music

20   building was dark.  And it just seemed weird to me

21   at the time.

22        And after maybe half an hour a couple

23   students showed up.  And I mentioned this instance

24   to several people, including my mom.  And I

25   remember she said, Wendy, you know, don't make a

PORTIONS ARE CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

1    big deal out of it.  It's probably fine.

2    Whatever.  But I didn't return the next -- I

3    didn't continue the class the next semester

4    because I thought something was wrong; it was

5    weird.

6              And I e-mailed him saying that I --

7    there's an e-mail where I told him that I just

8    wasn't -- I was interested -- the saxophone wasn't

9    the instrument for me.  And he was okay with it.

10       Q    Okay.

11       A    Yeah.

12       Q    But so you agree with the statement that

13   you had little contact with him in that semester,

14   spring of 2010 or that year?

15       A    Yeah.

16       Q    No, sorry, that semester, spring 2010?

17       A    Uh-hum.  I don't think I took classes

18   with him this semester.  Yeah.

19       Q    And you agree that in the fall of 2010

20   things were okay?

21       A    Yeah.

22       Q    All right.  And so then in the --

23       A    That's the only time when Chevan kind of

24   started asking about me and where he knew that I

25   had a doctor at that point and that I had been on

PORTIONS ARE CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

1     A    Right.

2     Q    It's dated April 27, 2011.  Does that

3  help?

4     A    Yeah, this is when I got the report.

5     Q    So, this is a copy of an e-mail you sent

6  to Dr. Irving and Dr. Hlavac?

7     A    Uh-hum.

8     Q    Thanking them?

9     A    Uh-hum.

10    Q    And this is a true and accurate copy of

11  the e-mail that you sent?

12    A    Yes.

13

14                 (Defendants' Exhibit 15:

15                 Marked for Identification.)

16

17  BY MS. BARBATO:

18    Q    Okay.  Wendy, have a look at Exhibit 15

19  for identification.  These are one set of

20  responses that you or your lawyers on your behalf

21  filed to some interrogatories that we served upon

22  them.

23    A    Okay.

24    Q    So -- and you see there's the date,

25  April 26, 2013.  And I want you to -- the document

1      Q      Were you sexually assaulted on

2   Southern's campus by someone other than --

3      A      No.

4      Q      -- Dr. Chevan?

5      A      I wasn't assaulted by Dr. Chevan.

6      Q      So, this is just the media being less

7   than precise, right?

8      A      Yes.

9      Q      Okay.

10                MR. LUCAS:   I know it happens.

11   BY MS. BARBATO:

12      Q      Wendy, have you ever sued anyone other

13   than the defendants in this lawsuit?

14      A      No.

15      Q      Ever filed a sexual harassment complaint

16   against anyone other than the defendants in this

17   lawsuit?

18      A      No.

19      Q      No?  You're looking like you need to

20   think about that.

21      A      At my job there was -- some employees at

22   my job reported that a guy was making sexual

23   comments and they told the boss.  And he was,

24   like, placed to another store.  But that's --

25      Q      But the comments weren't made to you?

PORTIONS ARE CONFIDENTIAL –
SUBJECT TO PROTECTIVE ORDER

STATE OF CONNECTICUT

1

2      I, KRISTINE A. PARADIS, LSR 338, a Notary Public

3  duly commissioned and qualified in and for the State

4  of Connecticut, do hereby certify that pursuant to

5  Re-Notice, there came before me on the 24th day of

6  September, 2013, the following named person, to wit:

7  WENDY WYLER, who was by me duly sworn to testify to

8  the truth and nothing but the truth; that she was

9  thereupon carefully examined upon her oath and her

10  examination reduced to writing under my supervision;

11  that this deposition is a true record of the

12  testimony given by the witness.

13      I further certify that I am neither attorney nor

14  counsel for, nor related to, nor employed by any of

15  the parties to the action in which this deposition is

16  taken, and further, that I am not a relative or

17  employee of any attorney or counsel employed by the

18  parties hereto, or financially interested in this

19  action.

20      IN WITNESS THEREOF, I have hereunto set my

21  hand this _9th_ day of _October_ 2013.

22

23      KRISTINE A. PARADIS, LSR #338
        Licensed Shorthand Reporter

24

25  My Commission expires:
        May 31, 2018

PORTIONS ARE CONFIDENTIAL –
SUBJECT TO PROTECTIVE ORDER

1                              INDEX

2   WITNESS                                        PAGE

3   WENDY WYLER

4       Direct Examination by Ms. Barbato              4

5
                          DEFENDANTS' EXHIBITS
6                          (For Identification)

7   EXHIBIT                                        PAGE

8   1        Re-Notice of Deposition                    4

9   2        Packet of documents brought by
             plaintiff                                  4
10
    3        Third Amended Complaint                   56
11
    4        Handwritten note; 1 pg.                  116
12
    5        Letter to W. Wyler from E. Marquez
13           dated 4/26/11; 1 pg.                     159

14  6        SCSU memo re:  Investigation, dated
             4/25/11; 5 pgs.                          161
15
    7        Statement labeled "Coyne"               161
16
    8        String of e-mails dated 4/27/11 to
17           5/31/11                                  181

18  9        Signed statement, dated 4/4/11;
             4 pgs.                                   239
19
    10       Discrimination complaint form, dated
20           4/7/11; 2 pgs.                           245

21  11       E-mail to S. Seeger from W. Wyler,
             dated 5/31/11; 3 pgs.                    247
22
    12       Statement dated 7/19/11; 2 pgs.         249
23
    13       Typed exposure; 5 pgs.                  251
24
    14       E-mail from W. Wyler to J. Irving,
25           dated 4/27/11; 1 pg.                     255

PORTIONS ARE CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

1                    INDEX (Cont.)

2

                   DEFENDANTS' EXHIBITS
3                   (For Identification)

4    EXHIBIT                                      PAGE

5    15       Plaintiff's Response to State
              Defendants' Amended Substituted
6             Interrogatories, dated 3/28/13      256

7    16       Letter to L. Barbato from J. Bagnell
              w/attachments, dated 5/23/13        263

8
     17       Letter To Whom It May Concern from
9             Dr. Nicholson, dated 8/19/11; 1 pg. 268

10   18       Request for payment from Dr. Nicholson
              dated 8/19/11; 1 pg.                270

11
     19       Press release                       276
12

13

14

15

16

17
     Reporter's note:  Exhibits retained by
18                      Attorney Barbato.

19

20

21

22

23

24

25

```
1                            JURAT

2     - - - - - - - - - - -x
      WENDY WYLER,                    |
3                 Plaintiff,          |
                                      |Civil Action No.:
4           v.                        |3:12-CV-00097 (RNC)
                                      |
5     CONNECTICUT STATE UNIVERSITY    |
      SYSTEM, SOUTHERN CONNECTICUT    |
6     STATE UNIVERSITY, DAVID CHEVAN, |September 24, 2013
      STANLEY BATTLE, AND             |
7     JONATHAN IRVING,                |
                 Defendants.          |
8     - - - - - - - - - - -x

9

10

11

12           With the addition of the changes,
      if any, indicated on the attached errata
13    sheet, the foregoing is a true and
      accurate transcript of my testimony
14    given in the above-entitled action on
      September 24, 2013.

15

16

17                      Wendy Wyler

18

19    Subscribed and sworn to before me, the undersigned
      authority, on this, the ___1st___ day of
20    ___November___, 2013.

21

22

23

24    My Commission expires:
```

Bonnie K. Ford-Wojna
Notary Public-Connecticut
My Commission Expires
January 31, 2017

```
25    kap
```

Falzarano Court Reporters, LLC

PORTIONS ARE CONFIDENTIAL –
SUBJECT TO PROTECTIVE ORDER

1    ERRATA SHEET

2    The ORIGINAL JURAT and ERRATA SHEET must be notarized
     (even if there are no corrections) and returned
3    within 30 days of receipt to the attorney who took
     the DIRECT EXAMINATION.  All other counsel of record
4    must be sent a COPY, along with a COPY to our office
     for our records.

5

6    Page    Line          From              To

7    *No  Corrections*

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   *11/1/13* _____   _____

18      Date                    Wendy Wyler

19

20   Sworn to before me this *1st* day of
     *November* , 2013.

21

22

23                          Notary Public

24   My Commission expires:
     Bonnie K. Ford-Wojna
     Notary Public-Connecticut
     My Commission Expires
     January 31, 2017

25   kap

Falzarano Court Reporters, LLC

# EXHIBIT
## I

```
 1                    UNITED STATES DISTRICT COURT
 2                      DISTRICT OF CONNECTICUT

 3         _____
                                      :
 4      WENDY WYLER,                  :    CIVIL ACTION NO.
                                      :    3:12-CV-00097(RNC)
 5                 Plaintiff,         :
                                      :
 6           -v-                      :
                                      :
 7      CONNECTICUT STATE UNIVERSITY  :
        SYSTEM, SOUTHERN CONNECTICUT  :
 8      STATE UNIVERSITY, DAVID       :
        CHEVAN, STANLEY BATTLE, AND   :
 9      JONATHAN IRVING,              :
                                      :
10                 Defendants.        :
           _____
11
12
13
14           DEPOSITION OF:  CRAIG HLAVAC
             DATE:  October 10, 2013
15           TIME:  10:00 a.m.
             HELD AT:  Lucas Bagnell Varga, LLP
16                     2425 Post Road, Suite 200
                       Southport, CT 06890
17
18
19           Reporter:  Cassie Stott, LSR# 498
20
21                  Brandon Huseby
                    249 Pearl Street
22                  Hartford, CT 06103
                    (860)549-1850
23
24
25
```

EXHIBIT
I

```
 1                      APPEARANCES

 2


 3      FOR THE PLAINTIFF:

 4      Law Offices of Lucas Bagnell Varga, LLP
        2425 Post Road, Suite 200
 5      Southport, CT 06890
        (203)227-8400
 6      jbagnell@lbv-law.com

 7      By:  Jeffrey S. Bagnell, Esq.

 8


 9


10      FOR THE DEFENDANTS:

11      Office of the Assistant Attorney General
        50 Elm Street
12      Hartford, CT 06141
        (860)808-5160
13      linsley.barbato@ct.gov

14      By:  Assistant Attorney General Linsley J. Barbato

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2

 3      WITNESS:                                    PAGE

 4      Craig Hlavac

 5      Direct Examination by Attorney Bagnell           5

 6

 7      PLAINTIFF'S EXHIBITS:                       PAGE

 8      Exhibit 1    Authorization to Disclose/Release
                     Information Form                     67
 9      Exhibit 2    Exhibit C - Craig Hlavac Documents   69
        Exhibit 3    Internal Notation of Incident with David
10                   Chevan                               89
        Exhibit 4    Handwritten Notes                   101
11      Exhibit 5    Document Chevan 001201              103

12

13          (All exhibits marked during the deposition were
        retained by Attorney Bagnell.)

14

15

16

17

18

19

20

21

22

23

24

25
```

STIPULATIONS


    It is stipulated by the Attorneys for the
Plaintiff and the Defendant that all objections are reserved
until the time of the trial, except those objections as are
directed to the form of the question.


    It is stipulated and agreed between counsel for
the parties that the proof of the authority of the
Commissioner before whom this deposition is taken is waived.


    It is further stipulated that any defects in the
notice are waived.


