UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
WENDY WYLER,                   :
                               :
      Plaintiff,               :
                               :
V.                             :     CASE No. 3:12-cv-0097 (RNC)
                               :
CONNCTICUT STATE UNIV. SYS.,   :
et al.,                        :
                               :
      Defendants.              :
```

RULING AND ORDER

Plaintiff Wendy Wyler, a former student at Southern Connecticut State University, brings this action against the Connecticut State University System, Southern Connecticut State University, former President of the University Stanley Battle and Chair of the Music Department Jonathan Irving, alleging violations of Title IX and, pursuant to 28 U.S.C. § 1983, violations of the Equal Protection Clause of the Fourteenth Amendment.  The claims relate to sexual harassment by music professor David Chevan, formerly a defendant in this action.[1] Specifically, plaintiff alleges: (1) Connecticut State University System and Southern Connecticut State University (the "University Defendants") violated Title IX by failing to take immediate, effective remedial steps to address sexual harassment by Chevan; and (2) defendants Battle and Irving (the "Supervising

---

[1] Plaintiff and Chevan filed a stipulation of dismissal of the claims against him on August 30, 2013.  See ECF No. 86.

Defendants") violated her rights under the Equal Protection Clause by exhibiting deliberate indifference to the sexual harassment and failing to adequately remedy the hostile educational environment it created.

Defendants have moved for summary judgment.  They contend that the Title IX claim fails because the University Defendants had no notice of sexual harassment before plaintiff's complaint, conducted a prompt investigation, issued an investigation report and conveyed the results in a timely fashion, and took appropriate remedial action.  Defendants further argue that the Equal Protection Clause claims fail because the Supervising Defendants were not personally involved in the sexual harassment, their conduct did not violate the Fourteenth Amendment and they are shielded by the doctrine of qualified immunity.  For reasons that follow, the motion for summary judgment [ECF No. 105] is granted and the case is dismissed.

I.   Background

The parties' Local 56(a) statements and supporting materials, viewed most favorably to the plaintiff, would permit a jury to find the following.[2]  In 2011, plaintiff Wendy Wyler was a student at Southern Connecticut State University, which is a state educational institution established by statute as part of

---

[2]  Unless cited otherwise, all statements of fact come from the parties' Rule 56 Statements.  See Defs.' Rule 56(a)(1) Statement (ECF No. 108); Pl.'s Rule 56(a)(2) Statement (ECF No. 118-4).

the Connecticut State College and University System.  Chevan was
a professor in the University's music department, Irving was
Chair of the music department and Battle was Interim President of
the University.  Plaintiff began attending classes taught by
Chevan in 2009.  She made no complaints to University officials
about his comments or conduct at any time prior to the spring of
2011.  She registered for two classes with him for the spring
2011 semester.  That semester, Chevan made numerous inappropriate
comments of a sexual nature to plaintiff.  During one incident,
he propositioned her in a music storage room while blocking her
exit.

On or around March 16, 2011, plaintiff brought Chevan's
conduct to the attention of University officials.  She was
discouraged from filing a complaint by one of the University's
Title IX directors and the director of the University's Women's
Center.  At some point thereafter, plaintiff and her mother left
several voicemail messages for Battle and messages with his
secretary, none of which were returned.  Dep. of Wendy Wyler,
Pl.'s Ex. 7 at 176, 262-263 (ECF No. 118-1 at 35, 37).[3]  On April
4, plaintiff reported to Irving and Professor Craig Hlavac that

---

[3] Sometime later, after the University investigation had been
initiated, plaintiff attempted to send Battle an email through
Patrick Dilger, whom she mistakenly thought was Battle's
secretary. Dep. of Wendy Wyler, Pl.'s Ex. 7 at 262-263 (ECF No.
118-1 at 37).  Dilger forwarded the email to Jaye Bailey, then
Associate Vice President of Human Relations and Labor Resources
Director, who did not share it with Battle.

Chevan had sexually harassed her.  The next day, Irving notified the University's Human Resources Office and the Dean of Arts and Sciences about plaintiff's complaint and left word that he would commit it to writing and forward it to Human Resources ("HR") or the Office of Diversity and Equity ("ODE").  Hlavac and Irving took written statements from plaintiff.  Irving brought the statements to HR, which forwarded them to ODE.  Irving had no further involvement with plaintiff's complaint after that, although he continued to email back and forth with her.

On March 29, plaintiff withdrew from Chevan's classes. Documentation of Wyler's Statement, Pl.'s Ex. 14 at 3 (ECF 118-2 at 39); Letter from Selase W. Williams to Ernest Marquez, Pl.'s Ex. 20 at 1 (ECF No. 118-3 at 22).  She had no contact with him after April 4 other than through litigation.  She requested and the University granted a tuition reimbursement for the two dropped courses.  The courses and withdrawals were removed from her academic transcript.

Following plaintiff's complaint, Ernest Marquez of ODE conducted an investigation.  Per University procedures and practice, then-President Battle did not appoint the investigator, monitor the investigation or exercise any oversight over it. Marquez stated in his deposition that he did not take any steps to investigate whether there had been prior complaints by students against Chevan.  Dep. of Ernest Marquez, Pl.'s Ex. 12 at

23 (ECF No. 118-2 at 25).  Nor did HR provide Marquez with any
file documents to review about Chevan.  Id. at 24 (ECF No. 118-2
at 25).  Marquez interviewed Chevan, who admitted to some but not
all of the allegations.  Marquez also interviewed plaintiff.
Another SCSU student, Megan Coyne, accompanied plaintiff to her
interview and handed Marquez a typed statement recounting an
incident in which Chevan made suggestive remarks to her, touched
her knee and held her hand.  She made no oral statement to
Marquez, explaining that she did not want to file a complaint of
her own and that she was only there to support the plaintiff.