    It is further stipulated that the reading and
signing of the deposition transcript by the witness is
waived.

```
1            Any questions that you have about the process,

2    Professor?

3        A    I don't think so.

4        Q    How old are you, Professor?

5        A    Thirty-three.

6        Q    What's your current position at Southern Connecticut?

7        A    I am an associate professor of music and the

8    department chairperson of the music department.

9        Q    You're now the chairperson?

10       A    I am.

11       Q    When did that happen?

12       A    Late August of this year.

13       Q    And that was a promotion?

14       A    The chairperson position is not really a promotion.

15   The associate professor -- I was an assistant professor.   On

16   the same day, I was also promoted to associate.   That's a

17   promotion.

18       Q    Okay.   Increase in salary?

19       A    Yes.

20       Q    Any increased job duties?

21       A    With reference to which?

22       Q    Any increased teaching responsibilities when you

23   become an associate professor?

24       A    No.

25       Q    Class size, for example; do you have more classes now
```

```
 1    or the same?

 2         A    Same.  With regards to associate professor, it's the

 3    same credit load.

 4         Q    All right.  And who had been the chairperson before

 5    you?

 6         A    Jonathan Irving.

 7         Q    Where is he now?

 8         A    He's still in the department.

 9         Q    Did he resign his position as chairperson?

10         A    No.

11         Q    What prompted you taking that position and him leaving

12    it?

13         A    His term was up, so there was another vote.

14         Q    What was the term?

15         A    The chairperson serves three-year terms.

16         Q    Do you now supervise all the music professors in the

17    department?

18         A    Define, "supervise."

19         Q    Do you give them performance reviews?

20         A    No, not all of them.

21         Q    How many?

22         A    On occasion, I review adjunct faculty.

23         Q    And adjunct faculty, if I understand correctly, are

24    people who are sort of loosely associated with the university?

25         A    No.  They're still employees of the State and the
```

```
1   university.

2        Q    Why are they called adjunct?

3        A    They're part-time.

4        Q    So you give the adjunct professors reviews

5   periodically?

6        A    Myself or other members of the department.

7        Q    So in the music department you're the chairperson so

8   you're at the top; correct?

9        A    Define, "at the top."

10       Q    Of your department.  You have a music department;

11  right?

12       A    We do.

13       Q    And you're the chairperson?

14       A    I am.

15       Q    Is any person above you in the music department?

16       A    It's not really a hierarchy like you're saying.  So

17  the chairperson is more like a first among equals.

18       Q    Yeah.  I don't mean to imply it's a monarchy or

19  anything like that, but I'm trying to get a sense of the

20  organizational chart.

21            In any event, you have that title, the chair of the

22  music department?

23       A    Correct.

24       Q    How many full professors are in the music department?

25       A    There are four full professors in the music
```

1     A    I would assume he asked about my current -- my

2  then-current job duties and what types of things I might like

3  to do at Southern.

4     Q    Did he tell you anything about the culture at the

5  music department at Southern?

6     A    I don't think so.

7     Q    Did he tell you anything about his specialties

8  himself, what his specialties are?

9     A    Perhaps.  I honestly don't recall.

10    Q    But he was on the hiring committee or interview

11  committee that you recall?

12    A    I believe so, but -- I believe so.

13    Q    How many people were on that committee?

14    A    I don't know officially.

15    Q    When you first started working, Professor, how were

16  you -- how was your performance reviewed, if that's -- I'm

17  kind of using a more Corporate America phrase, but I assume

18  you had some sort of performance monitoring by a senior

19  faculty member to make sure you were doing a good job

20  teaching?

21    A    That's correct.

22    Q    Who was responsible for that?

23    A    So full-time faculty are evaluated by what we call the

24  department evaluation committee.  This is a committee that I

25  believe every department in the university has, and the

1    committee is charged with observing classes and reviewing your

2    performance.

3        Q    Who was on that committee when you first started?

4        A    To the best of my recollection, it was Dr. Russell,

5    Dr. --

6        Q    This is Tilden Russell?

7        A    Correct.  Dr. Chevan and Dr. Gemme, but Dr. Kuss may

8    have been on the committee as well.  Dr. Irving was not on

9    that committee.

10       Q    Russell was a professor at the time?

11       A    Yes.

12       Q    I asked you earlier, Professor, for the full-time

13   faculty, and you gave me Irving, Kuss, Gemme, Chevan.  Is

14   Russell in there as well?

15       A    He does not work for the university anymore.

16       Q    He's no longer there now, but at the time he was a

17   full professor when you started; is that correct?

18       A    That's correct.

19       Q    And when did he leave employment?

20       A    A couple of years ago.

21       Q    Do you know why he left?

22       A    He retired.

23       Q    All right.  So Professors Russell, Chevan and, you

24   think, Kuss were on this committee?

25       A    I believe so.

1    Q   How did they evaluate your performance?  What were the

2    logistics of it?  Was it a written review that you received or

3    was it verbal feedback?

4    A   Generally speaking, one or more of -- I believe one of

5    the faculty members at different times would come into a

6    certain class, observe the class, and then give verbal

7    feedback.  How the process works is they convene as a

8    committee and write a letter of support or unsupport of your

9    renewal for the next year.

10   Q   Every year, that happened?

11   A   It happens -- it's supposed to happen for the first --

12   if you're on a tenure-track position, I believe it's supposed

13   to happen every year until you go up for tenure review.

14   Q   You were in a tenure-track position?

15   A   I was not in a tenure-track position.  At that time, I

16   was on a one-year emergency hire, which is not the same as a

17   tenure track.

18   Q   Why was that?  Why were you on an emergency hire?

19   A   I don't know why that was not a tenure track at the

20   time.

21   Q   So you don't know why you were on an emergency basis?

22   A   I assume because there was not a tenure-track line

23   available when that hire was made.

24   Q   So tenure-track lines are limited?

25   A   Correct.

1   are sent to the department chairperson and then remitted back

2   to me.

3        Q    And you kept them at your house or office?

4        A    Both.

5        Q    You made a copy?

6        A    I have the originals.

7        Q    And you kept a copy in the office?

8        A    I don't think I made any photocopies of these, no.

9        Q    I just want to understand.

10            You said you had them at your office and your home?

11       A    Not duplicates.  So there were some stored in my

12   office and some stored in my home.

13       Q    But you didn't dispose of any, and you had them for

14   the entire time since you had started?

15       A    I did, yes.

16       Q    What's the university sexual harassment policy,

17   Professor?

18       A    I'm not sure how to answer that.

19       Q    Best of your knowledge.

20       A    There is a written sexual harassment policy.  I'm

21   still not sure how to answer.

22       Q    I'm asking you what it is.

23       A    It's readily available.

24       Q    I'm asking your knowledge of what it is.

25       A    I'm still not sure how to answer that.

| | | |
|---|---|---|
| 1 | Q | It's not a trick question, Professor. |
| 2 | | Number 1, I assume there is a sexual harassment |
| 3 | policy? | |
| 4 | A | There is a sexual -- |
| 5 | Q | I'm asking you:  What is it, to your knowledge? |
| 6 | | MS. BARBATO:  Objection to form.  He's answered.  It's |
| 7 | a sexual harassment policy. | |
| 8 | | THE WITNESS:  I'm not sure how to answer.  There is a |
| 9 | sexual harassment policy that dictates -- | |
| 10 | Q | (By Mr. Bagnell) I know there is one.  I'm asking |
| 11 | you:  What is the policy?  What does it state? | |
| 12 | A | I couldn't state it verbatim. |
| 13 | Q | I understand.  Your own words is fine. |
| 14 | A | It speaks about what, you know, what is and is not |
| 15 | acceptable behavior regarding sexual harassment in the | |
| 16 | workplace. | |
| 17 | Q | And, "workplace," you mean the university? |
| 18 | A | University. |
| 19 | Q | And have you read it in your -- |
| 20 | A | I have read it. |
| 21 | Q | And do you know when? |
| 22 | A | To my knowledge, all employees are required to review |
| 23 | the sexual harassment policy and indicate that you've reviewed | |
| 24 | it. | |
| 25 | Q | Did you do that? |

1      A    I did.

2   .  Q    How many times?

3           MS. BARBATO:  Objection to form.  How many times what?

4   Reviewed it?

5           MR. BAGNELL:  Reviewed it.

6           You can answer.

7           THE WITNESS:  How many times did I officially review

8   it and sign off on it?

9           MR. BAGNELL:  We'll start there.

10          THE WITNESS:  I believe once.

11     Q    (By Mr. Bagnell) When was that?

12     A    Several years ago.

13     Q    Is that when you first started?

14     A    It was sometime after I started, to my knowledge.

15     Q    So you use the word, "official."  It was presented to

16  you, you had to read it and sign it, and you read it, I

17  assume?

18     A    Correct.  To my knowledge, I was required to read it

19  online and then certify that I read it.

20     Q    Who told you to read it online?

21     A    To my knowledge, employers are directed to do so by

22  the office of diversity and equity, and I believe that was

23  Paula Rice at the time but it may not have been.

24     Q    So would this be an email Ms. Rice sends to you saying

25  attached is the sexual harassment policy and please read?  Is

1   that what happened, Professor?

2       A    To my knowledge, we are given a -- basically there's

3   an area, a training area, on the website that you go to and

4   there are several areas of training that are available; some

5   are required and some are not.  This one was required.  You

6   click on this area, you are directed to read this policy, and

7   then we may actually be required to answer questions regarding

8   that.

9       Q    Were you tested on it?

10      A    I don't recall if that's the case or not.

11      Q    You said you officially reviewed it once and, I think,

12  signed it?

13      A    Signed it or passed some type of evaluation regarding

14  my knowledge of it.

15      Q    And this was several years ago?

16      A    I believe so.

17      Q    So it wasn't at the beginning of your employment at

18  Southern?

19      A    It may have been very close to the beginning of my

20  employment, and I don't recall if -- there were several pages

21  of documentation when you do an original hire.  One of them

22  may have been the sexual harassment policy.

23      Q    If a student makes a complaint of sexual harassment to

24  you, do you know how to make that complaint in accordance with

25  the university's policy?

1     A    There were no other complaints of a sexual nature

2   regarding Dr. Chevan's conduct.

3     Q    I assume there were complaints, though, of his

4   teaching style?

5     A    I likely have heard other comments regarding his

6   classes but regarding coursework.

7     Q    All right.  That he was difficult, for example?

8     A    Exactly.

9     Q    Abusive in his commentary during class?

10    A    No.

11    Q    Not that?  Just that he was a difficult professor?

12    A    That he had very high standards, that he may be

13  difficult regarding grading, things of those nature -- things

14  of this nature.

15    Q    What about that he ridiculed students in his class?

16    A    No.

17    Q    Did you and Professor Chevan ever socialize

18  personally?  For example, did you two ever get a drink at a

19  bar on a Friday after school was out?

20    A    No.

21    Q    Do you know his wife?

22    A    I have met her.

23    Q    All right.  Professor, I want to take you now

24  historically through the complaint that Ms. Wyler made to you.

25  And, again, I'm not trying to trick you and you are not in

1    trouble here, but you are obligated to tell me factually what

2    you know and remember under oath.

3        A    Of course.

4        Q    Can you tell me when Ms. Wyler first came to you with

5    complaints about Dr. Chevan?

6        A    I don't know the specific date off the top of my head.

7        Q    Approximately?

8        A    It was several years ago.  I honestly don't know the

9    date off the top of my head.

10       Q    Okay, several years ago.  What did she say to you?

11       A    She came into my office and mentioned to me that she

12   had been harassed by Dr. Chevan, and she listed several

13   specific instances, which I outlined in a document.  I was

14   alarmed.

15       Q    Do you recall what the specific instances were?

16       A    If I had the document in front of me, I could state

17   specifically.

18       Q    You have no independent recollection of what she was

19   talking about --

20       A    I have sparse independent recollection of what she

21   said.

22       Q    It involved sexually harassing conduct?

23       A    It did.

24       Q    And this was the first time you heard a student

25   complain about that?

| | | |
|---|---|---|
| 1 | A | That's correct. |
| 2 | Q | And you were surprised? |
| 3 | A | I was. |
| 4 | Q | Where did this conversation occur, by the way?  Was |
| 5 | | this in your office? |
| 6 | A | It was. |
| 7 | Q | So she came into your office? |
| 8 | A | That's correct. |
| 9 | Q | You two were alone at the time? |
| 10 | A | That's correct. |
| 11 | Q | Any reason why she chose to confide in you about this? |
| 12 | | MS. BARBATO:  Objection.  If he knows. |
| 13 | | MR. BAGNELL:  If you know. |
| 14 | | THE WITNESS:  I'm not sure why. |
| 15 | Q | (By Mr. Bagnell) You had her as a student? |
| 16 | A | I did not have her as a student. |
| 17 | Q | You had Ms. Coyne, but not Ms. Wyler? |
| 18 | A | That's correct. |
| 19 | Q | Did you know Ms. Wyler at all? |
| 20 | A | I did not know Ms. Wyler. |
| 21 | Q | So she came in to you, really unbeknownst to you at |
| 22 | | all? |
| 23 | A | I had seen her in passing.  I knew that she was a |
| 24 | | student in the department. |
| 25 | Q | Were you surprised that she was confiding in you since |

1   to 3:15, so maybe 2:30, 2:45.  I asked her to return at 3:15

2   so that she, myself, and Dr. Irving could discuss these

3   allegations.  I also phoned, to my recollection, the human

4   resources department to inquire about the process through

5   which I should take this complaint.