       Marquez completed his investigation on April 26.  He issued
a written report concluding that Chevan had violated the
University's discrimination and sexual harassment prevention
policy.  That same day, Marquez sent plaintiff a letter informing
her of his conclusions, his recommendation that HR take
appropriate personnel action, and her right to obtain a copy of
his investigation report from Diane Mazza, Labor Relations
Specialist.  He also sent copies to HR to aid in the
determination of whether and to what degree disciplinary action
would be taken, and to the Provost of the University, who was
responsible for considering the proper academic remedy.  Irving,
who was not a member of ODE, was also informed of the findings.

       On April 27, plaintiff sent an email to Irving and Hlavac
thanking them for their help and support.  Later, in response to

her question about what it meant that Chevan would be penalized, Irving wrote: "Yes, I heard.  Welcome to the world of academia! Penalize can mean anything from a slap on the wrist, to losing a week or a month of salary, to a suspension or even dismissal. Obviously the last two were not in the final decision.  What you did took courage.  In the end, this was what you must hold onto for your life will move well beyond the hallways of Southern." Email from Jonathan Irving to Wendy Wyler, Defs.' Ex. F-3 at 3 (ECF No. 107 at 98).  Plaintiff replied that she was offended by the "welcome to the world of academia" comment, to which Irving responded that she had misunderstood him, explaining: "I could not agree with you more that if a teacher behaves irresponsibly or in a threatening way, then he or she should be handed a 'sentence' that reflects the severity of his or her behavior and actions."  Id. at 1 (ECF No. 107 at 96).

On April 28, Mazza provided plaintiff with the complete written investigation report.  Mazza conducted a further investigation for the purpose of determining whether and what disciplinary action against Chevan would be appropriate in light of Marquez's findings.  The investigation included interviews with plaintiff, Chevan, Irving and two music students, a call to the dean of arts and sciences, a review of Chevan's personnel files and ODE's past complaint files, and a meeting with the representatives of the professors' union.  On the basis of her

**6**

investigation, Mazza determined that Chevan had no prior record of sexual harassment or discipline for any misconduct at SCSU, a finding that plaintiff disputes.

Mazza made a recommendation to Bailey that Chevan be disciplined for his conduct.  Mazza and Bailey discussed the possible appropriate disciplinary actions and began negotiations with union representatives of Chevan's collective bargaining unit, who were advocating for Chevan.  Ultimately, Mazza recommended a settlement with the union that the union would not oppose or grieve: a one-week suspension without pay.  The settlement also provided that the agreement would remain in Chevan's personnel file and would be removed after 24 months only if he did not engage in further conduct violating the University's discrimination and sexual harassment policy.  Bailey approved the settlement, and the parties executed the settlement agreement on June 6, 2011, at which time Bailey advised Battle of the settlement.  Irving, not a member of HR, played no part in deciding Chevan's discipline.

Plaintiff continued her studies and graduated from SCSU in the spring of 2012.[4]

---

[4] As the result of her graduation, any requests for declaratory or injunctive relief are moot.  See Hayut v. State Univ. of New York, 127 F. Supp. 2d 333, 336 n.4 (2d Cir. 2000) (request for injunctive relief moot because plaintiff no longer a student at university); Alexander v. Yale Univ., 631 F.2d 178, 184 (2d Cir. 1980) (graduation renders moot plaintiffs' request for an order directing university to institute effective procedures for

II.   <u>Legal Standard</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact."  The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 286 (2d Cir.2002).  A defendant's motion for summary judgment may be granted when the evidence in the record would not permit a jury to return a verdict in favor of the plaintiff. <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).  In determining whether this standard is met, the court gives credence to any evidence favorable to the plaintiff.  Evidence favorable to the defendant, on the other hand, is disregarded unless it is undisputed or comes from a neutral source and is uncontradicted and unimpeached.  <u>See Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150–51 (2000) (discussing identical standard under Fed. R. Civ. P. 50).  The party opposing summary

receiving and adjudicating complaints of sexual harassment); <u>Mennone v. Gordon</u>, 889 F.Supp. 53, 60 (D. Conn. 1995) (plaintiff's request for declaratory judgment on Title IX and Fourteenth Amendment claim moot upon her graduation).

judgment, however, "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful."   <u>Podell v. Citicorp Diners Club</u>, 112 F.3d 98, 101 (2d Cir. 1997).   "If little or no evidence supports the non-moving party's case, there is no genuine issue of material fact and summary judgment may be appropriate."   <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1223-24 (2d Cir.1994).

III.   <u>Discussion</u>

A.   <u>Title IX Claims - University Defendants</u>

Plaintiff asserts that the University Defendants violated Title IX by failing to address prior sexual harassment by Chevan and by demonstrating deliberate indifference to the sexual harassment she experienced.   The University Defendants seek summary judgment on the ground that, as far as the evidence shows, no one at the University vested with the requisite authority to address the alleged harassment had actual knowledge of Chevan's conduct before plaintiff complained.   They further argue that a jury would have to find that the University responded promptly and reasonably to plaintiff's complaint, precluding a finding of deliberate indifference.   I agree.

Title IX of the Education Amendments of 1972 provides, with certain exceptions not relevant here, that "[n]o person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  The statute was enacted "with two principal objectives in mind: To avoid the use of federal resources to support discriminatory practices and to provide individual citizens effective protection against those practices." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286 (1998) (internal quotations omitted).  To violate Title IX, discrimination must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 650 (1999).  Teacher-on-student hostile educational environment sexual harassment has been found to meet this standard. Hayut v. State University of New York, 352 F.3d 733, 750 (2d Cir. 2003).  When, as here, a plaintiff does not challenge an official policy of the University, she cannot recover damages unless an official with authority to address the alleged harassment and institute corrective measures (1) had actual knowledge of harassment and (2) failed adequately to respond. Gebser, 524 U.S. at 290.  Demonstrating failure to adequately respond requires evidence that the University either rendered no response at all or acted with deliberate indifference. Davis, 526 U.S. at 643 (explaining that Title IX

unquestionably places on schools a duty to not permit teacher-student harassment in its schools "and recipients violate Title IX's plain terms when they remain deliberately indifferent to this form of misconduct"). Deliberate indifference may be found if the response was "clearly unreasonable in light of the known circumstances" or "remedial action only follow[ed] after a lengthy and unjustified delay." Hayut, 352 F.3d at 751.