6        Q    I assume it's fair to say that you would say that a

7   professor taking a young female student into an enclosed room

8   and closing the door and making a sexual proposition is

9   something of a very serious nature; is that correct?

10       A    That's correct.

11       Q    Have you heard of it happening anywhere else on the

12  campus of Southern other than the incident that Ms. Wyler

13  relayed to you?

14       A    I have not.

15       Q    So it's the sole episode of that happening, to your

16  knowledge?

17       A    To my knowledge, yes.

18       Q    In your interactions with Professor Chevan, Professor,

19  over the years, are you aware that he was a marijuana user?

20       A    I am not aware of that, no.

21       Q    You never heard of that?

22       A    I had not heard of that.

23       Q    Even to this day, you have no knowledge of that?

24       A    I have no knowledge of that.

25       Q    Did Ms. Coyne mention anything to you about marijuana

```
 1     A    No.

 2     Q    And I assume you, after that, didn't probe into that?

 3     A    No.

 4     Q    You didn't ask questions about that?

 5     A    To whom?

 6     Q    To anyone?

 7     A    To my recollection, no.

 8     Q    All right.  So you said this initial conversation was

 9   about 15 minutes.  You were surprised and concerned.  You then

10   brought it to the attention of who, again?

11     A    I brought it to the attention of either the department

12   of human resources -- I believe I called the department of

13   human resources.

14     Q    Jaye Bailey?

15     A    It was either Jaye Bailey or Diane Mazza.

16     Q    So you picked up the phone from your office and made

17   these calls?

18     A    I did.

19     Q    Who did you speak to first?

20     A    Again, I don't recall specifically who it was.

21     Q    But both Jaye Bailey and Diane Mazza?

22     A    It was one or the other, to my knowledge.

23     Q    What did you say?

24     A    I indicated that a student had come in and made

25   allegations regarding sexual harassment against one of our
```

1    faculty members, and I inquired about the process in which I

2    should proceed.

3        Q    And what was your further involvement in the

4    investigation after that?

5        A    I was directed to take the statement by Ms. Wyler,

6    document specifically what she said, which I did with

7    Dr. Irving in the room.  To my knowledge, he did the same.  We

8    wrote up our recounts of those statements individually, and

9    sought approval from Ms. Wyler regarding the accuracy of those

10   statements.  I believe I then submitted that to Dr. Irving,

11   who then submitted it to human resources.

12       A short time later, I was asked by Dr. Irving to

13   accompany Ms. Wyler to, I believe it's called the intake,

14   where she was meeting with the investigator where he would

15   take the statement of Ms. Wyler.

16       Q    Did you call Professor Chevan at any time during this

17   process?

18       A    I did not.

19       Q    Did you ever tell him about it at any time?

20       A    I don't recall.

21       Q    Did you feel that you needed to keep it confidential?

22       A    I think that's fair to say.

23       Q    Okay, go on.  What other involvement did you have,

24   Professor, after that?

25       A    Again, I was there when Ms. Wyler made her complaint

1  to the investigator, after which I believe I received an email

2  from Ms. Wyler regarding the outcome of the investigation.  To

3  my knowledge, that's the entire extent of my involvement.

4      Q   So the same day that Ms. Wyler came to you, you called

5  human resources, Jaye Bailey or --

6      A   Immediately thereafter.

7      Q   You, yourself, didn't discourage her from making a

8  complaint; correct?

9      A   No.

10     Q   An investigator interviewed you, Professor, at some

11 point?

12         MS. BARBATO:  I'm sorry.  You asked if an investigator

13 interviewed him?

14         MR. BAGNELL:  Interviewed him.

15         THE WITNESS:  I don't believe so, but I don't recall.

16     Q   (By Mr. Bagnell) Ernest Marquez:  Does that ring a

17 bell?

18     A   It does.

19     Q   Did he ever sit down with you individually and ask you

20 what happened?

21     A   I don't believe so.

22     Q   So you had the second meeting with Ms. Wyler where you

23 were told to take down what she was saying to you; correct?

24     A   Correct.

25     Q   And you did that?

1    A    Yes.

2    Q    Both you and Dr. Irving did that?

3    A    Correct.

4    Q    What further involvement did you have in Ms. Wyler's

5    complaint and the investigation process?

6         MS. BARBATO:   Objection.   Asked and answered.

7         THE WITNESS:   As I indicated prior, I took the

8    complaint, asked for her -- I believe the next day Dr. Irving

9    asked for her to review the individual statements that we

10   created based on Ms. Wyler's complaint based on our meeting,

11   and then, as I said before --

12   Q    Did you take any notes on these meetings?

13   A    I did.

14   Q    These are handwritten notes?

15   A    They were.

16   Q    And you produced those to the Attorney General's

17   office?

18   A    I did.

19        MS. BARBATO:   And the Attorney General's office

20   produced them to you.

21        MR. BAGNELL:   Oh, yeah.   I'm not suggesting that you

22   didn't.

23   Q    (By Mr. Bagnell) So you were taking handwritten

24   notes, and then you also took down an official chronology of

25   what happened?

1      A    I believe I did that -- part of her complaint was a

2   chronology, so those may be the same thing.

3      Q    But, anyway, you took down handwritten notes.  You

4   also ended up with a typed statement; correct?

5      A    That's correct.

6      Q    And was that the full extent your involvement in the

7   Wyler/Chevan complaint investigation; is that fair to say?

8      A    It's not fair to say.

9      Q    What other involvement did you have?

10      A    As I mentioned, after the statement, Ms. Wyler was

11   asked to verify the accuracy of the typewritten memo.  I then

12   also went with Ms. Wyler -- or I was in the room with

13   Ms. Wyler when she made the complaint to Mr. Marquez.

14      Q    Beyond that, did you have any further involvement?

15      A    I don't believe so.

16      Q    Did you ever talk to Ms. Wyler about the incidents

17   again?

18      A    Not specifically about the incidents.

19      Q    About anything?

20      A    I may have seen her once or twice after that to

21   inquire about her wellbeing.

22      Q    And where did that happen?

23      A    To the best of my knowledge, that happened in a

24   hallway in Engleman Hall.

25      Q    And do you recall what she said to you?

```
 1                    CERTIFICATE

 2

 3         I, Cassie Stott, Licensed Professional

 4   Reporter/Commissioner within and for the State of

 5   Connecticut, do hereby certify that pursuant to notice there

 6   came before me on the 19th day of October, 2013, the

 7   following named person, to wit:  Craig Hlavac, who was by me

 8   duly sworn to testify to the truth, the whole truth, and

 9   nothing but the truth; that he was thereupon carefully

10   examined upon his oath and his examination reduced to print

11   under my supervision; that this deposition is a true record

12   of the testimony given by the witness.

13         I further certify that I am neither attorney nor

14   counsel for nor related to nor employed by any of the

15   parties to the action in which this deposition is taken, and

16   further, that I am not a relative or employee of any

17   attorney or counsel employed by the parties hereto, or

18   financially interested in this action.

19         IN WITNESS THEREOF, I have hereunto set my hand

20   this 8th day of November, 201^

21

22

23                  Cassie Stott, LSR# 00498

24

25      My Commission expires on:  January 31, 2016
```

| | |
|---|---|
| 1 | JURAT |
| 2 | |
| 3 | I, Craig Hlavac, do hereby certify that the |
| 4 | foregoing testimony given by me on October 10, 2013 is true |
| 5 | and accurate, including any corrections noted on the |
| 6 | corrections page, to the best of my knowledge and belief. |
| 7 | |
| 8 | |
| 9 | CRAIG HLAVAC |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | At _____2:30pm_____ in said County of |
| 15 | _New Haven CT_, this _2_ day of _December_, 2013, |
| 16 | personally appeared Craig Hlavac, and she made oath to the |
| 17 | truth of the foregoing answers by her subscribed. |
| 18 | Before me, _____, Notary Public. |
| 19 | My commission expires: _My Commission Expires 01/31/2017_ |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

TRANSCRIPT CORRECTIONS

REPORTER:    CASSIE STOTT

CASE STYLE:  WYLER v. SOUTHERN

| PAGE | LINE | CORRECTION | REASON |
|------|------|-----------|--------|
| 31 | 21 | Change "employers" to "employees" | Wrong word was transcribed |
| 37 | 10 | Change "Competition" to "Composition" | Wrong word was transcribed |
| 98 | 1 | Change "Shevon" to "Chevon" | Wrong spelling |

12/2/13

DATE

CRAIG HLAVAC

# EXHIBIT
# J

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WENDY WYLER | : | CIVIL ACTION NO. |
| | : | 3:12-CV-00097(RNC) |
| v. | : | |
| | : | |
| CONNECTICUT STATE UNIVERSITY | : | |
| SYSTEM, SOUTHERN CONNECTICUT | : | |
| STATE UNIVERSITY, DAVID CHEVAN, | : | |
| STANLEY BATTLE, AND | : | |
| JONATHAN IRVING | : | JANUARY 31, 2014 |

### AFFIDAVIT OF ERNEST MARQUEZ

I, Ernest Marquez, being duly sworn, do hereby depose and say of my own

personal knowledge:

1.     I am over the age of eighteen (18) and I understand and appreciate the

obligations of an oath.

2.     I am a retired state employee who worked for several state agencies full-

time for 32 years, primarily in human resources. I also worked for the state at different

times after retirement on a per diem basis.

3.     In April, 2011, at the request of Southern Connecticut State University

[SCSU], I returned from retirement to fill in for SCSU's Director of the Office of Diversity

and Equity [ODE] and Title IX coordinator during her temporary leave of absence.

4.     While at SCSU, I conducted an investigation of Wendy Wyler's complaint

of sexual harassment by Professor David Chevan.

5.     In conducting my investigation, I followed the university's sexual

harassment policy and procedures.



EXHIBIT
J

6.     My investigation included interviews of Ms. Wyler and Chevan. I have attached a true and accurate copy of the letter I sent to Chevan to this affidavit as Ex. J-1.

7.     When I questioned Chevan, he admitted that he made some, but not all, of the alleged comments to Ms. Wyler, but stated that they were taken out of context and misinterpreted. He claimed that the alleged incident in the music storage room lasted less than one minute; and, although he denied soliciting sex from Wyler, admitted that he "crossed boundaries" with her.

8.     A female student, who identified herself as Megan Coyne, accompanied Ms. Wyler to her interview and handed me an unsigned, typed statement recounting an incident in which Chevan had made suggestive remarks, touched her knee and held her hand. The statement did not include her name and was unsigned and unsworn.

9.     Ms. Coyne gave no oral statement about Chevan and stated that she did not want to file a complaint of her own. She said, instead, that she was there to provide support for Wyler.

10.     I completed my investigation on April 26, 2011, and wrote a report concluding that Chevan violated the university's discrimination and sexual harassment prevention policy. I have attached a true and accurate copy of my investigation report to this affidavit as Ex. J-2.

11.     In my report, I recommended that the university grant Ms. Wyler's request that it grant her a tuition reimbursement for two classes with Chevan that she dropped

after filing her complaint; and that it remove the courses and withdrawals from her academic transcript. I understand that the university followed those recommendations.

12.     On April 27, 2011, I sent Ms. Wyler a letter informing her of my findings, my recommendation that HR take appropriate personnel action, and her right to obtain a copy of my investigation report from Diane Mazza, Labor Relations Specialist at the university's Human Resources office. I also sent Interim President Stanley Battle a copy to the letter I sent to Ms. Wyler.