Because the University Defendants did not have actual knowledge of harassment by Chevan prior to his alleged harassment of plaintiff and did not demonstrate deliberate indifference in responding to her complaint, the motion for summary judgment is granted as to the Title IX claim.

   1. *Actual Knowledge of Prior Harassment*

Plaintiff asserts that the University Defendants are liable for damages under Title IX because University officials had prior knowledge of sexual harassment by Chevan, before his alleged harassment of her, and did nothing to address or remedy it. The Supreme Court in Gebser held that "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." 524 U.S. at 290. Under this standard, the University must have had actual knowledge, which imposes a higher

evidentiary burden than constructive knowledge.  <u>Hayut</u>, 352 F.3d
at 750; <u>see also</u> <u>Tyrrell v. Seaford Union Free Sch. Dist.</u>, 792 F.
Supp. 2d 601, 624 (E.D.N.Y. 2011) ("Plaintiff's argument that
'[t]he nature and pervasiveness of [the] harassment of [her] may
be evidence from which actual notice could be inferred,' in
essence, asks this Court to find that defendants had constructive
notice of the harassment, which is insufficient to establish
liability under Title IX.").  Further, the prior harassment about
which the University had knowledge must have been sufficiently
similar to the harassment about which plaintiff complains.  <u>See,</u>
<u>e.g.</u>, <u>Bliss v. Putnam Valley Cent. School Dist.</u>, No. 7:06-cv-
15509(WWE), 2011 WL 1079944, at *6 (S.D.N.Y. Mar. 24, 2011)
("[T]he conduct that allegedly put the administration on notice
and the conduct ultimately at issue in the litigation must be
sufficiently similar to find liability.").  Courts in this
Circuit require that a school official "possessed enough
knowledge of the harassment that he reasonably could have
responded with remedial measures to address the kind of
harassment upon which plaintiff's legal claim is based."
<u>Carabello v. New York City Dep't of Educ.</u>, 928 F. Supp. 2d 627,
638 (S.D.N.Y. 2013) (citing cases).  The knowledge must be
possessed by someone with authority to address the alleged
discrimination and to take corrective measures.  <u>See</u> <u>Gebser</u>, 524
U.S. at 290 ("An 'appropriate person' . . . is, at a minimum, an

official of the recipient entity with authority to take
corrective action to end the discrimination."); <u>Davis</u>, 526 U.S.
at 642-43 ("The high standard imposed in <u>Gebser</u> sought to
eliminate any 'risk that the recipient would be liable in damages
not for its own official decision but instead for its employees'
independent actions.'").  None of the admissible evidence offered
in support of plaintiff's claim would permit a jury to find that
the University Defendants had actual knowledge of prior
harassment by Chevan as required by this standard.

Plaintiff relies on deposition testimony of Tilden Russell,
former Chair of the Music Department.  During his deposition,
Russell explained that he was not surprised by plaintiff's
allegations because, while Chair, he had "intimations and
secondhand reports . . . all secondhand or worse" about sexual
harassment by Chevan.  Dep. of Tilden Russell, Pl.'s Ex. 1 at 34
(ECF No. 118-1 at 4).  He described a conversation he had in 1999
with a former student, Hillary Arcovitch Brentson, who told him
"about [Chevan's] involvement with, I think – that he had
sexually harassed two students.  I think she also suggested that
he had made advances to her at some point."  <u>Id.</u> at 35 (ECF No.
118-1 at 4).  About Brentson's own allegation, he stated:
"[w]ell, that got me thinking, I guess, that was the intimation.
I followed it up.  I tried – Hillary was not going to say
anything to anybody."  <u>Id.</u> at 36 (ECF No. 118-1 at 4).  He did

not remember the names of the other two alleged victims, but
remembered that he tried to talk to one of them about the alleged
harassment. "I remember speaking to her, speaking with her
privately. I said – I tried to persuade her that if she had been
involved in any sexual harassment, that she needed to talk to
somebody in the university and make a complaint. She refused."
Id. at 37 (ECF No. 118-1 at 5). Russell testified that this
student did not tell him what happened and that neither he nor
she mentioned Chevan's name. Id. As for the third alleged
victim, Russell testified: "I have no recollection of who that
person was." Id. at 38 (ECF No. 118-1 at 5). In addition,
Russell stated that "a colleague, a teacher in a different
department did ask me once if I had heard of any cases of David
being involved with sexual harassment. From which I gathered
that a student had made a complaint to her." Id. at 40 (ECF No.
118-1 at 5). This testimony, which describes unconfirmed rumors,
intimations and Russell's own suspicions, is insufficient to
permit a reasonable jury to find actual knowledge under the
Gebser standard. See Romero v. City of New York, 839 F. Supp. 2d
588, 605 (E.D.N.Y. 2012)(testimony about rumors, without
identifying those involved, absent supporting evidence in the
record, and contrary to other testimony, is insufficient for a

reasonable jury to return a verdict for the plaintiff on the issue of actual knowledge).[5]

Brentson's own affidavit contradicts Russell's testimony about her complaint to him. Brentson avers that in 1999 she informed Russell and his wife "that David Chevan had hit on me after spending time in a recording studio located in a barn." Pl.'s Ex. 4 at 1 (ECF No. 118-1 at 14). It is not clear from her affidavit whether she reported the incident to the Russells in the same detail with which she describes it in her affidavit, which states that Chevan followed her to a cemetery, kissed her against her will, described a past affair, and asked her for a letter recommending him for promotion. Id. She further alleges that Chevan "hit on her" on a few other occasions and once asked her to have a child with him. Id. The affidavit is not explicit about whether the alleged harassment occurred while Brentson, who graduated in 1997, was still a student, or while she was babysitting for Chevan's children, which she did "for years." Id. at 2 (ECF No. 118-1 at 15). Brentson's affidavit includes a comment she wrote in September 2013 that "Chevan did it to me, too, about 17 years ago," id. at 1 (ECF No. 118-1 at

---

[5] It is at best disputed that Russell and Irving, as chairs of the music department, had authority to take corrective action as required by Gebser. Even assuming the requisite authority, however, the evidence is insufficient to permit a reasonable juror to find that either had actual knowledge of harassment by Chevan prior to Wyler's complaint.