13.     I have attached a true and accurate copy of the letter I sent to Ms. Wyler to this affidavit as Ex. J-3.

14.     I also sent copies of my report to HR to determine whether and what degree of disciplinary action may be required; and to the provost to determine the proper academic remedy. I took no part in determining Chevan's discipline.

15.     Neither Stanley Battle nor Jonathan Irving was a member ODE. Neither of them conducted or assisted me in the investigation of Ms. Wyler's complaint; and neither was involved in the resulting findings.

16.     Battle did not appoint me as the investigator of Ms. Wyler's complaint and did not monitor my investigation or exercise any oversight over it. The responsibility for investigation was mine as ODE's investigator.

_Ernest Marquez_

STATE OF CONNECTICUT    )
                             )    SS
COUNTY OF _Hartford_   )

Sworn and subscribed before me this 2ND day of _February_ 2014.

_Neil Suffinaler Esq._
Notary Public
Commissioner of the Court
Juris No: 303810

# EXHIBIT
## J-1

April 8, 2011

Transmitted via email April 8, 2011
chevand1@southernct.edu

David Chevan, PhD
Music Department
Southern Connecticut State University
501 Crescent Street
New Haven, CT 06515

Dear Dr. Chevan:

The Office of Diversity Programs received notice of a complaint filed by Ms. Wendy S. Wyler on April 7, 2011 alleging discrimination on the basis of sex and emotional and psychological harassment. This office is responsible for conducting an investigation of the allegations of sexual harassment as outlined in your complaint to determine whether the policies of the University have been violated.

> In accordance with Public Act 03-151 codified in the CGS 46a-68(b) sections (4) (A-C):
>
> (4) Each person designated by a state agency, department, board or commission as an affirmative action officer shall
>
> (A) be responsible for mitigating any discriminatory conduct within the agency, department, board or commission,
>
> (B) investigate all complaints of discrimination made against the state agency, department, board or commission,
>
> (C) report all findings and recommendations upon the conclusion of an investigation to the commissioner or director of the state agency, department, board or commission for proper action.

In order to meet the requirements of the law I need to meet with you to discuss the allegations. Please contact my office at 392-5491 as soon as possible to schedule an appointment. You may elect to have a union representative in attendance at this meeting. I am also forwarding a copy of the complaint for your review and response.

If there are questions or concerns, you may reach me at (203) 392-5491 or marqueze1@southernct.edu. Thank you for your cooperation in this matter.

Sincerely,


*Ernest Marquez, Acting Director*
Office of Diversity and Equity



EXHIBIT
J-1

# EXHIBIT
## J-2



# Southern Connecticut
# State University

SC
SU



601 Crescent Street
New Haven, CT 06515 -1355

| | |
|---|---|
| Date: | April 25, 2011 |
| Investigator: | Ernest R. Marquez, Office of Diversity and Equity Programs |
| Complainant: | Ms. Wendy Wyler, Student – Psychology Major |
| Respondent: | Dr. David Chevan, Professor, Music Department |
| Basis of Complaint: | Sexual, Emotional and Psychological Harassment |
| Date Filed: | April 4, 2011 |

### Statutory Jurisdiction

DISCRIMINATION AND SEXUAL HARASSMENT PREVENTION POLICY

It is the policy of Southern Connecticut State University to prohibit discrimination based on all protected classes including but not limited to race, color, religious creed, age, sex, marital status, national origin, ancestry, physical or mental disability, and sexual orientation. Discrimination includes harassment on any basis mentioned above, and sexual harassment as defined in the Connecticut General Statutes, U. S. EEOC Guidelines of Sexual Harassment, and in Title IX of the Higher Education Amendments of 1972. Discrimination or harassment will not be tolerated at Southern Connecticut State University, whether by faculty, students or staff, or by others while on property owned by or under the control of the University.

DEFINITION

"Sexual harassment" is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature directed at an employee or student by another when:

(a)    submission to such conduct is made either explicitly or implicitly a term or condition of employment, academic status, receipt of University services, participation in University activities and programs, or affects the measure of a student's academic performance; or,

(b)    submission to or rejection of such conduct is used as the basis for a decision affecting employment, academic status, receipt of services, participation in University activities and programs, or the measure of a student's academic performance; or,



A Campus of the Connecticut State University System
An Equal Opportunity University



EXHIBIT
J-2

(c) such conduct has the purpose or effect of unreasonably interfering with employment opportunities, work or academic performance or creating an intimidating, hostile, or offensive work or educational environment. The conduct must typically be persistent and pervasive and be reasonably perceived as offensive or hostile to constitute this type of sexual harassment referred to as "hostile environment".

### Summary of Issue

Was the University's Discrimination and Sexual Harassment Prevention Policy violated?

Finding: the University's Discrimination and Sexual Harassment Prevention Policy was violated.

### Remedy Requested

The two course withdrawals to be removed from my transcript; the two credits to be reimbursed (Ms. Wyler wishes to receive the two credits that she would have earned had she been able to complete the courses) ; to attend college in an environment free of harassment and fear.

### Parties Interviewed

Ms. Wendy Wyler (April 7, 2011)

Present at Interview: Donata Wyler, Mother; Megan Coyne, Student; Craig Hlavac, Assistant Professor of Music.

Dr. David Chevan (April 15, 2011)

Present at Interview: Virginia Metaxas, AAUP; Linda Cunningham, AAUP.

### Complaint Excerpted

Dr. Chevan's sexually suggestive behavior has resulted in great amount of emotional and psychological distress. Dr. Chevan's behavior and this ordeal in itself have caused significant damage with my academics and overall wellbeing. His sexual behavior, personal remarks and manipulation continued and I began to avoid the music building, arrived late for class and ran out of what was to be my last music class. I felt extremely afraid, threatened, disrespected and uncomfortable. I did not know how Dr. Chevan would penalize, hurt or react if I were to show my fear or if I were to reach out for help. Eventually I did and was left with no other option but to drop the two Small Ensembles, Blues Band and Latin Jazz Band.

Ms. Wyler stated that following the Mardi Gras concert on March 9th Dr. Chevan stopped her outside of Earl Hall and during a conversation made the following comments: "there is something between us, some kind of chemistry" and "I'm a sensual person". Ms. Wyler told him that he was misinterpreting her to which he replied —"no I'm not" and "If I wasn't your professor and you my student, things could be different". He also said — "my only mistress is music".

Dr. Chevan, when asked by the interviewer if he had made those statements he replied — "yes, but they were taken out of context".

Ms. Wyler stated that she received an email from Dr. Chevan asking her to stop by his office and she did. During more than an hour in the office, the conversation turned intimate. Dr. Chevan told Ms. Wyler about an affair he had had with a student many years ago that caused him a lot of stress but that she, Ms. Wyler, was giving rise to those thoughts in him again and that he could see himself in that situation again with her. He then added — "but what would you want with a fifty year old?"

Dr. Chevan, when asked if he had had that conversation he replied — "it was a misinterpretation and I do not want to discuss the conversation, but it was not meant that way".

Ms. Wyler further stated that during that same conversation Dr. Chevan complimented her good looks.

Dr. Chevan replied — "that is possible".

Ms. Wyler further stated that while preparing for a rehearsal of the Latin Jazz ensemble Dr. Chevan invited Ms. Wyler to go with him for coffee and asked the other students to set up the rehearsal room. Ms. Wyler felt uncomfortable as she was singled out. On the way to get coffee Dr. Chevan asked Ms. Wyler to come into the music storage room. Ms. Wyler responded — "I'm not coming in there". Dr. Chevan replied "come on you can trust me, how long have you known me?" Alone in the room, Dr. Chevan closed the door, leaned on it blocking her exit and said —"remember that affair I told you about? If anything were to happen between us it would happen right now". Ms. Wyler told him that he was misinterpreting her and that nothing was going to happen. Dr. Chevan asked — "are you sure?" On the way out Dr. Chevan said "let's get back to reality".

Dr. Chevan denies saying —"remember that affair I told you about? If anything were to happen between us it would happen right now", but refused to discussed what they talked about in the closet. When asked by the interviewer why he asked Ms. Wyler into the closet he replied — "I didn't want her to be seen with me". When asked why not he refused to answer. He also refused to explain why he chose the closet when he could have had a private conversation with the student in his office.

Dr. Chevan stated that they were in the closet for less than one minute and that he asked Ms. Wyler a couple of questions that he does not want to reveal. He stated that the questions were of the nature that could have been misinterpreted and were. Dr. Chevan stated that while he did not solicit sex, he feels that at some level he crossed boundaries that he should not have crossed. Dr. Chevan admitted

having been involved in an emotional relationship with a student at another college in 1987 that lead to a sexual relationship.

Ms. Wyler further stated that after the meeting in the closet and back at rehearsal, Dr. Chevan told the ensemble that the song, While My Guitar Gently Weeps, was dedicated to Ms. Wyler, again singling her out which made her feel extremely uncomfortable.

Dr. Chevan stated during the interview that he had simply assigned the solo to Ms. Wyler.

Dr. Chevan stated that he was not trying to become emotionally intimate with Ms. Wyler, but only acting as a therapist/counselor. When asked why he thought that Ms. Wyler had filed the complaint he stated -- "I'm a very good teacher, but a very bad therapist/counselor. Some of the things I said and did such as sharing my own life, are things I never should have done.

Ms. Megan Coyne, a student majoring in music, provided me with a written statement regarding similar experiences she had had with Dr. Chevan. In the statement she asserts that he gradually assumed a counselor role for her in a time of need but later his demeanor seemed to take a less professional and platonic nature. He began to make more physical contact than was comfortable for her, such as touching her knee and holding hands as well as making blatantly suggestive comments. The two-page statement reveals a similar pattern of behavior by Dr. Chevan as that experienced by Ms. Wyler.

Dr. Chevan, when informed that another student had come forward with similar allegations he seemed to know who it was and gave me her name. When asked why he thought that Ms. Coyne would have come forward he stated -- "I also transgressed boundaries with Ms. Coyne but not in the same degree and when she heard about Ms. Wyler's complaint she must have felt like she needed to come forward.

### Summary of Findings

Dr. Chevan claims that he did not solicit sex from Ms. Wyler and that he did not intend on having a sexual relationship with her.

The information gathered does not indicate that he actually asked Ms. Wyler to have a sexual or physically intimate relationship with him, but it does suggest that he did engage in behavior that lead to an emotionally intimate relationship with his student. In addition, his suggestive comments and actions, by his own admission, could be and were interpreted as sexually inappropriate and as crossing the boundaries of the student-teacher relationship.

Such sexually suggestive behavior has resulted in emotional and psychological distress to Ms. Wyler to the extent where she found it necessary to abandon her academic objectives and withdraw from two courses taught by Dr. Chevan.

## Conclusion

It is not necessary to determine whether Dr. Chevan's intent was to arrive at a sexual or physically intimate relationship with his student. There is sufficient information to show that Dr. Chevan's conduct had the purpose or effect of unreasonably interfering with work or academic performance or creating and intimidating, hostile, or offensive educational environment for Ms. Wyler. His conduct was persistent and pervasive and was reasonably perceived as offensive or hostile to constitute the type of sexual harassment referred to as "hostile environment". (See Definition of Sexual Harassment Section (c)).

## Recommendation

That this case is forwarded to the Human Resources Office to determine whether and what degree of disciplinary action may be required.

That this case is forwarded to the Provost to determine the proper academic remedy.

## Documents on File

Wendy Wyler – Statement of Complaint. Received April 7, 2011.

            Email communications between Ms. Wyler and Dr. Chevan

Dr. Jonathan Irving – Complaint of W. Wyler. Taken April 4, 2011.

Asst. Professor Craig Hlavac – Complaint of W. Wyler. Taken April 4, 2011.

Megan Coyne – Statement RE Dr. Chevan. Dated April 5, 2011. Received April 7, 2011.

            Email correspondence between M. Coyne and Dr. Chevan.