14), but that she "reported it to the chair at the time,"
presumably to Russell in 1999, id. at 2 (ECF No. 118-1 at 15).
Regardless of whether Brentson was a student at the time of the
harassment, however, she told Russell and his wife about the
harassment two years after she graduated and in the context of
her relationship with them as their babysitter, rather than as a
student making an official complaint to the department chair.
See id. at 1 (ECF No. 118-1 at 14) ("I was a babysitter for
Tilden and Dominique Russell when he was chairman of the music
department.   I informed Tilden and Dominique during a visit that
David Chevan had hit on me . . . ."); Dep. of Tilden Russell,
Pl.'s Ex. 1 at 38 (ECF No. 118-1 at 5) ("Might have happened she
had been babysitting one day, we came back, and she decided to
gossip for a while; hang around and gossip.").   Russell testified
at his deposition that after his conversation with Brentson he
attempted to follow up with another alleged victim to encourage
her to file an official complaint; neither she nor Brentson did.
On this record, a reasonable jury could not find that the
University possessed sufficient knowledge such that it
"reasonably could have responded with remedial measures to
address the kind of harassment upon which plaintiff's legal claim
is based."   Carabello, 928 F. Supp. 2d at 638.   Nor can the
University be charged with actual notice of a substantial risk of
serious harm to current students based on a complaint made

informally by a former student and unsubstantiated rumors of other instances of harassment. Id. at 638 ("The actual notice standard may be satisfied by knowledge of a 'substantial risk of serious harm' where there have been multiple prior allegations of the same or similar conduct that is at issue.").

To prove the University had actual knowledge, plaintiff points to Brentson's statement that "I know at least one other person reported it to the University, but I don't know her name." Pl.'s Ex. 4 at 2 (ECF No. 118-1 at 15). This statement is in the nature of a rumor lacking specific or identifying information, which does not provide a basis for finding actual knowledge under Gebser. E.g., Romero, 839 F. Supp. 2d at 605-06 ("Ms. Doe has no personal knowledge regarding what, when, and under what circumstances an unidentified classmate told Ms. Mottola about the relationship. Rather, Ms. Doe only recounted rumors that she heard from other unidentified students. Accordingly, plaintiff has thus failed to present admissible evidence sufficient to establish a genuine dispute of fact as to . . . actual knowledge."). In the same category is a January 25, 2012 email from professor Heidi Lockwood, on which plaintiff relies. The email states that "[t]hree colleagues have independently and unequivocally informed me that the faculty member named in the news reports (Chevan) is not the only person on campus who is known to be a 'serial' sexual harasser – i.e., not the only

17

person for whom there are multiple substantiated reports of
sexual harassment violations by 'known and nameable' harassers,
involving multiple members of the community."  Pl.'s Ex. 6 at 2
(ECF No. 118-1 at 21).[6]

Plaintiff further points to an "Index of Recommendations"
showing that in 1998 and 1999 Russell did not recommend Chevan
for a promotion.  Pl's Ex. 2 at 1 (ECF No. 118-1 at 10).  This
document, which nowhere mentions sexual harassment, does not
permit a reasonable jury to find that Russell or any other
University official had actual knowledge of harassment; indeed,
Russell himself does not purport to have been aware of rumors of
harassment by Chevan until 1999, <u>after</u> he first opted not to
recommend a promotion.  Dep. of Tilden Russell, Pl.'s Ex. 1 at 35
(ECF No. 118-1 at 4).  A summary of student evaluations of Chevan
from 1997, describing feedback that Chevan made "inappropriate
sexual remarks" during class, Pl.'s Ex. 11 at 1 (ECF No. 118-2 at
20), is similarly insufficient.  Complaints of inappropriate
sexual remarks made to the entire class are not sufficiently
similar to the sexual harassment about which plaintiff complained

_____

[6] The deposition testimony of Professor Jason Smith that his ex-
wife had been propositioned by Chevan is similarly insufficient
to permit a reasonable jury to find actual knowledge; Smith does
not allege that his ex-wife ever reported the incident to anyone
at the University.  Pl.'s Ex. 21 at 12 (ECF No. 118-3 at 25)("I
don't remember if she said anything – I don't believe – I
honestly don't remember if she reported it officially to anyone .
. . .").

for a reasonable jury to find actual knowledge of past harassment.  E.g., Gebser, 524 U.S. at 291 (complaints about inappropriate comments during class "plainly insufficient" to alert principal to possibility that teacher was involved in a sexual relationship with a student).

Finally, for reasons described in more detail in Part B, infra, plaintiff's reliance on evidence that Irving had knowledge of past harassment is unavailing.  First, plaintiff points to Russell's testimony that Irving told him that he was aware of Chevan's history of sexual harassment and not surprised by it. Dep. of Tilden Russell, Pl.'s Ex. 1 at 66-67 (ECF No. 118-1 at 7).  The conversation described in Russell's deposition took place after plaintiff had already complained about Chevan's harassment of her and after an investigation had been initiated; thus, it is insufficient to permit a reasonable jury to find that Irving had knowledge of past incidents of harassment prior to plaintiff's own complaint.[7]  Plaintiff also offers Mazza's notes of a 2011 interview with Irving describing in Chevan a "need to share intimacy that is not appropriate," Diane Mazza's

---

[7]
   Indeed Russell admitted this later in his deposition:
   Q: Jonathan Irving didn't tell you he knew about this before Wendy [Wyler] came forward, did he?
   [Objection.]
   A: I don't believe so.
   Dep. of Tilden Russell, Defs.' Ex. N at 87 (ECF No. 122-1 at 26).