Authorization by W. Wyler to Disclose/Release Information

      Megan Coyne

      Craig Hlavac

      Donata Wyler

      Jonathan Irving

# EXHIBIT
## J-3

 **Southern Connecticut State University**
601 Crescent Street
New Haven, CT 06515 -1355



April 26, 2011

Ms. Wendy Wyler
Via email wendywyler89@yahoo.com

The Office of Diversity and Equity Programs has completed its investigation of your complaint filed on April 4, 2011 which alleged sexual harassment.
The investigation determined that the alleged respondent did violate the University's Discrimination and Sexual Harassment Prevention policy. Appropriate personnel action has been recommended. The complaint investigation has been closed.

In accordance with the Freedom of Information Act, you may request in writing a copy of the investigation report by contacting Ms. Diane Mazza, Labor Relations Specialist, Wintergreen Building, 501 Crescent Street, New Haven, CT 06515. My contact information is Office of Diversity and Equity Programs, 203-392-5492 or MarquezB1@southernct.edu.

Sincerely,
*Ernest R. Marquez*
Office of Diversity and Equity Programs

pc:     Dr. Stanley F. Battle, interim president
        Human Resources



**EXHIBIT**
**J-3**

# EXHIBIT
# K

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF CONNECTICUT

3    CIVIL ACTION NO:   3:12-CV-00097(RNC)

4

5    ------------------------------------x

6    WENDY WYLER,

7                    Plaintiff,

8      -versus-

9    CONNECTICUT STATE UNIVERSITY SYSTEM,
     SOUTHERN CONNECTICUT STATE UNIVERSITY,
10   DAVID CHEVAN, STANLEY BATTLE, AND
     JONATHAN IRVING,
11
                    Defendants.
12
     ------------------------------------x
13

14

15              DEPOSITION OF ERNEST MARQUEZ

16

17   Taken pursuant to the Federal Rules of Civil Procedure,

18   at the law offices of New Haven Legal Center, LLC,

19   900 Chapel Street, New Haven, Connecticut, before

20   Vicki S. McManus, a Licensed Shorthand Reporter and a

21   Notary Public in and for the State of Connecticut,

22   Shorthand Reporter License No. 00152, on Friday,

23   November 22, 2013, at 11:11 a.m.

24

25

EXHIBIT
K

```
 1    A P P E A R A N C E S:

 2

      For the Plaintiff:
 3
              Lucas, Bagnell, Varga, LLC
 4            2425 Post Road
              Suite 200
 5            Southport, Connecticut 06890
              203-227-8400
 6            jbagnell@lbv-law.com
              By: JEFFREY S. BAGNELL, Esquire
 7

 8    For the Defendants:

 9            Assistant Attorney General
              55 Elm Street
10            P.O. Box 120
              Hartford, Connecticut 06106
11            860-808-5160
              linsley.barbato@ct.gov
12            By: LINSLEY J. BARBATO, Esquire

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 1 | WITNESS INDEX | |
| 2 | ERNEST MARQUEZ | PAGE |
| 3 | Direct Examination by Mr. Bagnell | 5 |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | EXHIBIT INDEX | |
| 10 | EXHIBIT                DESCRIPTION | PAGE |
| 11 | | |
| 12 | Plaintiff 1          Package of documents | 26 |
| 13 | | |
| 14 | *Exhibit attached to Original* | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

1                    S T I P U L A T I O N S

2

3

4        IT IS HEREBY STIPULATED AND AGREED by and between

5    counsel for the respective parties hereto that all

6    technicalities as to proof of the official character

7    before whom the deposition is to be taken are waived.

8

9

10        IT IS FURTHER STIPULATED AND AGREED by and

11    between counsel for the respective parties hereto that

12    the reading and signing of the deposition by the

13    deponent are required.  Instructions, errata and jurat

14    were sent to Attorney Barbato.

15

16

17        IT IS FURTHER STIPULATED AND AGREED by and

18    between counsel for the respective parties hereto that

19    all objections, except as to form, are reserved to the

20    time of trial.

21

22

23                    *    *    *    *    *

24

25

| | |
|---|---|
| 1 | A    Well, that was not the purpose.  The purpose was |
| 2 | for me to fill in at the office, for whatever came |
| 3 | along. |
| 4 | Q    And this happened? |
| 5 | A    But this happened. |
| 6 | Q    And this happened to come along? |
| 7 | A    Yeah. |
| 8 | Q    Okay.  I want to ask you, before you --  Is it |
| 9 | fair to say that the Office of Diversity and Equity |
| 10 | asked you to conduct an investigation of Miss Wyler's |
| 11 | complaint? |
| 12 | A    Yes. |
| 13 | Q    And who was your superior there? |
| 14 | A    Well, I was an interim director.  I was like the |
| 15 | head of the diversity -- |
| 16 | Q    You were the head of the office at the time? |
| 17 | A    The office.  There was me and an administrative |
| 18 | assistant. |
| 19 | Q    Okay.  Had you performed any investigations of |
| 20 | sexual harassment complaints before Miss Wyler's |
| 21 | incident? |
| 22 | A    Yes. |
| 23 | Q    Okay.  Can you tell me how many? |
| 24 | A    I don't know.  Several.  I don't know, maybe ten. |
| 25 | Q    These are --  Were these cases at Southern? |

1    Q    How old are you now, Mr. Marquez?

2    A    65.

3    Q    All right.  Can you tell me in Miss Wyler's case:

4    What did you do to investigate her complaints, to the

5    best of your memory?

6    A    I spoke with her.  In fact, I interviewed her,

7    and there were a couple of other people present during

8    the interview.

9         And then I interviewed Dr. Chevan.  And there

10    were a couple of people present during that interview.

11         And then I came up with a conclusion.

12    Q    Okay.  Anyone else you talked to other than those

13    individuals?

14    A    I don't recall having talked to anyone else.

15    Q    And the conclusion you reached was that there had

16    been a violation of the sexual harassment policy.  You

17    recall that?

18    A    Correct.  Yeah.

19    Q    Did you draw any conclusions about --

20         Let me ask it another way.  You met with

21    Professor Chevan?

22    A    Yes.

23    Q    You interviewed him?

24    A    Yes.

25    Q    And were union representatives present when that

1   conducted an investigation on behalf of the Office of

2   Diversity and Equity.  Is that correct?

3       A   Correct.

4       Q   Then you made a finding that there had been a

5   policy violation, correct?

6       A   Correct.

7       Q   You then referred the matter to human resources,

8   correct?

9       A   Correct.

10      Q   And did they then have to conduct their own

11  investigation on top of yours at that point?  Do you

12  have an understanding of that?

13      A   I don't know that.

14      Q   When you were at Central, was that how the

15  process worked?  Were there two investigations, where,

16  you know, you did one and then HR did another one?

17      A   I don't think so.  But I don't know that for

18  sure.

19              MR. BAGNELL:  Can we mark this as

20          Exhibit 1 please, the whole thing.

21              (Plaintiff's Exhibit 1 marked for

22              identification.)

23              MR. BAGNELL:  Go off the record for a

24          second.

25              (Discussion off the record.)

CERTIFICATE

I hereby certify that I am a Notary Public in and for the State of Connecticut duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and transcribed by means of computer-aided transcription by the undersigned, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor of either counsel in said suit, nor related to or employed by any of the parties or counsel to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this day of 2nd of December, 2013.



Vicki S. McManus
NOTARY PUBLIC


My commission expires:  July 2016

Shorthand Reporter License No. 00152

## TRANSCRIPT CORRECTIONS

WITNESS NAME: ERNEST MARQUEZ

CASE STYLE:   Wendy Wyler

       vs.   Connecticut State University System

| PAGE | LINE | CORRECTION |
|---|---|---|
| 5 | 18 | Should say " I remember testifying |
| | | at a deposition 20-25 years ago |
| | | and again in 2006 or 2007.  I also |
| | | testified at arbitrations, in court |
| | | and during jury voir dire." |

# J U R A T

I, ERNEST MARQUEZ, do herby certify that the foregoing

testimony given by me on November 22, 2013, is true and

accurate, including any corrections noted on the

corrections pages, to the best of my knowledge and

belief.

At  _243 Zion St._  in said County of _Hartford_
_Ct_  , this _7th_ day of _December_
2013, personally appeared _Ernest R. Marquez_, and
made oath to the truth of the foregoing testimony.

Before me, _Karen Duffy Wallace Esq._
_Commissioner of Superior Court_
~~Notary Public~~
_Juris No: 303810_
My commission expires:

# TRANSCRIPT CORRECTIONS

WITNESS NAME:  ERNEST MARQUEZ

CASE STYLE:   Wendy Wyler

      vs.   Connecticut State University System


| PAGE | LINE | CORRECTION |
|------|------|------------|
| 5 | 18 | Should say " I remember testifying at a deposition 20-25 years ago and again in 2006 or 2007.  I also testified at arbitrations, in court and during jury voir dire." |

## J U R A T

I, ERNEST MARQUEZ, do herby certify that the foregoing

testimony given by me on November 22, 2013, is true and

accurate, including any corrections noted on the

corrections pages, to the best of my knowledge and

belief.

At  _243 Zion St._  in said County of _Hartford_

_Ct_ , this _7th_ day of _December_

2013, personally appeared _Ernest R. Marquez,_  and

made oath to the truth of the foregoing testimony.

Before me, _Karen Duffy Wallace Esq._

_Commissioner of Superior Court_

~~Notary Public~~

_Juris No: 303810_

My commission expires:

# EXHIBIT
# L

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

WENDY WYLER           :      CIVIL ACTION NO.
                         :      3:12-CV-00097(RNC)
     v.                     :
                         :
CONNECTICUT STATE UNIVERSITY    :
SYSTEM, SOUTHERN CONNECTICUT   :
STATE UNIVERSITY, DAVID PROFESSOR CHEVAN,      :
STANLEY BATTLE, AND               :
JONATHAN IRVING             :      FEBRUARY 6, 2014

## AFFIDAVIT OF DIANE MAZZA

I, Diane Mazza, being duly sworn, do hereby depose and say of my own personal knowledge:

1.     I am over the age of eighteen (18) and I understand and appreciate the obligation of an oath.

2.     I am currently the Director of Employee and Labor Relations in the Human Resources Department [HR] at Southern Connecticut State University [SCSU]. I have held this position since August of 2013.

3.     I have worked in HR at SCSU since March of 2004. In 2011, I was a labor relations and employment officer.

4.     In April 2011, Ernest Marquez conducted an investigation for the university's Office of Diversity and Equity [ODE] into Wendy Wyler's complaint that music professor David Chevan had sexually harassed her.



EXHIBIT
L

5.      Marquez sent a copy of his concluded investigation report to HR on April 27, 2011, including his finding that Professor Chevan violated the university's discrimination and sexual harassment prevention policy.

6.      I provided Ms. Wyler with a copy of the investigation report the next day.

7.      I then initiated a further investigation into Ms. Wyler's complaint and Professor Chevan's disciplinary history in order to determine whether and what degree of disciplinary action was appropriate.

8.      As part of my investigation, I questioned Ms. Wyler, Professor Chevan, Professor Jonathan Irving of the music department, and two music students identified by Ms. Wyler.

9.      Professor Irving told me he had never heard of Professor Chevan sexually harassing a student before Ms. Wyler came to him; and the two students told me that they had never heard of Professor Chevan sexually harassing a student.

10.      Professor Irving is not a member of HR, and played no part in deciding Professor Chevan's discipline.

11.      Professor Irving was not a supervisor and had no authority to discipline Professor Chevan or any other faculty member. Professors serving as department chairs are not supervisors and have no duty or right to hire; evaluate, except as part of a committee with other department members; discipline; or terminate fellow professors.

12.      Service as chair is not a promotion, but a faculty assignment, for a three-year term. Department chairs are members of the same collective bargaining unit as all other professors; and, although they perform some administrative functions and may

serve as a member of a hiring or evaluation committee, they have no supervisory authority over their colleagues.

13.    Except for answering my questions, Irving had no personal involvement whatsoever with the investigation of Professor Chevan's conduct or the subsequent discipline.

14.    I also called another former music student, Megan Coyne, and attempted to get her to confirm the allegations in an unsigned statement she had provided to Marquez. Ms. Coyne did not answer or return my calls; so I was unable to confirm the allegations in the statement.

15.    I questioned Professor Chevan at a fact-finding meeting with his union representatives present, as required by the collective bargaining agreement. I have attached to this affidavit a true and accurate copy of notes taken of this meeting as Exhibit L-1.

16.    During the fact-finding meeting, Professor Chevan admitted complimenting Ms. Wyler on her appearance, but said he complimented her, as well as other male and female students, to build their confidence for performances. He denied that his compliments were sexual or that he ever asked Ms. Wyler to have a sexual relationship or any relationship outside of school.

17.    Professor Chevan also denied that giving Ms. Wyler a featured instrumental role had any sexual connotation. He stated that he thought it was inappropriate for teachers to have affairs with students and denied ever having sexual contact with a student at Southern.

18. Professor Chevan denied telling Ms. Wyler he was having trouble with his marriage.

19. Professor Chevan admitted that his comments to Ms. Wyler transgressed boundaries, but stated that Ms. Wyler's interpretation was a "horrendous misunderstanding of [his] intent."

20. Professor Chevan also denied blocking the exit door to the music storage room and stated that he and Ms. Wyler were in the storage room for less than a minute.

21. Before hearing about Ms. Wyler's allegations, I had not received or heard of any complaints about Professor Chevan sexually harassing students.

22. I searched for, but found no records of such complaints in Professor Chevan's personnel file; and questioned Professor Irving and the Dean of Arts and Sciences, but learned of no prior incidents or complaints of sexual harassment from them.

23. After my investigation, I concluded that Professor Chevan had no prior record of sexual harassment or discipline for any misconduct at SCSU.

24. I also learned that Ms. Wyler had withdrawn from Professor Chevan's classes.

25. Finally, I instructed Professor Chevan to have no further contact with Ms. Wyler.

26. I then made a recommendation to Jaye Bailey, then Associate Vice President of Human Relations and Labor Resources Director, that Professor Chevan be

disciplined for his conduct; and engaged in settlement negotiations with union representatives from Professor Chevan's collective bargaining unit.

27. After negotiations with Professor Chevan's union representatives, I recommended a settlement that the union would not oppose or grieve: that Professor Chevan be suspended without pay for five days; and that the agreement would be placed and remain in his personnel file; and removed after 24 months, only if he did not engage in further conduct violative of the university's discrimination and sexual harassment policy.

28. Bailey agreed with the recommended settlement, we executed the agreement on June 6, 2011; and the university imposed the agreed upon discipline. I have attached to this affidavit a true and accurate copy of the settlement agreement with the union as Ex. L-2.

_____
Diane Mazza

STATE OF CONNECTICUT      )
                          )      ss
COUNTY OF *New Haven*      )

Sworn and subscribed before me this 6th day of February 2014.

_____
Notary Public/
Commissioner of the Court

# EXHIBIT
## L-1

Fact-finding Meeting with David Chevan                    5/6/11

Present: Linda Cunningham, Virginia Metexas and David Chevan

GM: One or two items we have questions. Meeting in ODE with student included Craig Hivac. Concerned about break in confidentiality. Feel uncomfortable about that.

Ernie metioned another student Dr. Chevan was aware of the name because of Ernie's documentation. Why was the student interviewed with faculty member Craig Hivac?

Back story that Ernie did not include in his report. David did not want to reveal information about the larger context because student had confided many personal things to him. Still does not feel comfortable breaking that confidence. Make for an inaccurate narrative. Still does not want to share that information.

DM: Storage room, DC needs to ask her the question. My office in Earl Hall is a central place, keep my door wide open. Office faces courtyard, keep my window open. Things that Ms. Wyler was sharing with me confused and upset me. Needed a place so I would not embarrass her. It was a mistake. She would not be placed into embarrassment. In the room for a short time, less than a minute. Was not in front of door to block her. Disagree with implication of that word. Not sure if she said she does not want to go in.

Did not force her into closet, no physical contact. Don't remember saying "If anything were to happen". Do not recall telling her about the affair but not in the closet. Intention to ask her a specific question but do not want to share that question. Related to some things she shared with me. Confused by some things she shared with me.

Have been in therapy since all of this happened. Great mistake here is to allow myself into this role, compromised some of my judgment , should have passed her onto counseling services.

Affair- to my recollection, after we left the closet, went to bagel wagon, went back to my office. Will try to contextualize this, working on notion of trust. What I was trying to explain that she could trust me. Committed this indiscretion and would never do it again. Sharing that was very upsetting to her. Indiscretion was in 1987 started at Southern in 1993.

Indiscretions- Have never had an affair with any of my students. Are not aware of any sexual harassment complaints filed against me.

Did you say could see yourself engaging in those behaviors?
Not exactly what I said. Trying to explain to her that the world is not black and white. It is grey. Could find someone attractive but not carry it through. Do not think it was appropriate to say that to a student. Thought it was crazy cannot tell you how sorry I am for this.

Complimenting student- Tend to do that with young men appearances are important for musicians. Ms. Wyler is not the only recipient of those compliments.

EXHIBIT
L-1

Jazz Ensemble at WCSU, students showed up with shorts told them to change. Other students looked good and told them they looked wonderful.

Very likely that I said she looked pretty. Goal was not sexual and was not to make her feel uncomfortable. It was confidence building.

Was not aware that she was uncomfortable and did not express it to me.

Dropped out of two Jazz Ensemble, email exchange from Ms. Wyler about David Chevan criticizing another student. Had not realized I crossed the line teacher/student. Caught off guard. Recognize this. Not taking it lightly, don't want to see this repeated. Founded most of these ensembles, passion for music.

Did not click with me what I thought. Crossed and transgressed boundaries, need to find a better way to communicate with my students.

Realized that he engaged in a discussion on 2 topics. Let students talk about students talking about personal things.

Reveal some of his own personal issues. Taking all of this very seriously. Need to make things right.

Physical contact- Do not recall having physical contact with a student. Do recall giving her a ride to the parking lot, recall counseling her. Backing off feeling as though I was transgressing boundaries and put space between students so it would not take place.

This same student asked me for a letter of recommendation in 2010. Requested to friend him on facebook. I was giving her a ride. Getting rides from everyone when I broke my ankle. No female students offered to give me a ride.

Have never asked any of my female students to come to my home. Have never had a female student in my house. Do not think that happened.

Have never tried to kiss a female student and has never tried to kiss. Never any attempt at physical contact.

Did not tell Ms. Wyler that I was having trouble in my marriage. Did not speak to any students about that.

Solo for Ms. Wyler- Ensemble supporting parts with improvisions. Have not given her the opportunity for a solo. Being sexiest. Only two females Wendy was a success story so was proud of her.

As I writing through Wendy could do the melody and is a featured role. Thought I was doing a good thing. Was not thinking I was harassing her nothing of a sexual nature. Thought I was being nice. Lyrics meant she would be playing melody.

Hugs- Many have hugged, Ms. Wyler once. Gave body language that she did not want to be hugged. Recognize that line between males and females. Have a tendency to not hug females.

Don't remember saying that she is sexy and those boys would be lucky to have you.

Relationship with Ms. Wyler-
2 relationships (1) teacher/student was a strong relationship, (2) found it to be more of a counseling relationship. Thought we were developing a 3rd relationship, not in a sexual way because she was sharing a lot with me, bringing me coffee, a friendly relationship had developed. Never asked her to have that relationship outside of school.

Had situations where I had no ride when I broke my ankle needed a network of people to bring me. There was a team of students helping me.

May have said fantasies are always better than the real thing. Fantasies are for better for worse than to act on your imagination.

Horrendous misunderstanding of intent on four separate occasions. Think it is inappropriate for students and teachers to have an affair.

Never intended to have a sexual relationship with Ms. Wyler.

Physically and emotionally distressed. At the end when she left class she said it was about Andrew. If she said it was about her I would have apologized.

LC: David recognizes the he has a problem with boundaries and is seeking counseling. Should have referred students to others on campus. Makes students feel they can express themselves.

VM: Music is not just a mechanical thing. Engaging in motions too. Music raises emotions. Motions can be misunderstood. Happens in the Arts in general.

Week of the 16th.
Wednesday May 18@ 10:00

In addition to working with a therapist, working closely with my Rabbi. Want to make things right. Would like to have a mediation where I could apologize to Ms. Wyler.

# EXHIBIT
# L-2

## Memorandum of Agreement
### Between
### Southern Connecticut State University
### And
### Connecticut State University American Association of University Professors
### And
### Dr. David Chevan

This agreement is entered into by and between Southern Connecticut State University and the Southern Connecticut State University American Association of University Professors and Dr. David Chevan.

Now, therefore, in full and final resolution of any and all issues resulting from the investigation into alleged misconduct by Dr. Chevan, it is agreed:

Dr. David Chevan will receive a five (5) day suspension without pay fulfilled by a five (5) day reduction in pay for the check dated July 1, 2011 for violating the University's Discrimination and Sexual Harassment policy.

If Dr. Chevan does not engage in further conduct found to be violative of the University's Discrimination and Sexual Harassment policy, this agreement will be removed from his personnel file after 24 months from the date of execution of this agreement.

The parties agree that this matter shall be fully settled by this agreement. The member and the AAUP agree that no conditions outlined herein will be subject to the grievance and arbitration provisions of the contract or any other administrative or legal proceeding.

This agreement is with prejudice but without precedent except in matters involving Dr. David Chevan and is not intended to change any other terms and conditions of the Collective Bargaining Agreement or the Faculty Senate procedures.

SCSU-AAUP   Michael Shea, President                 Date: 6-6-11

For SCSU   Diane Mazza, Human Resources             Date: 6/6/11

Dr. David Chevan                                     Date: 6-3-11



EXHIBIT
L-2

CHEVAN 001139

# EXHIBIT
# M