Investigation  Notes, Pl.'s Ex. 3 at 1 (ECF No. 118-1 at 12), as
well as Irving's own contemporaneous notes of a January 2012
conversation with Chevan that contain strong language about
Chevan.  Pl.'s Ex. 5 at 2 (ECF No. 118-1 at 18).  These notes,
however, describe inappropriate behavior by Chevan and Irving's
own feelings of discomfort in vague terms, and would not permit a
reasonable jury to find actual knowledge of prior sexual
harassment sufficiently similar to that experienced by plaintiff.
Cf. Carabello, 928 F. Supp. 2d at 639 ("Although Knight's October
10, 2008 report mentions that B.P. 'has harassed certain female
students in ways that are inappropriate, as well as discussing
his 'virility' with women,' this statement does not indicate
whether the prior harassment was physical or sexual in nature
and, therefore, does not provide actual knowledge of behavior
'the kind in which plaintiff's legal claim is based.'") (internal
citation omitted).

    In the absence of evidence sufficient to establish that an
official with authority at the University had actual knowledge of
prior, sufficiently similar sexual harassment, the University
cannot be liable under Title IX for its alleged failure to take
appropriate action prior to the date of plaintiff's complaint.
E.g., Tyrrell, 792 F. Supp. 2d at 624 ("Absent any evidence
sufficient to establish that defendants had actual knowledge of

any such harassment, they cannot be liable under Title IX for their alleged deliberate indifference in responding to it.").

    *2. Deliberate Indifference to Plaintiff's Complaint*

Plaintiff alleges that the University demonstrated deliberate indifference to her own complaint of harassment by Chevan.  In support of her assertion, she cites the discouragement she received when she initially tried to file a complaint and phone calls made to Battle's office that were never returned.  She further asserts that the investigation into her complaint was "careless" and that the discipline Chevan received - limited to a five-day retroactive pay suspension and lacking individual counseling about sexual harassment laws - was inadequate.

As described above, plaintiff must show that the University's response to her complaint was "clearly unreasonable in light of the known circumstances" or that "remedial action only follow[ed] after a lengthy and unjustified delay."  <u>Hayut</u>, 352 F.3d at 751.  "To show that a defendant was deliberately indifferent, a plaintiff must provide something more than a proffer indicating the ultimate inadequacy of preventative and curative measures.  Rather, the measures taken must be so inadequate that a degree of discriminatory intent may be inferred."  <u>Carabello</u>, 928 F. Supp. 2d at 641.  Further, the deliberate indifference must subject plaintiff to harassment or

make her more vulnerable to it.  Tyrrell, 792 F. Supp. 2d at

628.[8]  Viewing the record fully and most favorably to the

plaintiff, a reasonable jury could not find that the University

acted with deliberate indifference to her complaint.

Plaintiff argues that a jury could find that the University

demonstrated deliberate indifference because she was initially

dissuaded by Paula Rice and Cathy Christy – a Title IX director

at the University and the director of the University's Women's

Center, respectively – from pursuing her complaint against

Chevan.  She testified during her deposition that when she

approached Rice and Christy,[9] she was told that there was "nobody

to take on [her] case," and that they later tried to discourage

her from filing a complaint, telling her that there was nothing

they could do and that "it might be better if [she] just let it

go."  Dep. of Wendy Wyler, Pl.'s Ex. 7 at 175-178 (ECF No. 118-1

at 35-36).  Apparently, a staffing change at the time plaintiff

sought to make her complaint contributed to a delay in initiating

the investigation.  Documentation of Wyler's Statement, Pl.'s Ex.

---

[8] Although plaintiff urges that the question of deliberate
indifference is necessarily a jury question, the Supreme Court
has made clear that "in an appropriate case, there is no reason
why courts, on a motion to dismiss, for summary judgment, or for
a directed verdict, could not identify a response as not clearly
unreasonable as a matter of law."  Davis, 526 U.S. at 649.

[9] On or around March 16, 2011, according to the documentation of
her complaint to Irving.  Pl.'s Ex. 14 at 3 (ECF No. 118-2 at
39).

14 at 4 (ECF No. 118-2 at 40) (explaining that because Ms. Rice
was moving to a different office, plaintiff would have to wait an
extra one to two weeks for Marquez to handle her complaint).
After plaintiff's therapist called Rice, a meeting with Marquez
was scheduled for April 5.  Id.  On April 4, plaintiff complained
directly to Irving; he called to confirm the meeting with Marquez
and was told that it would be rescheduled for April 7.  Id.
Around this time, plaintiff and her mother also made calls to
Battle's office, leaving voicemail messages and messages with his
secretary that he never returned.  Dep. of Wendy Wyler, Pl.'s Ex.
7 at 176 (ECF No. 118-1 at 35).

     The discouragement and delay shown by the evidence is not
sufficiently severe or pervasive in and of itself to constitute
harassment or a hostile environment.  Nor does plaintiff allege
that any inaction by Christy, Rice or Battle subjected her to
additional sexual harassment by Chevan.  Instead, once plaintiff
met with Irving and Hlavac, an official complaint was promptly
filed, an investigation was initiated, action was taken to
remediate any negative effects on plaintiff's transcript of her
withdrawal from Chevan's classes, and, ultimately, Chevan was
disciplined – albeit discipline that plaintiff challenges.  In
light of this, no reasonable jury could find based on plaintiff's
allegations about Rice, Christy and Battle that the University
Defendants acted with deliberate indifference in responding to

her complaint.  <u>Gebser</u>, 524 U.S. at 290; <u>see also</u> <u>Hayut</u>, 352 F.3d at 752 (no deliberate indifference where the University, through the actions of its officials, acted expeditiously and reasonably in response to plaintiff's allegations).