```
 1                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
 2

 3    _____
      WENDY WYLER,              ) CIVIL ACTION NO.
 4          Plaintiff,          ) 3:12-CV-00097(RNC)
                                )
 5             vs.              )
                                )
 6    CONNECTICUT STATE UNIVERSITY)
      SYSTEM, SOUTHERN CONNECTICUT)
 7    STATE UNIVERSITY, DAVID    )
      CHEVAN, STANLEY BATTLE, AND )
 8    JONATHAN IRVING,          )
            Defendants.         )
 9    _____)

10

11

12

13

14
            DEPOSITION OF:      DIANE MAZZA
15
            DATE:              NOVEMBER 20, 2013
16
            HELD AT:           LUCAS, BAGNELL, VARGA, LLC
17                             2425 POST ROAD, SUITE 200
                               SOUTHPORT, CT
18

19

20

21

22          BRANDON SMITH REPORTING & VIDEO
        249 Pearl Street          Six Landmark Square
23      Hartford, CT 06103        4th Floor
        (860) 549-1850            Stamford, CT 06901
24      (800) 852-4589            (800) 852-4589

25
            Reporter:  Samantha M. Howell, LSR #00462
```

EXHIBIT
M

```
 1    APPEARANCES:

 2

      REPRESENTING THE PLAINTIFF, WENDY WYLER:
 3

          Lucas, Bagnell, Varga, LLC
 4        2425 Post Road, Suite 200
          Southport, CT 06890
 5        (203) 227-8400
          By:  Jeffrey S. Bagnell, Esq.
 6

      REPRESENTING THE DEFENDANTS, CONNECTICUT STATE UNIVERSITY
 7    SYSTEM, ET AL:

 8        Assistant Attorney General
          55 Elm Street
 9        Hartford, CT 06141-0120
          (860) 808-5160
10        By:  Linsley J. Barbato, Esq.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2   WITNESS:                                              PAGE:

 3   Diane Mazza

 4
     Direct Examination by Attorney Bagnell                 5
 5

 6
     ─────────────────────────────────────────────────────────
 7                       PLAINTIFF'S EXHIBITS
                          (for identification)
 8

 9   EXHIBIT:                                              PAGE:

10   Plaintiff's Exhibit 1    Note                          36

11
     ─────────────────────────────────────────────────────────
12   (Reporter's Note:  Original exhibit for identification was
     returned with original transcript.)
13