Plaintiff asserts that the investigation into her complaint was "careless;" specifically, she appears to challenge Marquez's failure to take steps to investigate whether there had been earlier complaints from other students about harassment by Chevan.  <u>See</u> Pl.'s Rule 56(a)(2) Statement ¶ 45 (ECF No. 118-4 at 10).  As described above, however, plaintiff has not presented admissible evidence sufficient to charge the University with actual knowledge of harassment pre-dating her complaint. Marquez's investigation report acknowledges Coyne's statement describing a "similar pattern of behavior by Dr. Chevan."  Pl.'s Ex. 16 at 4 (ECF No. 118-3 at 5).  Moreover, Mazza's follow-up investigation to determine disciplinary action included questions to Irving and two students about prior incidents of sexual harassment by Chevan.  Aff. of Diane Mazza, Defs.' Ex. L ¶ 9 (ECF No. 107 at 196).  Further, Mazza avers in her affidavit that she attempted to follow up with Megan Coyne, but that Coyne did not answer or return her calls and thus Mazza was unable to confirm her allegations of harassment.  <u>Id.</u> ¶ 14 (ECF No. 107 at 196). Finally, plaintiff does not allege that any insufficiencies in the investigation led to further harassment by Chevan.  No

reasonable jury could find deliberate indifference based on
plaintiff's speculative assertion that additional investigatory
steps might have changed the outcome of the investigation or
disciplinary process in some way.  See, e.g., DT v. Somers Cent.
Sch. Dist., 588 F. Supp. 2d 485, 497 (S.D.N.Y. 2008) aff'd, 348
F. App'x 697 (2d Cir. 2009) ("Given the undisputed facts that
defendants engaged in some forms of investigation into the
Cafeteria Incident, even though plaintiffs may have been
dissatisfied with the outcome, and the fact that JL was never
again subjected to harassment by MC or L, this Court finds that
defendants' response was not so deliberately indifferent as to be
clearly unreasonable.").

Finally, plaintiff contends that a jury could find that the
discipline Chevan received – a one-week pay suspension, imposed
retroactively – was clearly unreasonable, particularly because
Chevan has not been required to undergo additional sexual
harassment counseling or training.  See Dep. of David Chevan,
Pl.'s Ex. 10 at 52-53 (ECF No. 118-2 at 17).[10]  The deliberate
indifference standard, however, is not an invitation for courts
to second-guess disciplinary decisions.  Plaintiff has no right
to a particular remedy; instead, the University is entitled to

---

[10] Plaintiff does not allege that this failure to provide
additional training or counseling to Chevan subjected her to
further harassment or made her more vulnerable to it; he was
directed to have no further contact with her and, except as
related to this litigation, no such contact has occurred.

latitude in determining what constitutes a reasonable response. See Davis, 526 U.S. at 648-49 ("We stress that our conclusion here—that recipients may be liable for their deliberate indifference to known acts of peer sexual harassment—does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action . . . . School administrators will continue to enjoy the flexibility they require. . . ."). Here, the University promptly undertook to investigate what it believed to be the first official complaint of sexual harassment regarding Chevan. As a result of the investigation, Chevan was found to have violated the sexual harassment policy and discipline followed. No reasonable jury could find that the University's response to plaintiff's complaint was clearly unreasonable, and jurors should not be permitted to second-guess the disciplinary decision made in this case even though it falls well-short of plaintiff's desired outcome (termination of Chevan's employment). E.g., Brodsky ex rel. S.B. v. Trumbull Bd. of Educ., CIV. 3:06CV1947PCD, 2009 WL 230708, at *8 (D. Conn. Jan. 30, 2009) ("The fact that Plaintiffs were not satisfied with the outcome of the investigation, which found the allegations of bullying unsubstantiated, or that the students who allegedly bullied S.B. were not punished as severely as Plaintiffs might have wished is not itself indicative of the

Board's deliberate indifference. . . . An aggrieved party is not entitled to the precise remedy that he or she would prefer.") (internal citation omitted); <u>Soriano ex rel. Garcia v. Bd. of Educ. of City of New York</u>, 01 CV 4961(JG), 2004 WL 2397610, at *4 (E.D.N.Y. Oct. 27, 2004) ("While plaintiffs may have preferred a different response from the school administrators, the standard is not whether the administrators responded in a particular manner, but whether their response was clearly unreasonable in light of all the known circumstances.").

    B.  <u>Section 1983 Claims - Supervising Defendants</u>

Plaintiff claims that Supervising Defendants Battle and Irving violated the Equal Protection Clause of the Fourteenth Amendment because they failed to adequately address or remedy sexual harassment by Chevan, effectively condoning it, which led to a hostile educational environment for her.  Battle and Irving respond that they cannot be held liable because they lacked notice, personal involvement, and authority to remedy the sexual harassment, because there was no intent to discriminate, and because they are entitled to qualified immunity.  I agree.

To survive a motion for summary judgment on her § 1983 claim for sexual harassment, plaintiff must proffer evidence that the defendants were acting "under color of state law" at the time they committed the conduct complained of, and that their conduct deprived her of "rights, privileges or immunities secured by the

Constitution or laws of the United States." <u>Hayut</u>, 352 F.3d at
743-44.  It is undisputed that Battle and Irving, as employees at
a state university, were acting under color of state law at all
times relevant to this action.  As to the second requirement,
plaintiff does not claim that Battle or Irving directly
participated in any of Chevan's sexual harassment of her but
rather that they are liable because of their inaction as
supervisors.  Under § 1983, a supervisor is not liable for a
subordinate's wrongful conduct in violation of another's rights
in the absence of personbal involvement on the part of the
supervisor.  <u>Id.</u> at 753.  "Personal involvement is not limited to
direct participation by the supervisor in the challenged conduct,
but may also be established by evidence of an official's (1)
failure to take corrective action after learning of a
subordinate's unlawful conduct; (2) creation of a policy or
custom fostering the unlawful conduct; (3) gross negligence in
supervising subordinates who commit unlawful acts; or (4)
deliberate indifference to the rights of others by failing to act
on information regarding the unlawful conduct of subordinates."
<u>Id.</u>  Moreover, plaintiff must show an affirmative causal link
between inaction by the supervisory defendant and her injury.