14

15

16

17

18

19

20

21

22

23

24

25
```

S T I P U L A T I O N S

IT IS STIPULATED by the attorneys for the parties that each party reserves the right to make specific objections in open court to each and every question asked and the answers given thereto by the witness, reserving the right to move to strike out where applicable, except as to such objections as are directed to the form of the question.

IT IS STIPULATED and agreed between counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

IT IS FURTHER STIPULATED and agreed that the reading and signing of this deposition is not waived and any defects in the Notice are waived.

1    meetings with Linsley.

2         Q    How many meetings?

3         A    Two or three.

4         Q    Within what time period?

5         A    Maybe within the last two months.  I don't recall

6    exactly, but probably in the last two months.

7         Q    This was at the Attorney General's Office?

8         A    No, actually in my office at Southern.

9         Q    And how much time total did you spend with her?

10        A    I don't know, maybe a few hours.

11        Q    Okay.  What's your current position at

12   Southern?

13        A    Director of employee and labor relations in the

14   human resources department.

15        Q    How long have you held that position?

16        A    Since August of 2013.

17        Q    Was that a promotion?

18        A    Yes.

19        Q    Who promoted you?

20        A    Jaye Bailey.

21        Q    Okay.  And when did you start at Southern?

22        A    I started at Southern in 2004.

23        Q    What was your position when you started?

24        A    Associate in human resources.

25        Q    Okay.  When did Ms. Bailey become your

1  community colleges.

2       Q     Oh, it includes the Connecticut community

3  colleges?

4       A     It does, yes.

5       Q     But as far as I know there's Southern and Central

6  Connecticut University, right, there's no other...

7       A     Yes, there's Southern, Eastern, Western, and

8  Southern.  There are four.

9       Q     Oh, there is Eastern?

10      A     Yes.

11      Q     All right.  Okay.  Your current title, Ms. Mazza,

12  you may have given it to me; what's your current title?

13      A     Director of employee and labor relations.

14      Q     Okay.  And what were you before that?

15      A     Labor relations and employment officer.

16      Q     Was that -- and you started as an associate;

17  correct?

18      A     Yes.

19      Q     How many times has Ms. Bailey promoted you; was

20  it just the last time or did she do the other change

21  also?

22      A     It was just when I got promoted to labor

23  relations employment officer and then director, so twice.

24      Q     Okay.  In 2011 you were labor relations and

25  employer specialist?

| | | |
|---|---|---|
| 1 | A | Labor relation employment officer. |
| 2 | Q | Officer, okay.  Reporting to Ms. Bailey; |
| 3 | correct? | |
| 4 | A | Yes. |
| 5 | Q | Did she review your performance, Ms. Mazza? |
| 6 | A | Yes. |
| 7 | Q | Annually? |
| 8 | A | Yes. |
| 9 | Q | Would you get a written performance review? |
| 10 | A | Yes. |
| 11 | Q | Would she make decisions about your |
| 12 | compensation? | |
| 13 | A | Since there were -- there was a period of two |
| 14 | years where all salaries were frozen, and I believe those |
| 15 | two years was when I was reporting to Jaye, so we didn't |
| 16 | have -- you know, the annual increases we didn't have them |
| 17 | for two years, but she would -- if I was promoted she would |
| 18 | decide what the salary would be when I was promoted. |
| 19 | Q | In 2011 you were working for her and what |
| 20 | building are you both in? | |
| 21 | A | The Wintergreen building on Wintergreen Avenue. |
| 22 | Q | And that's on the campus? |
| 23 | A | Yes. |
| 24 | Q | What floor were you on? |
| 25 | A | The first floor.  There is only one floor to the |

| | | |
|---|---|---|
| 1 | A | Yes, it was off duty conduct, so... |
| 2 | Q | Was there any on duty conduct? |
| 3 | A | Not that I'm aware of. |
| 4 | Q | Is he still teaching there? |
| 5 | A | Yes. |
| 6 | Q | Okay.  What is your -- what's your relationship |

7 with the Office of Diversity and Equity, Ms. Mazza, how

8 does HR and ODE interact?  I know that's a broad question,

9 but is there -- can you answer that question, if not I'll

10 ask it in another way?

11     A    We do interact frequently.  We do deal with them

12 a lot with search procedures, and if a complaint comes to

13 our office and it's of -- let's say it's sexual harassment,

14 we would refer it to their office.  So we do work fairly

15 closely together, but they're...

16     Q    If a sexual harassment complaint comes to the

17 human resources department, is there any policy saying that

18 you had to notify ODE?

19     A    Yes.

20     Q    That's policy?

21     A    Yes.

22     Q    And does it go in the other direction?

23     A    Yes, it does.

24     Q    Okay.  And how does the Title IX coordinator

25 interplay with that dynamic?

```
 1        A    The Title IX coordinator is the responsibility of
 2   the Office of Diversity and Equity.
 3        Q    Okay.  So it's within that office?
 4        A    Yes.
 5        Q    All right.
 6        A    Yes.
 7        Q    Do you know Ernest Marquez?
 8        A    Yes.
 9        Q    How long have you worked with him?
10        A    He was -- he was the associate vice-president at
11   Southern when I was hired.  He actually hired me and then
12   shortly after retired, so I didn't work with him very long,
13   but I had known him because he was at the system office and
14   then he went to Southern.  So I did work with him when I
15   was at Central, and he was at the system office, and he
16   hired me at Southern.
17        Q    Okay.  When's the first time you ever met David
18   Chevan?
19        A    In 2011, I believe, when we started the
20   investigation.
21        Q    Had you met him before that?
22        A    I normally know names of faculty whether I've met
23   him or not.  I'm not sure.
24        Q    Had you heard of any complaints against him
25   before 2011?
```

 1    A    No.

 2    Q    Did you -- I understand you conducted an

 3  investigation of him back in 2011?

 4    A    Yes.

 5    Q    Did you have anyone assisting you?

 6    A    Yes.

 7    Q    Who was that?

 8    A    Well, Marlene Cordera, sometimes she will come in

 9  and take notes during the investigation.  I mean, she does

10  conduct investigations, but in this one she did sit in and

11  took notes during the meetings with David.

12    Q    How did it first come to your attention,

13  Ms. Mazza, that there was a need to investigate Professor

14  Chevan in relation to Ms. Wyler's complaint?

15    A    I was aware that the complaint was made from

16  Wendy Wyler.

17    Q    How did you find out?

18    A    I -- through Jaye Bailey.

19    Q    Okay.

20    A    So I was aware that Jaye had received a call

21  about it and she was referred -- Wendy was referred to the

22  Office of Diversity and Equity for an investigation into

23  her complaint.

24    Q    All right.  And -- but then human resources also

25  did their own investigation?

1      A    Once we -- usually the Office of diversity and

2  Equity will conduct their investigation.  Once their

3  investigation is complete they report to us the findings,

4  whether he had violated any policies.

5      Q    Did you do your own investigation of him?

6      A    Yes.

7      Q    So it's really -- it sounds like it's a two track

8  system.  We have ODE investigating and then there's, you

9  know, a referral to you, but then HR also did its own

10  investigation?

11      A    Yes, from a contractual standpoint we have to

12  decide if any discipline is warranted once the ODE

13  investigation is completed.

14      Q    And you don't feel like you can make that

15  decision without conducting your own investigation?

16      A    That's right.

17      Q    And in this case that was the same case with

18  Professor Chevan?

19      A    Yes.

20      Q    All right.  So how did you go about -- we're

21  talking about in 2011 now.  How did you go about organizing

22  HR's investigation of the allegations?

23      A    So once Ernie Marquez completed his investigation

24  I was sent the report of his findings and he concluded that

25  David Chevan did, in fact, violate the sexual harassment

1    policy.  So I read through the report and see if there's

2    anyone I need to talk to.  I like to talk to any witnesses

3    prior to bringing in David Chevan, so I attempted to do

4    that.

5              I spoke to Wendy Wyler first, asked her if she

6    read through the report and if it was accurate and if she

7    wanted to share any other information with me.  I also --

8    there were some other names mentioned in there, Megan

9    Coyne.  Wendy Wyler, herself, also mentioned to me that I

10   should speak to other students who were familiar with David

11   Chevan and who may know something.

12        Q    Okay.

13        A    So I attempted to talk to all witnesses that I

14   can.

15        Q    Who was the first witness that you talked to in

16   this particular case?

17        A    You mean, aside from Wendy or...

18        Q    I guess Wendy was the first.

19        A    Wendy was the first.

20        Q    All right.  Who was after that?

21        A    Wendy had mentioned Megan Coyne.  I was not able

22   to contact her.  I attempted more than one occasion to

23   contact her, she did not return my calls.  Wendy also

24   mentioned two other students, one was Gina Monte and the

25   other one is John, he's a male student.  I don't recall his

1       Q      If she were a current student presumably you

2  could have located her on campus.  Southern is a boarding

3  school; correct?

4       A      Yeah, we have residence halls, yes.

5       Q      But you don't recall right now whether she was

6  living on campus?

7       A      I don't.

8       Q      Okay.  All right.  So did you read Ms. Coyne's

9  statement?

10      A      Yes.

11      Q      What was your reaction to that?

12      A      That according to her statement, I mean, it

13  wasn't appropriate, David Chevan's behavior was

14  inappropriate.

15      Q      Were you alarmed by the content of her

16  statement?

17      A      Yes.

18      Q      So Ms. Wyler, you met with Ms. Monte who didn't

19  say much, you couldn't get in touch with Ms. Coyne; who did

20  you meet with next?

21      A      I believe it was David.

22      Q      Okay.  Can you -- I'd like to know, I guess, how

23  many meetings you had with him, if it was just one meeting

24  what happened; can you tell me what the process was?

25      A      The process is I would need to -- under the

1   contractual provisions I need to send him a letter stating

2   under Article 16 why we're meeting, what the allegations

3   are.  I think I said to him since I had already known that

4   the Office of Diversity and Equity had concluded that he

5   did, in fact, violated the policy, that I needed to discuss

6   that with him and it could, in fact, result in discipline.

7           So I sent him that letter, copied his union and

8   then set up a meeting to have him come in with his -- he

9   actually had two union reps.

10       Q    He had two reps with him?

11       A    Yes.

12       Q    Is that unusual?

13       A    Not at all.

14       Q    There's typically two union reps?

15       A    There's a union rep who -- she's not a faculty

16  member, her name is Linda Cunningham, she usually comes to

17  all the fact finding investigations.  And then there's

18  usually a faculty representative at the meeting.

19       Q    So this was Linda Cunningham and Virginia

20  Metaxas?

21       A    Yes.

22       Q    And they met at your office?

23       A    Yes.

24       Q    Was Jaye present?

25       A    No, she was not.

1      A      Yes.

2      Q      What did he say about that?

3      A      If I recall, I believe he said he's in counseling

4    to help him through this situation.  That's about all I can

5    recall at this time.

6      Q      What did he say about Megan Coyne; do you

7    remember?

8      A      He said that -- because I asked him if he had any

9    physical contact with students, he said he did not, he

10   never -- it was never physical with any student, whether it

11   was Megan or Wendy, so he denied that.

12     Q      Okay.  Did he -- did he mention the names of any

13   other female students other than Ms. Coyne and Ms. Wyler

14   with whom he had transgressed boundaries?

15     A      He did not.

16     Q      Do you know a student by the name of Jennifer

17   Mastinardi?

18     A      No.

19     Q      Did he ever bring up a Hillary Brenson?

20     A      No.

21     Q      Have you heard that name since?

22     A      No.

23     Q      Hillary Brenson?

24     A      I don't believe so.

25     Q      All right.  Ms. Mazza, I want to show you what

1    he had any sexual relationships with any students while at

2    Southern, you know, he denied that.  He denied ever

3    physically touching any student, you know.  I asked him in

4    general, too, not just about Wendy, but I wanted to know

5    if, you know, there were any other relationships he had

6    with students.  He did mention the one obviously before he

7    came to Southern, but he denied ever having any physical

8    contact with any students at Southern, and also denied

9    having any sexual relations.

10        Q    I know, but I'm asking did you find him

11   credible?

12        A    That's hard.  That's a difficult question to

13   answer.  I -- you know, he did seem to be sorry for what he

14   did.  Did I think he had a sexual relationship with any

15   other student?  Maybe not, but...

16        Q    Did you think he was being honest in what he was

17   telling you?

18        A    You know, he said to me that yes, he transgressed

19   boundaries, and he's a musician, and, again, he said we

20   express ourselves differently in the music world.

21        Q    Did you think that was a way to sort of

22   rationalize his behavior as if it was okay because he was a

23   music professor?

24        A    I mean, he did admit to saying that it was wrong,

25   what he did with Wendy.  He didn't come in there and say I

1    did absolutely nothing, I admit to nothing.  I mean, he

2    admitted to, again, transgressing boundaries.

3        Q    I understand.  Let me ask it another way:  Did

4    you find him to be completely believable, was he being

5    fully honest with you?  And if you didn't draw that

6    conclusion, you didn't, I'm just asking because you were

7    there.

8        A    You know, it's always -- when we do

9    investigations you always have to determine -- it's hard to

10   say are they telling the truth.  You know, I didn't --

11   again, I didn't have any other witnesses regarding his

12   behavior.  I had -- Wendy was the only individual that I

13   spoke to, so, you know, and he admitted to that.  He didn't

14   admit to anything that happened with Megan.

15       Q    Did you ask him whether any other students had

16   complained about him at Southern?

17       A    Did I ask him if any students complained about

18   him?

19       Q    Had any other female students complained about

20   him of sexually harassing --

21       A    No, because he had said that I have never had a

22   complaint prior to this allegation.

23       Q    Okay.  Did you simply accept that?

24       A    No.  And then I asked him have you ever had any

25   physical contact with any other students, any sexual

1    relationships, and he denied that.

2        Q    What about non-physical; did you limit it to

3    physical relationships?

4        A    No.  No.  No.

5        Q    All right.  Did you think to inquire of his prior

6    associates in the music department, Ms. Massy -- I'm sorry,

7    Ms. Mazza, I apologize, about whether complaints had been

8    made about him?  Past chairs, past associates?

9        A    I didn't check with any past chairs, no.

10       Q    Did you ever talk to -- you talked to Jonathan

11   Irving; correct?

12       A    Yes, I also recall talking to DonnaJean Fredeen,

13   who was the dean at the time.

14       Q    Did you sit down and determine -- you know,

15   Chevan's date of hire with Southern, did you look at the

16   whole time that he'd been at Southern?

17       A    Yeah, we normally look at the personnel file and

18   we have investigation files that we keep back, you know,

19   several years probably.  I think we have some from the '80s

20   forward, so we checked all that.  When we start an

21   investigation we look at all our records in the HR

22   department.

23       Q    Did you contact any prior chairs of the music

24   department to find out if any complaints had been made

25   about him?

1      A    I did not, but I contacted the dean of arts and

2   sciences who was there for -- she's gone now, she just

3   left, but she was there for at least 15 years.

4      Q    Okay.  The dean of what exactly?

5      A    Arts and sciences, DonnaJean Fredeen.

6      Q    Who was not his supervisor; correct?

7      A    Well, she actually has oversight for all the

8   departments in arts and sciences.

9      Q    Well, correct, but she wasn't in the music

10  department, per se?

11     A    No, she was not, but she has oversight for the

12  music department.

13     Q    All right.  For whatever reason, you didn't

14  contact past chairs of the music department?

15     A    I did not.

16     Q    Was it an oversight looking back now, do you

17  think?

18     A    I don't think it was an oversight.  I just think

19  I had no other knowledge or information that this sexual

20  harassment had occurred prior to this investigation.  I had

21  no -- absolutely nothing in our office or anywhere else

22  that would show that he sexually harassed students.  I had

23  no other knowledge -- prior knowledge or prior incidents.

24     Q    Right.  But you would gain that knowledge by

25  talking to people, obviously.  Did you talk to any of his

1    resources office to determine whether and what degree of

2    disciplinary action may be required.  So at some point was

3    the file transferred to you, Ms. Mazza, to make a

4    recommendation as to discipline?

5        A    Yes.

6        Q    Okay.  I know you don't recall the exact date,

7    but you did make a recommendation at some point?

8        A    Yes.

9        Q    Okay.  Who did you make it to?

10       A    To Jaye Bailey.

11       Q    Okay.  What was your recommendation?

12       A    My recommendation was -- I mean, we discussed

13   suspension and termination.  I mean, we discussed -- you

14   know, when we have these cases we sit down and discuss

15   everything that we have, all the documentation, past

16   history, you know, we look at progressive discipline, so,

17   yeah, we did discuss termination.

18       Q    Did you recommend that to the union -- well, that

19   wouldn't be a recommendation.  I mean, I guess you would be

20   recommending something to the president of the university;

21   correct?

22       A    I would first discuss and make a recommendation

23   to my supervisor, who is Jaye Bailey.

24       Q    Okay.  And then she would make a recommendation

25   to the president?