<u>Poe v. Leonard</u>, 282 F.3d 123, 140 (2d Cir. 2002).  The ultimate
inquiry in establishing an Equal Protection Clause violation
based on an administrator's response to harassment "is one of

discriminatory purpose on the part of the defendant himself,"
which may be established by a showing "that the defendant's
indifference was such that [he] intended the discrimination to
occur." Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d
134, 141 (2d Cir. 1999).  The requisite deliberate indifference
may be found "when the defendant's response to known
discrimination is clearly unreasonable in light of the known
circumstances." Id.  In this case, no reasonable jury could
find that the Supervising Defendants are liable under this
standard; accordingly, they are entitled to summary judgment.

    *1.  Irving*

    The crux of plaintiff's claim against Irving appears to be
that he "knew of prior instances of harassment by Chevan, but did
nothing to prevent him from remaining [in] a position of
authority[,] which allowed him to harass Wyler repeatedly in the
Spring of 2011 and earlier."  Pl.'s Opp'n to Mot. for Summary
Judgment (ECF No. 118) at 26.  Based on the summary judgment
record, however, no reasonable jury could find that Irving had
prior knowledge of past harassing conduct by Chevan.

    "While the court must view the inferences to be drawn from
the facts in the light most favorable to the party opposing the
motion, a party may not rely on mere speculation or conjecture as
to the true nature of the facts to overcome a motion for summary
judgment." Lipton v. The Nature Company, 71 F.3d 464, 469 (2d

Cir. 1995).  Instead, plaintiff must offer "concrete evidence
from which a reasonable juror could return a verdict in [her]
favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256
(1986).  To establish that Irving should have acted to prevent
Chevan from harassing her before she complained to him on April
4, 2011, plaintiff must offer evidence permitting a reasonable
inference that Irving had knowledge of sexual harassment by
Chevan prior to that date.  E.g., Gant, 195 F.3d at 143-44 ("mere
speculation" about the timing of a statement made by a supervisor
insufficient to support a reasonable finding of deliberate
indifference; "[i]f plaintiff sought to rely on the timing of the
"we don't tell" statement, he would be required to produce, in
response to defendants' summary judgment motion, evidence
sufficient for a jury to find that the statement was made after
[defendant] learned of the February 26 . . . incident").
Plaintiff does not have evidence from which a reasonable jury
could infer that Irving had such knowledge.

Plaintiff offers three pieces of evidence to support her
claim.  First, she cites Irving's contemporaneous notes of a
January 2012 conversation he had with Chevan.  In the notes,
Irving refers to the "current" situation, states that "Chevan
exhibited same issue of power and control," and questions whether

Chevan is "pathological."[11]  These comments, written nine months after plaintiff's complaint to Irving, are insufficiently concrete to permit a jury to infer that Irving had prior knowledge of harassment by Chevan, much less that he acquired such knowledge before April 2011.

Plaintiff points to notes that Mazza took during the investigation in 2011, reflecting that Irving said that Chevan had a "need to share intimacy that is not appropriate."  Diane Mazza's Investigation Notes, Pl.'s Ex. 3 at 1 (ECF No. 118-1 at 12).  The quoted comment does not support a reasonable inference that Irving knew about harassment by Chevan before plaintiff's complaint earlier that month.  Finally, plaintiff cites the deposition of Tilden Russell, in which he testified that Irving indicated at some point after plaintiff's complaint that he was aware that Chevan had a history or reputation for harassing

---

[11] The excerpt from Irving's notes on which plaintiff relies, in its entirety, is as follows: "Trying to rope me in as being equally complicit in the current situation, as if we're equally responsible, equally guilty.  Misery wants company (Jaye Bailey). Frightening feeling of being manipulated.  Feeling of satisfaction of pushing back.  Chevan exhibited same issue of power and control.  Subtle and manipulative.  Scary that he seemed to actually believe that even though a sentence was handed down resulting in a guilty verdict, he still feels that somehow his words had been twisted, and he did not do anything wrong. Scary.  Delusional?  Pathological?"  Jonathan Irving's Internal Notation of Incident with David Chevan, Pl.'s Ex. 5 at 2 (ECF No. 118-1 at 18).

students.[12]  Even if this testimony, which appears to be

speculation by Russell, were sufficient to reach a jury as to

whether Irving had knowledge of Chevan's history of harassment at

some point after plaintiff complained to him,[13] it is

---

[12]

   The relevant testimony is as follows: [In the context of
"conversations you had with Professor Irving that involved
allegations against Chevan sexually harassing students"]:
   Q: Did Professor Irving tell you that he was aware that Chevan
had a history or reputation for harassing students?
   A: Yes.
   Q: When did he say that?
   A: Well, probably in one of these phone calls.  I don't think
I was the first person to tell him that.  When he – when we spoke
on the phone this past year or so, you know, I told him what I
knew, which is more or less what I'm telling you.  I don't think
any of that was news to him at the time.
   Q: He wasn't surprised when you conveyed that information?
   A: No.  I wasn't surprised when he told me.  He wasn't
surprised when I told him.
   Dep. of Tilden Russell, Pl.'s Ex. 1 at 66-67 (ECF No. 118-1 at
7).
   [Later, on cross-examination]:
   Q: And you testified that David – I'm sorry – that Jonathan
Irving mentioned the name of another student who he believed to
have been sexual harassed, Megan [Coyne], correct?
   A: Yes.
   Q: Jonathan Irving didn't tell you he knew about this before
Wendy [Wyler] came forward, did he?
   [Objection.]
   A: I don't believe so.
   Dep. of Tilden Russell, Defs.' Ex. N at 87 (ECF No. 122-1 at
26).

[13] Indeed Irving's awareness of other incidents of alleged
harassment based on plaintiff's complaint to him would appear to
be undisputed.  The written document that Irving submitted to HR
indicates: "Ms. Wyler also stated that a recent encounter with
another friend and Southern student . . . revealed that Ms. C had
also incurred similar inappropriate behavior. . . . Ms. C.
related that *she* knew of another Southern student who had also
incurred similar inappropriate behavior from Dr. Chevan."