```
 1        A     Yes.   And under Article 16 of the contract
 2   there's provisions in there.   There's a termination clause
 3   which is a very lengthy process.
 4        Q     I understand.   I'm not asking about that now.
 5        A     Okay.
 6   .      Q     So you had a meeting with Ms. Bailey about
 7   this?
 8        A     Yes.
 9        Q     Okay.   What discipline should be imposed;
10   correct?
11        A     Yes.
12        Q     And what was the conclusion that you and she
13   reached, you know, what should be the discipline for the
14   conduct that Mr. Marquez details in his report?
15        A     So, again, we did talk about termination.   And
16   then looking at the history of David and he had no prior
17   discipline at all, no other claims of sexual harassment
18   prior to 2011, we discussed a severe suspension.
19        Q     Did Ms. Coyne's statement factor into your
20   decision making?
21        A     I think everything that we had factors in, all
22   the evidence that we have.
23        Q     So you talked about a severe suspension?
24        A     Yes.
25        Q     Along what kind of time period are we talking?
```

```
 1        A    Maybe -- you know, I think we talked about maybe
 2   10 to 20 days.
 3        Q    10 to 20 days?
 4        A    Mm-hm.
 5        Q    Suspension from teaching?
 6        A    Yes.
 7        Q    That was considered severe for this kind of
 8   conduct?
 9        A    Based on the prior history of David.
10        Q    Did you -- as a matter of policy or procedure
11   when this kind of thing happens, do you come to a final
12   recommendation as to what the discipline should be?
13        A    We do, and then we also have to discuss it with
14   the union because they're part of the.
15        Q    I understand.  Let's take the first part.
16        A    Okay.
17        Q    Did you make the initial recommendation for
18   discipline yourself?
19        A    To Jaye Bailey I -- we, you know, I could
20   recommend something, but it's always a discussion.
21        Q    I asked you did you make a recommendation to
22   Ms. Bailey initially what should be the discipline here;
23   did you do that?
24        A    I did; I said suspension or up to termination,
25   absolutely.
```

1      Q    Up to termination.  Okay.

2      A    Yes.

3      Q    And you two talked about it?

4      A    We discussed.

5      Q    Excuse me, I don't want to know about the union

6   yet, I know the union plays a role, but between the

7   discussions you had, did you and Jaye ultimately come to a

8   conclusion of what appropriate discipline would be that

9   would be recommended to the president?

10     A    Yes.

11     Q    What was that?

12     A    Suspension.

13     Q    For how long?

14     A    It was longer than five days.  It was -- after we

15  discussed it I believe it was maybe ten days.

16     Q    Ten days.  Okay.  That was the initial

17  recommendation, ten days?

18     A    Well, it could have been more than that.  I mean,

19  yeah, again, these are ongoing discussions based on, you

20  know, Jaye would ask what evidence do you have, what do you

21  have, is there any progressive discipline, you know,

22  leading up to this.  We have to look at his history, and

23  those are all the factors that are involved when we talk

24  about the discipline.

25     Q    Is there like a zero tolerance policy at Southern

1   for sexual harassment of students?

2        A    There's a policy, yes.

3        Q    Is the term zero tolerance used?

4        A    I don't -- I'm not -- I don't think it's used in

5   the policy.

6        Q    Okay.  All right.  So do you know if Ms. Bailey

7   picked up the phone and called -- I guess this was maybe

8   Battle at the time -- and said we're recommending ten

9   days?

10       A    I'm not sure if she -- I mean, she usually

11  consults with the president on decisions like this, but I

12  don't know.

13       Q    Did you consult with the president directly?

14       A    I did not.

15       Q    So, as far as you knew, Ms. Bailey was going to

16  make the recommendation to the president?

17       A    Yes.

18       Q    Okay.  And at some point -- we know the final

19  conclusion here was a five day suspension by a reduction in

20  pay from a previous paycheck.  I assume that was the result

21  of the union contacting your office and saying, wait a

22  minute, we're not okay with ten days, we want five days,

23  something like that?

24       A    Yes.

25       Q    Were you involved in those negotiations?

```
1        A    Yes.

2        Q    Who were you dealing there?

3        A    Linda Cunningham.

4        Q    All right.  What did Ms. Cunningham say to you,

5   as best you recall?

6        A    You know, the union --

7        Q    Did she say ten days was too extreme?

8        A    Yeah.  She thought five was too extreme as well

9   given that he's cooperated fully during this investigation,

10  he has no prior record, no previous discipline.  This is

11  how they looked at it.  He's cooperated, he's now -- he's

12  admitted to transgressing boundaries with his students,

13  he's seeking counseling, he's getting help on these issues,

14  and so we think it's a -- suspension is very severe.

15       Q    So she thought he was seeking counseling for the

16  issues he was having with students; is that correct?

17       A    Yes.

18       Q    It wasn't about his wife?

19       A    No.

20       Q    Okay.  The counseling, I assume, was with a

21  therapist?

22       A    I think he mentioned his Rabbi.  I don't -- you

23  know, I'm not sure who the individual was that he was being

24  counseled by, but I know he did mention his Rabbi.

25       Q    Okay.  So at this point the union comes back and
```

```
 1               C E R T I F I C A T I O N

 2    STATE OF CONNECTICUT:
      COUNTY OF HARTFORD:
 3

 4         I, SAMANTHA M. HOWELL, a Notary Public duly
      commissioned and qualified in and for the State of
 5    Connecticut, do hereby certify that pursuant to
      Attorney Bagnell there came before me on the 20th of
 6    November, 2013, the following named person, to wit:
      Diane Mazza, who was previously duly sworn to testify to
 7    the truth and nothing but the truth; that she was thereupon
      examined upon her oath; that the examination was reduced to
 8    writing by computer under my supervision and that this
      transcript is a true record of the testimony given by said
 9    witness.

10
           I further certify that I am neither attorney nor
11    counsel for, nor related to, nor employed by any of the
      parties to the action in which this deposition was taken,
12    and further, that I am not a relative or employee of any
      attorney or counsel employed by the parties hereto, or
13    financially interested in the outcome of this action.

14         In witness whereof I have hereunto set my hand
      this 5th day of December, 2013
15

16

17                     _____
18                          Samantha M. Howell
                                Notary Public
19

20    My Commission expires
         September 31, 2016
21

22

23

24

25
```

```
 1                              ERRATA SHEET
 2      Page    Line      From                      To
        10      21        Oaks                      Oak
 3
        10      24        Oaks                      Oak
 4
        15      21        SHERM                     SHRM
 5
        18      25        Cordera                   Cordero
 6
        23      18        Duntley                   Dunkley
 7
        27      8         Cordera                   Cordero
 8
        33      15        Cordera                   Cordero
 9
        35      9         Cordera                   Cordero
10
        44      10        Cordera's                 Cordero's
11
12      _____
13      _____
14      _____
15      _____
16      _____
17      _____
18      _____
19      _____
20      12/9/13
          Date                         Diane Mazza
21      Sworn to before me this     9      day
        of    December          , 2013.
22
                                      Notary Public
23
24      My commission Expires:  8/31/2015
25
```

```
1                              JURAT

2

3

4

5

6                              Diane Mazza

7

8

9

10

11              Subscribed to and sworn before me on this

12    ____9____   of ___December___   2013.

13

14

15

16   My commission Expires: 8/31/2015

17

18

19

20

21

22

23

24

25
```