Documentation of Wyler's Statement, Pl.'s Ex. 14 at 3 (ECF 118-2
at 39).

insufficient to support a reasonable inference that Irving had knowledge of sexual harassment by Chevan prior to his harassment of plaintiff.  See Gant, 195 F.3d at 143-44.

To the extent plaintiff also bases her claim against Irving on any alleged failure to take adequate action in response to her complaint, the claim is unavailing.  It is undisputed that one day after plaintiff complained to Irving about Chevan's harassment, he notified the University's Human Resources Office and the Dean of Arts and Sciences and left word that he would commit the complaint to writing and forward it to HR or ODE.  He and Hlavac took written statements from plaintiff and brought them to HR, which forwarded them to ODE.  Irving, who is not a member of HR or ODE, had no further involvement with the investigation or Chevan's discipline.  On April 27, 2011, plaintiff sent an email to Irving and Hlavac, thanking them for their help and support.  Nowhere in her opposition to the motion for summary judgment does plaintiff suggest in anything other than conclusory terms that Irving could or should have acted any differently than he did in response to her complaint.  Indeed, her only issue with his post-complaint conduct appears to be the "welcome to the world of academia" comment in an email to her, which is an insufficient basis for a reasonable finding of deliberate indifference.  See, e.g., Hayut, 352 F.3d at 754 (granting summary judgment as to § 1983 claim when "the response

33

of the individual defendants to [plaintiff's] allegations was timely and reasonable under the circumstances").

Even if a jury could reasonably find that Irving's response to plaintiff's complaint was somehow insufficient, he is entitled to summary judgment based on qualified immunity.  Under § 1983, a government official performing discretionary functions is immune from suit in his personal capacity except for conduct that violates clearly established law.  An official violates clearly established law only when, "at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011).  Though the right to be free from sexual harassment is clearly established, a reasonable official in Irving's position could think that the steps he took to address plaintiff's complaint were legally sufficient.  See Tyrrell, 792 F. Supp. 2d at 634 ("Even assuming, arguendo, that defendants violated plaintiff's Fourteenth Amendment right to a FAPE free from discrimination and sexual harassment, that right was not clearly established at the time of their challenged conduct, i.e., it was objectively reasonable for defendants to believe at all relevant times that their conduct did not violate that right since, inter alia, they took immediate and appropriate steps to address and rectify the harassment of which they were aware.").

*2. Battle*

Plaintiff asserts that Battle failed to take adequate action in response to her complaint about Chevan.  She argues that a jury could reasonably infer deliberate indifference on his part because he avoided all phone calls from her and her mother regarding Chevan's sexual harassment[14] and because he "accepted" the 5-day retroactive pay suspension disciplinary settlement. Viewing the record in a light most favorable to the plaintiff, a reasonable jury could not find that Battle demonstrated deliberate indifference.

It is undisputed that pursuant to University procedures and practices, Battle, who was not a member of ODE, did not appoint the investigator responsible for addressing plaintiff's complaint, monitor the investigation, or exercise any oversight over it.  He was not involved in the resulting findings, the discussions about appropriate discipline, or the negotiations with the union.  His involvement in the process was limited to his "acceptance" of – or lack of objection to - the disciplinary

---

[14] As described above, plaintiff stated during her deposition that her mother left numerous messages with Battle's secretary.  In addition, an email plaintiff intended to send to Battle was inadvertently sent to Patrick Dilger, director of Public Affairs. Dilger forwarded the email to Jaye Bailey, who declined to forward it to Battle.  Battle testified during his deposition that he did not recall any calls from plaintiff's mother, Dep. of Stanley Battle, Pl.'s Ex. 22-23 (ECF No. 118-3 at 32), and plaintiff concedes that her mother left the messages with Battle's secretary and not with Battle himself.  Dep. of Wendy Wyler, Pl.'s Ex. 7 at 262-263 (ECF No. 118-1 at 37).

settlement.  Jaye Bailey's sworn testimony states: "I approved the settlement and advised Battle of the agreement."  Dep. of Jaye Bailey, Defs.'s Ex. B ¶ 31 (ECF No. 107 at 35).  Battle did not have to sign off on the agreement for it to go forward – and indeed he did not, <u>see</u> Mem. of Agreement, Defs.' Ex. L-2 (ECF No. 107 at 205) – although, in theory, he might have objected to it and directed Bailey and others to renegotiate Chevan's discipline.

On this record, a jury could not find that Battle acted clearly unreasonably by failing to respond to phone messages.  Plaintiff does not allege that his failure to respond hampered the investigation or affected its outcome.  In the context of an ongoing investigation in which Battle had no involvement, per University policy, his failure to respond to phone calls from the complainant is insufficient to expose him to liability for an equal protection violation.

Nor could a jury reasonably find that Battle acted clearly unreasonably by "accepting" the disciplinary settlement.  As discussed above, the deliberate indifference standard is not an opportunity for jurors to second-guess the disciplinary decisions of University officials.  Further, because Battle's approval was not required for the settlement to go forward, it cannot be said that his acquiescence caused plaintiff harm.  <u>See</u> <u>Bass v. Jackson</u>, 790 F.2d 260, 263 (2d Cir. 1986) (for liability under §

1983, "[a] plaintiff must thus allege a tangible connection between the acts of a defendant and the injuries suffered"); see also Davis, 526 U.S. at 645 ("[D]eliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it") (internal quotation marks and citations omitted).  Moreover, Battle was not sufficiently involved in the disciplinary settlement that his failure to object (after the agreement had already been approved) could be found to demonstrate discriminatory purpose.  Finally, even if a reasonable jury could find that Battle demonstrated the requisite deliberate indifference, he would be entitled to qualified immunity because it was objectively reasonable for him to believe that his conduct did not violate plaintiff's rights.  See Tyrrell, 792 F. Supp. 2d at 634.

IV.  Conclusion

Accordingly, the motion for summary judgment is hereby **granted**.

So ordered this 30th day of March 2015.


                                    /s/RNC
                              Robert N. Chatigny
                         United States District Judge